## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ANGEL DAVID MORALES VALLELLANES,** Plaintiff, <br><br> v. <br><br> **JOHN POTTER UNITED STATES POSTMASTER GENERAL, ET ALS.,** Defendants. | **CIVIL NO. 97-2459 (JAG)** <br><br> **DAMAGES BASED ON RETALIATION AND DISCRIMINATION; PROHIBITED PERSONNEL PRACTICES; UNFAIR LABOR PRACTICES; BREACH OF COLLECTIVE BARGAINING AGREEMENT** <br><br> **TRIAL BY JURY IS HEREBY REQUESTED** |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT TO HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**COMES NOW**, plaintiff Angel David Morales-Vallellanes through his legal counsel and very respectfully submits his Memorandum of Law, as follows:

### I.  NATURE OF THE CASE AND JURISDICTION

This is a civil action brought pursuant to Title VII of the Civil Rights of 1964, Sec. 701, et seq. as amended, 42 U.S.C. 2000(e) et seq.; the Civil Rights Act of 1991, 42 U.S.C. sec. 1981, et seq.; Labor Management Relations Act, 1947, ' 301,  29 U.S.C. ' 185; National Labor Relations Act, '  9, as amended, 29 U.S.C.A. '  159; 39 U.S.C. ' '  409 and 1208; the Collective Bargaining Agreement between the American Postal Workers Union and the United States U.S.P.S.; 5 U.S.C. '  2302; and Law 100 of June 30, 1959, 29 L.P.R.A. ' '  146 et seq., as amended.  "Morales" were subjected to one of the most brutal and insane retaliation and discrimination practices because his involvement in a protected activity as is the complaints he filed with the Occupational Safety and Health

Administration ("OSHA"), and the Equal Employment Opportunity (EEO) also he was a victim of sex discrimination by defendants "USPS" and Caparra Heights Station Manager Enrique López ("López").

The United States Court of Appeals for the First Circuit in a August 4, 2003 decision limited plaintiff's amended complaint to Count I of the Amended Complaint and three allegations of the EEO claims:

### COUNT I. RETALIATION AND DISCRIMINATION

*"101. Plaintiff alleges and incorporates by reference each and every preceding allegation.*

*102. The U.S.P.S., through its management, representatives and/or employees, has engaged in retaliatory activities against Plaintiff due to plaintiff's health and safety protection activities as alleged above, equal employment opportunity charges and filing of unfair labor practice charges.*

*103. As a direct and proximate result of the U.S.P.S.'s systematic, repeated and continuous harassment, as alleged above, the Plaintiff endured great mental suffering and emotional distress since his original notification to O.S.H.A. of the violations of safety and health standards at Caparra Station until Plaintiffs constructive discharge from employment.*

*104. The U.S,P.S., and Enrique Lopez' conduct, as set forth above, constitutes unfair labor practices, prohibited personnel practices, retaliation, and discrimination against the Plaintiff for his willingness to engage in safety and health protecting activities and for attempting to vindicate his rights under applicable law.*

*105. The U.S.P.S. and Enrique Lopez violated Plaintiffs rights under Federal law when they unlawfully removed Plaintiff from the position granted to him as a reasonable accommodation for his arm condition, as alleged above. The duties imposed on Plaintiff were harmful to him and detrimental to his condition. Said co-defendants retaliated against the Plaintiff for his safety and health protecting activities by taking away Plaintiffs reasonable accommodation.*

106.  Under Federal law, the employer is obliged to keep a disabled employee in the position granted to him as a reasonable accommodation.

107.  The duties imposed upon the Plaintiff involved the constant use of his arms, which aggravated Plaintiffs employment related injury in both arms, as set forth above.

108.   Plaintiff, as a direct consequence of the employment related injury to his arms, is now suffering and will continue to suffer a limitation of his life activities and the performance of manual tasks. Also, his ability to work has been significantly reduced. The damages suffered by Plaintiff are hereby estimated in the amount of $200,000.00.

109.  As a result of said co-defendants intentional retaliatory and discriminatory acts, Plaintiff is entitled to monetary damages and such other relief, compensatory damages, damages for pain and suffering, out-of-pocket expenses, all of which are herein estimated in the amount of $500,000.00.

110.  Also, as a proximate result of co-defendants' conduct, Plaintiff has suffered and continues to suffer substantial losses in earnings, job experience, retirement benefits, and other employee benefits that he would have received absent co-defendants' intentional acts against the Plaintiff is therefore entitled to front pay, back pay, severance pay and benefits. Such compensation is estimated in an amount no less than $2,000,000.

111.   As a further proximate result of the above mentioned acts, Plaintiff has suffered humiliation, mental pain and anguish, and loss of the ability to enjoy life. These damages are estimated in the amount of$ 1,000,000.00." (see Exhibit 24)

The EEO claims:

1) Morales' allegation that Job Bid #2541417 was posted with Thursday/Sunday rest days rather than Saturday/Sunday rest days in retaliation for plaintiff's OSHA complaints;

2) Morales' allegation of sexual discrimination and retaliation arising from an

*April 9, 1996 incident in which plaintiff's duties and responsibilities were awarded to a female employee and he was given window clerk duties to perform;*

3) *Morales' allegation that the "coffee and lunch breaks" policy was not applied in an equal and nondiscriminatory manner. " (See Exhibit 24)*

The above mentioned EEO allegation if taken individually does not tell the whole story of the retaliation and discriminatory persecution by "USPS" and "López" to "Morales". Said incidents should be taken in its entirety as a result of a long and tortuous persecution in which "Morales" was the target.

For instance, the following **<u>Uncontested Facts</u>** are very important in order to understand the actions taken by defendants against "Morales":

1) At all times during 1995 and 1996 Plaintiff "Morales" was the Caparra Heights Safety Captain until January 2, 1997 when he was removed from the position by "López".

2) On March 21, 1995 "Morales" as Safety Captain for Caparra Heights Station with other co-workers filed a Postal Service safety form 1767 as the procedure requested by "USPS" to report safety hazard in this case because the dust accumulation and unsanitary conditions at the Caparra Heights Station. (Exhibit 19, page 2 thru 8)

3) Due to the lack of action by "USPS" "Morales" filed on April 6, 1995 a formal complaint at OSHA. (Exhibit 20)

4) The Occupational Safety and Health Administration ("OSHA") notified about the violations to "USPS" through the District Manager Odarit Tirado and

Safety Manager Cándido López and gave them until June 19, 1995 to correct the violations without an inspection. (Exhibit 21).

5) On June 21, 1995 District Manager Odarit Tirado sent a letter to OSHA in which he (Tirado) accepted the dust accumulation problem and the presence of rodents and roaches at the Caparra Heights Station, notwithstanding he said the situation was "under control" (Exhibit 2). Obviously this confirms "Morales" complaint about the unhealthy and safety conditions at said station.

6) On June 8, 1995 a safety inspection was conducted at Caparra Heights Station by Ms. Elizabeth Rivera as USPS Collateral Duty Safety Officer of the Safety & Health Office, Enrique López as Acting Manager at Caparra Heights Station and "Morales" as the representative of the employees. The above mentioned employees noted as the Abatement Committee members and recorded all deficiencies in a Safety and Health Deficiency Report. (Exhibit 3) In accordance with the June 8, 1995 Safety and Health Deficiency Report codefendant Enrique López was well aware of all the deficiencies of safety and health at Caparra Heights Station, also he knew that "Morales" was the person behind the OSHA complaint as both of them were members of the Abatement Committee. In such meeting Supervisor Enrique López whispered in "Morales" ear "sooner or later I am going to take care of you and you are going to pay for this". (See Exhibit 22).

7) On July 20, 1995 District Manager John Malavé sent a MEMORANDUM to Caparra Heights Station Manager José Sepúlveda and requested the

corrections of the safety hazards included in the Safety Inspection and Program Evaluation report within thirty (30) calendar days after completion of the inspection (June 8, 1995).  (Exhibit 3, page 1)

8)  On August 1, 1995 "Morales" sent a letter to OSHA as he informed that the violations at Caparra Heights Station were not corrected and requested an inspection,  (Exhibit 22)  It is very important to notice that as of this date both Caparra Heights Station manager José Sepúlveda and supervisor "López" were very angry at "Morales" because his OSHA complaints and also they knew about his ("Morales") involvement in the safety inspection at Caparra Heights Station on June 8, 1995 for whose report a memorandum from District Manager John Malavé was sent to Sepúlveda to correct the safety hazards.

9)  On February 15, 1996 "Morales" filed an EEO Precomplaint based on retaliation for previous EEO activity because manager Jose Sepúlveda and supervisor "Lopez" changed the rest days of a position that Plaintiff was interested and had a good chance to get it.

10) On February 23, 1996 OSHA sent a letter to manager José Sepúlveda notifying the unsanitary conditions maintained at Caparra Heights Station due to dust accumulation. In said letter OSHA set a deadline until March 4, 1996 to correct the violations in order to avoid an inspection. A copy of said letter was sent to "Morales" as it emphasized the protection provided by OSHA for employees against discrimination because their involvement in protected safety and health activity.

11) On February 27, 1996 Postmaster and District Manager John Malavé notified a memorandum to all employees regarding safety in which notifies the commitment to safety and encourages all employees to reduce the accidents in the Postal Service.

12) March 4, 1996 is the deadline given by OSHA to the Caparra Heights Station management to correct the violations which were not corrected USPS management did not respond to OSHA.

13) On March 5, 1996 Plaintiff went to a meeting of Safety Captains as a representative of the Caparra Heights Station where Postmaster and District Manager John Malavé and USPS Operations Manager Virginia Matías spoke in front of all people about the importance of safety in the workplace and how safety was priority number one in the Postal Service. In said meeting "Morales " spoke in front of all people to John Malavé about the safety hazards at Caparra Station and how he had to file a complaint in OSHA who gave until the day before (March 4, 1996)) as a deadline to correct the violations which were not corrected.

During the afternoon of that same day Postmaster and District Manager John Malavé went to Caparra Heights Station to meet employee Luis Ramos.

14) On March 7, 1996 Plaintiff was placed under an investigation by Postal Inspector Eliezer Julián for the third (3rd) time because an alleged death threat by "Morales" to employee Luis Ramos.

15) On March 19, 1996 "Morales" sent a certified letter to OSHA Area Director

José Carpena in which he informed him the discrimination he was subject of due to the safety and health complaints he filed.

16) On March 23, 1996 Plaintiff was notified by supervisor "López" a letter of warning in presence of Manager José Sepúlveda for unsatisfactory performance. Said letter of warning alleged that "Morales" abused his coffee breaks.

On this same date Plaintiff sent a certified letter to Postmaster and District Manager John Malavé about the investigation against him by Postal Inspector Eliezer Julián.

17) On March 26, 1996 Plaintiff sent a certified letter to OSHA Area Director José Carpena informing all the discrimination he was subject as of that date.

18) On March 27, 1996 the letter of warning was eliminated from Plaintiff record as it was proven that it was based on false facts. After supervisor "López" knew about said elimination he was very angry at "Morales".

19) On April 1, 1996 Plaintiff received a letter from OSHA to inform him that his new contact for discrimination and reprisal complaints was the Director of Office of Federal Agency Programs at OSHA John E Plummer.

20) On April 3, 1996 Plaintiff filed an EEO formal complaint based on retaliation for the changes made in the rest days for the position "Morales was interested. Said complaint was against Manager José Sepúlveda and supervisors "López" and Juan Rodríguez.

21) On April 6, 1996 Plaintiff sent a certified letter to Postmaster and District Manager John Malavé explaining in chronological order the unsanitary

conditions at Caparra Station, the reprisal and discrimination practices against him and the hostile work environment by the manager at the station especially by supervisor "López". "Morales" received no response to said letter.

22) On April 9, 1996 supervisor "López" held a meeting with all employees at Caparra Station in order to establish a new policy of coffee and lunch breaks.

23) On April 10, 1996 Plaintiff gave to supervisor "López" a letter from his otolaryngologist who stated that the conditions at the station were affecting him and recommended a clean workplace environment.

24) On April 25, 1996 Plaintiff filed an informal EEO complaint based on reprisal and sex discrimination regarding the application of the new coffee and lunch breaks policy.

25) On March 18, 1996 supervisor "López" held a meeting with all the clerk employees at Caparra Station and said very angry that ***"because somebody have filed an EEO against me now everybody must use their timecards each time an employee takes a break".*** Also as a reprisal supervisor "López" removed "Morales" from his assigned regular duties as a Business Reply, Postage Due and Express Mail clerk and placed female employee Mayra Irene.

## II.   REPLY TO STATEMENTS OF THE MATERIALS FACTS

At the time of events, "Morales" held a position as a window/distribution clerk, but since 1993 was assigned duties as Postage Due, Express Mail and

Business Reply Mail Clerk ("Business Reply") due to his injured right arm. (See Exhibit I). It was not until "López" as part of his reprisal and retaliatory agenda began in May 1996 to rotate only the duties assigned to "Morales" in the past four (4) years. (Exhibit 13, paragraphs 8 and 9, Exhibit 14 paragraphs 7 and 8, Exhibit 23 paragraphs 17 and 18)

At the time of the events, "López" was in 1995 a supervisor for the letter carriers and held a position as "acting manager" at Caparra Heights Station, and José Sepúlveda was a Manager at Caparra Heights Station. (Exhibit 3 page 4)

Between April 1995 and April 1996, Plaintiff filed one (1) complaint with "OHSA" on April 7, 1995 and renewed said complaint through certified letters on August 1st, 1995; February 23, 1996; and April 6, 1996. (See Exhibit 24)

On February 15, 1995, "Morales" filed an informal EEO complaint as he alleged that as a retaliatory action the rest days for Job Id #2541417 posting #96-007 that "Morales" was interested, were changed. This action was taken due to his "OSHA" complaints and his involvement in the safety and health problems at Caparra Heights Station. (See Exhibits 4 and 23 paragraphs 8, 9, 10, 11)

Defendant is used to take advantage of a legitimate mean as a pretext for an illegitimate purpose and the present case is not an exception. For instance, defendant alleges that the National Agreement empowers the USPS to determine the methods to maintain the efficiency of the operations. On behalf of the above, defendant alleges that the change of the rest days was due to the needs of the service because too many employees were having the entire

weekend as rest days.  Also, defendant alleges that "Morales" was number 432 on the seniority list.  Both allegations are meritless because the first one is a pretext used previously in another case of retaliation and reprisal by Manager José Sepúlveda and "López" (See Exhibit 7 and 12), and the last one gives the false impression that "Morales" had a slim opportunity to be awarded the position because he had to compete with four hundred thirty one (431) fellow employees in front of him.

As an evidence that Manager Sepúlveda and López used to discriminate and retaliate against any employee who complaint against them; plaintiff is submitting evidence where Manager Sepúlveda and "López" harassed and retaliated against letter carrier employee Carmelo Martínez who filed a complaint against Manager José Sepúlveda.  In said Award, the opinion of the arbitrator Roger E. Maher about Manager José Sepúlveda and "López" actions using the National Agreement as a pretext to maintain the efficiency of the operation is a follows in pages 8 and 9 of the Award:

> "However, the NALC's direct testimony and indirect evidence clearly establish that the inspection of the Grievant's route was tainted by the station manager's animus towards the Grievant.  This evidence strongly suggests that the station manager intended and deliberately sought to abolish the Grievant's route by using a route inspection as retaliation because the Grievant sought and was granted Saturdays off by Post Master Tirado over his objections, in maintaining the efficiency of the operation.
> The station manager's statements, as testified by the Grievant and Carmen Suárez, was that he, the station manager, took offense to the Grievant's going over his head to the Post Master, who granted his Saturdays off even though the station manager had repeatedly denied the Grievant this consideration.  The Arbitration finds this was the sole grounds for abolishing the Grievant's full time route to that of auxiliary one.
> Given the direct testimony of the Grievant and Suarez and the USPS failure

*to call station manager's Sepúlveda as a witness to refute this damaging testimony, the Arbitrator adopts the NALC's version that the Grievant was singled our for a route inspection. The indirect testimony establishes that as no one else at this post office was subject to a route inspection. Furthermore even though the Grievant's route was more than eight hours, other carrier routes with less than eight hours were not inspected. This speaks to no more or no less than the station manager's intent to punish the Grievant for going over his head.*

*The Arbitrator could expound further on the minutia of both route inspections and the inspectors failure to properly inspect the Grievants' route pursuant to the M-39 Handbook regulations. However he believes it is unnecessary upon his findings that the USPS's grounds for a route inspection in this instant matter was arbitrary and capricious because the credible testimony established the station manager's personal animus towards the Grievant.*

*The mendacious position of the USPS on behalf of the station manager[sic], who did not appear at the hearing, that the route inspections of the Grievant were done in good faith, pursuant to the M-39 Handbook and that it's determination in this instance was a management's right guaranteed by the contract is simply incredulous and of no value, especially when it was established that management's used its right as a retaliatory weapon to inflict hardship upon the Grievant because of his temerity to ask and be granted Saturdays off.*

*The convincing testimony and evidence established that the decision to inspect the Grievant's route was intended for retaliatory purposes. The Arbitrator holds the USPS can not use the guise of maintaining efficiency, its contract right, when it has been shown by convincing testimony and evidence that the decision to inspect the Grievant's route was purposely for retaliatory purposes."* (See Exhibits 7 and 12)

Also, according to a sworn statement by Carmelo Montañez he declares that both "Sepúlveda" and "López" were capable as the above mentioned case shows to retaliate against employees who dare to file EEO complaints and/or grievances against them. (See Exhibit 12) In the present case "Morales" was the subject of retaliation because his OSHA and EEO complaints and his involvement in health and safety issues at Caparra Heights Station. (See Exhibits 10, 11, 12, 13, 14, 17 and 23). The change in rest days was a pretext to retaliate against "Morales" as the same happened to Carmelo Montañez using the same justification of the National Agreement. (See Exhibit 7) Also,

there were other employees at the time who were assigned a position with Saturday and Sunday days off who could be subject to change the rest days. The fact that "Morales" was number 432 on the seniority list did not made him unavailable to the position due to the fact that in the previous two (2) years he bided for said position finishing as the second runner-up the first time and the last time he was the first runner-up because said seniority list was for the positions available at USPS stations in the entire metropolitan area. Therefore, it is misleading the statement that "Plaintiff" was not the senior clerk but was No. 432 on the seniority list. Said statement alone gave the false impression that "Morales" did not have an opportunity to be awarded the position which was not the case. It is important to this court to take notice that the position interested by "Morales" changed to Sunday and Thursday was bided and awarded to employee Antonio López who was a junior as of "Morales". It means that Antonio López was way back from "Morales" because he entered to the USPS many years after Plaintiff. Wherefore, it proves that said seniority list is not the main issue to get an specific position in any postal station as Antonio López who had at that time few years in the USPS was awarded with the position. As a matter of fact, at this date on the seniority list "Morales" is number **202** and Antonio López is number **402**  (See Exhibit 40 seniority list and Exhibit 23 "Morales" Sworn Statement)

The allegations that the two (2) ten minutes breaks and either half-hour or hour lunch break were afforded to all employees in a fair and non-discriminatory manner, with consideration given to the needs of the postal operation is not true.

Supervisor "López" did not requested said scheduling of break and lunch breaks to female employee Mayra Irene who began her tour of duty late almost every day and took long breaks while having fun at "López" office (see exhibits 13, 14 and 23).   Also, is not true when defendants allege that "*Mayra Irene has breakfast in the break room before she begins her tour. As she has no yet punched in she was not in violation of the break policy* ".  However sworn statements of Raymond Ruiz, Howard Hall, and Angel David Morales allegations are on the contrary to defendants allegations (see exhibits 13, 14, and 23).

The fact that Mayra Irene took a break as soon as she began her tour was so obvious that most employees at Caparra Heights Station noticed.  "Morales" complaints that the break policy was not applied in an equal, non-discriminatory manner was based not as an obsession by Plaintiff toward said employee but by her open violation to said policy.  The violation by female employee Mayra Irene affected negatively the postal operations at Caparra Heights Station and created a chaos to the break and lunch hour schedule in particular to those employees who began their tour of duty earlier like "Morales".  The open violation to the break and lunch policy by female employee Mayra Irene was known, allowed and permitted at all times by "López" as she abused the break policy daily.  (See Exhibits 13, 14, and 23, Raymond, Howard and Angel David.)

The Secretary's week is not a special occasion to be celebrated according to USPS policy and standards. Said policy specifically prohibits said Secretary's week celebration as it forbids any use of postal service funds for such purpose. (See Exhibit 16 USPS Management Directives)    When Supervisor "López"

admitted taking female employees Rita Maldonado and Mayra Irene for lunch on April 20, 1996 to celebrate Secretary's Week he violated the postal service policy. Moreover, neither employees Rita Maldonado nor Mayra Irene held secretarial position at the Caparra Heights Station as supervisor "López" admitted Ms. Maldonado was a general clerk and Ms. Irene was as window/distribution clerk. Supervisor "López" violated the postal service policy when he manually adjusted both employees' time cards so they would not be penalized after they exceed the allotted time of their assigned lunch breaks. Said action by supervisor "López" violated the policy because it was an unlawful use of postal service funds as it was time paid by USPS used in a celebration specifically prohibited by its standards. (See Exhibits 25 Deposition of Enrique López, p.23-25; and exhibit 16) Also, said action should be considered a fraud and/or an illegal appropriation of government funds.

On April 25, 1996 "Morales" filed an EEO pre-complaint based on the fact that the coffee and lunch breaks policy was not applied in an equal and nondiscriminatory manner. The procedure of EEO's complaints includes that once the precomplaint is filed the EEO officer immediately notifies the management. In this case the EEO officer Carmen Rosa in order to comply with said proceedings had to notify "López", therefore supervisor "López" at the time of his service talk on May 18, 1996 had full knowledge of the EEO complaint filed by "Morales". (See Exhibit 11 Alberto Ortiz sworn statement and exhibit 27 Carmen Rosa deposition page 58) Also, at said service talk meeting "López" mentioned that because somebody had filed an EEO complaint now everybody

had to record the duration of their breaks and had to punch in their time cards. (Exhibit 13 paragraph 7 and exhibit 23 paragraph 15, Raymond Ruiz and Angel D. Morales sworn statements)  It is very unusual that precisely the basis of "Morales" EEO complaints were exactly the topic of supervisor "López" service talk on May 18, 1995.

The removal of "Morales" from his assigned regular duties since 1993 as Postage Due, Express Mail, and Business Reply Mail was ordered almost immediately the day of supervisor "López" service talk about the coffee breaks on May 18, 2005.  The removal action by defendants is another pretext in order to retaliate against "Morales" using a legitimate mean for an illegitimate purpose.

For instance, "Morales" was assigned to do the Business Reply Mail, Express Mail and Postage Due Mail" duties because of his right arm condition since 1993.  (See Exhibit 1 Medical condition of "Morales" right arm) During the previous years to "Morales" removal employees Héctor Ortiz, Porfirio Aviles and/or Mario Izquierdo performed the "Business Reply" and other "Morales" duties while he was on vacation or in his rest days, therefore Plaintiff was not the only clerk in Caparra Heights with this knowledge. Also, "Morales" "Business Reply" and other duties were the only one subject to rotation in Caparra Heights Station as no other duties were rotated. (See Exhibits 13, 14 and 23 Raymond Ruiz; Howard Hall; and Angel D. Morales)

## I.  APPLICABLE LAW

### A.  Standards of a Prima Facie case

In an action against and employer for alleged unlawful retaliation to an employee, plaintiff must initially establish a prima facie case of retaliation. See Johnson v. Allyn & Bacon, Inc., 731 F.2d 1012 64, 70 (1st Cir. 1984); Parker v. Baltimore & O.R.R. Co., 209 U.S. App. D.C. 215, 652 F. 2d 1012, 1019 (D.C. Cir 1981); Sims v, MME Paulette Dry Cleaners, 580 F. Supp. 593 (S.D.N.Y. 1984); Toscano v. Nimmo, 570 F. Supp. 1197, 1204 (D. Del. 1983).

In order to establish a prima facie case plaintiff has the burden of proof. As it was stated in Castillo Morales v. Best Finance Corporation, 652 F. Supp. 412 (1987). "This requirement establishes upon a plaintiff an initial threshold burden of establishing that (a) he engaged in a protective activity (those mentioned in Title VII and OSHA Regulations); (b) because of that activity he was subjected by his employer to adverse employment action, and (c) a nexus, causal link exists between (a) and (b)."

In the above captioned case "Morales" complies with the initial threshold burden of a prima facie case as it shows as follows:

**(a) "Morales" engaged in a protected activity**.

Since March, 1995 "Morales" filed an USPS 1767 form to complain about the safety and healthy problems at the Caparra Heights Station and in April, 1995 he filed a formal complaint at "OSHA". (See Exhibits 19 and 20 USPS 1767 form and "OSHA" complaint)  Since the very beginning "OSHA" notified "Morales" the fact that he was engaged in a protected activity and can not be retaliated because his activity. (See Exhibit 5, Exhibit 8 page 2 and Exhibit 21 page 3 and 8 "OSHA" notifications to "Morales"). Also, on August 1995;

February 1996 and April 1996 "Morales" renewed his "OSHA" complaint. "Morales" filed two (2) EEO complaints on February 15, 1996 and April 25, 1996 and he ("Morales") was retaliated because of them also which are defined as a protected activity.

**(b) because of that activity he was subjected by his employer to adverse employment action.**

Plaintiff was subjected to a vicious and insane harassment and retaliation as the vandalism of his car when supervisor "López" and two other employees poured sugar in the fuel tank of "Morales"car and punctured the tires of "Morales" car in several occasions (see sworn statement of Samuel Cora, exhibit 10). When supervisor "López" opened and inspect the private mail of "Morales"(see exhibit 10). When the job bid position with Saturday and Sunday rest days offs he was interested was suddenly changed the rest days.   On March 7, 1996 "Morales" was investigated by postal inspector Eliezer Julián for the third time because allegedly he made a threat of death to employee Luis Ramos.  (See Exhibit 28 and 29)  On March 23, 1996 "Morales" received a letter of warning from supervisor "López" for unsatisfactory performance.  (See Exhibit 30 letter of warning) On May 18, 1996 supervisor "López" removed "Morales" from his regular duties as "Business Reply" clerk after he found that "Morales" filed an EEO against him.  (See Exhibits 13, 14 and 23 Howard Hall, Raymond Ruiz, and Angel David Morales). On December 13, 1996 "Morales" received another letter of warning from supervisor Enrique Lopez for failure to follow instructions (see exhibit 31). On December 20, 2006 "Morales" received a 7

days suspension letter for "Morales" wearing a Postal jacket with his postal uniform (see exhibit 32). On January 10, 2006, supervisor Enrique Lopez expulsed "Morales" from Caparra Station alleging that he do not have work for "Morales" (see exhibit 26).

### (c)  a nexus, causal link exists between (a) and (b).

"Morales" was not subjected to that pattern of disciplinary actions by "USPS" before he filed his "OSHA and EEO complaints. On the contrary, "Morales" received (before his OSHA and EEO complaints) several letters of recognition by supervisors and management including José Sepúlveda and Juan Rodríguez (the sames that retaliate and discriminate "Morales" after he filed the OSHA and EEO complaints)(see exhibits 33, 34, 35 and 36). One of such recommendations was given by Manager Pedro Reyes supporting "Morales" for the position of US Postal Inspector agent which is a position that require great responsibility and security clearance since it is a federal law enforcement position. (See Exhibit 36).  It was not until his involvement in the health and safety issues at Caparra Heights Station and filing the "OSHA" and EEO complaints as protected activities that his problems began with the management. Also as another nexus between the protected activity engaged by "Morales" and the adverse employment action he was subjected of, are the statements made by supervisor "López" to OSHA inspectors Efigenio Rivera and Madeline Medina during an inspection. On December 6, 1996 said inspectors went to Caparra Heights Station to perform a second inspection as they found that the violations remained but also had to deal with a very hostile and aggressive behavior from

supervisor "López". In a very revealing narrative report made by said inspectors (See Exhibit 17) they quote supervisor "López" when he said **"the employee who was reporting conditions to OSHA will be severely punished".** After this statement by supervisor "López", "Morales" received the most brutal discrimination when Plaintiff received suspensions, expulsions from Caparra Station; criminal acts like pouring sugar in the fuel tank of his car; death threats; phone calls threatening him; the unlawful opening of his private mail and the list goes on and on. (See also Exhibits 10, 11, 12, 13, 14, 17 and 23 Alberto Ortiz; Radamés Sierra; Carmelo Montañez; Raymond Ruiz; Howard Hall; Samuel Cora; Efigenio Rivera and Angel D. Morales). In the above mentioned sworn statements, the common factor is that all witnesses testified the harassment and animosity  of supervisor "López" towards "Morales" for his OSHA and EEO complaints and that all the adverse action taken against "Morales" was in reprisal for his EEO and OSHA complaints which are protected activities under that law. A nexus between (a) and (b) has been established beyond any doubt, therefore a prima facie case by Plaintiff is sustained. Defendant's Motion for Summary Judgment should be denied as held by the following cases:

"Summary judgment was not appropriate in a case where an employee was allegedly fired because he filed a complaint for age discrimination against his employer.  Since the plaintiff proved his prima facie case of discriminatory intent in this Title VII case, he met his burden of proving the factual question of intentional discrimination." Hairston v. Gainesville Sun Publishing Co, 9 F 3d 913 (11th Cir Fla 1993).

"*To prevail on a claim in respect to retaliation a plaintiff must show that he brought charges of some type against the employer alleging race or sex discrimination, that he subsequently suffered from an adverse employment decision, and that the adverse decision by the employer was because the plaintiff had brought the charges in question.*" White v. McDonnell Douglas Corp. 985 F 2d 434 (8th Cir Mo 1993)

"*Former employee's allegations that she had filed charge of discrimination with Equal Employment Opportunity Commission (EEOC) and that she thereafter suffered harsher treatment, threats and harassment were sufficient to state Title VII retaliation claim*". Yaba v. Roosevelt, 961 F Supp 611 (SD NY 1997).

Title VII makes it unlawful for an employer to discriminate against an employee on the basis of either the employee's participation in EEO or other similar proceedings or opposition to unlawful practices by the employer. Graham v. Texasgulf, Inc., 662 F. Supp. 1451 (D Conn 1987) affd without op 842 f.2d 1287 (2nd Cir Conn 1988); Holden v. Owens-Illinois, 793 F 2d 745 (6th Cir Ohio 1986) cer den 479 US 1008 (1987); Architectural v. Colorado Department of Institutions, 936 F 2d 483 (10th Cir Colo 1991); Morgan v. jasper, 959 F 2d 1542 (11th Cir Ala 1992).

If genuine issues as to any material facts remain, the summary judgment shall not be rendered Fed. R. Cir Pro. 56 (c).  "Morales" opposition for summary judgment has shown that genuine issues as to every material fact brought by defendants remain.  As a matter of fact, "Morales" has included in opposition a

variety of documents including:  depositions; affidavits, etc. from different persons with personal knowledge and who do not have any interest in the case. This is to the contrary of defendants who included only the sworn statement from supervisor "López" who obviously is a codefendant in this case, therefore has a personal interested and is bias in the present case.  At this point, it is important to take in consideration that Honorable Court must view the facts in a light most favorable to the non-moving party, drawing all informs in Plaintiff's favor.  Wood v. Fiction Materials, Inc., 30 F 3d 255, 259 *1st Cir. 1994)

"Morales" has established that the remained issues are both genuine and material.  In Streeter v. Erie R. Co., S.D.N.Y. 1960, 25 F.R.D. 272 the court stated that a motion for summary judgment is not a substitute for a trial, and on such motion the court must decide any factual issue whose answer admits of reasonable doubt.

"Moving party must prove his right to summary judgment with such clarity that the nonmoving party cannot recover under any discernible circumstance." William v., Taylor, C.A.5 (Miss.) 1982, 677 F. 2d 510.  See also, Northeast Georgia Radiological Associates, P.C. v. Tidwell, C.A. 5  (Ga.) 1982; Kennedy v. Bennett, C.A, Iowa 1958, 261 F.2d 20; Tele-Radio Systems Ltd. v. De Forest Electronics, Inc., D.C.N.J. 1981, 92 F.R.D. 371; Prince v. Pittston Co., D.C.W. Va. 1974, 63 F.R.D. 28.  Federal Civil Procedure 2546.

"Summary judgment should be granted only when the truth is clear, where basic facts are undisputed and parties are not in disagreement regarding material factual inferences that may be properly drawn from such facts."

Sindermann v. Perry, C.A. 5 (Tex.) 1970, 430 F2d 939, certiorari granted 91 S Ct. 2226, 403 U.S. 917, 29 L.Ed. 2d 694, affirmed 92 S.Ct. 2694, 408 U.S. 593, 33 L.Ed. 2d 570, concurring opinion 92 S. Ct. 2717, 408 U.S. 593, 33 L.Ed. 2d 581, dissenting opinion 92 S. Ct. 2717, 408 U.S. 593, 33 L.Ed. 581. See also, Crystal City v. Del Monte Corp., C..A. Tex. 1972, 463 F.ed. 976, certiorari denied 93 S.Ct. 464, 409 U.S. 1023, 34 L.Ed.2d 315, Federal Civil Procedure 2470.2.

"Summary judgment should be granted only when the truth is clear." Cole v. Chevron Chemical Co., Oronite Division, C.A.5 (La.) 1970, 427 F. 2d 390.  See also, Heyward v. Public Housing Administration, C.A.Mich. 1952, 200 F. 2d 191; American Ins. Co. v. Gentile Bros. Co., C.C.A. Fla. 1940, 109 F 2d 732, certiorari denied 60 S. Ct. 1075, 310 U.S. 633, 84 L.Ed. 1403; *Port of Palm Beach Dist. V. Goethals,* C.CA. Fla. 1939, 104 F.2d 706; Drittel v. Friedman, D.C.N.Y. 1945, 60 F. Supp. 999, affirmed 154 F.2d. 653; U.S. ex re. Ryan v. Broderick, D.C.Kan. 1945, 59 F. Supp 189.

"Summary judgment is an extreme and treacherous device which should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for controversy and unless the other party is not entitled to recover under any discernible circumstance". Anderson v. Industrial Elec. Reels, Inc., D. Neb. 1993, 812 F. Supp. 999. Federal Civil Procedure 2465.1.

"Before summary judgment will be granted it must be clear what truth is and any doubt as to existence of material fact will be resolved against movant."

Cousins v. Yaeger, E.D.Pa. 1975, 394 F. Supp. 595.  See Also, Quadra v. Superior Court of City and County of San Francisco, D.C. Cal. 1974, 378 F.Supp. 605; Fuller v. Aetna Cas & Sur. Co., Inc., D.C. Miss. 1974, 369 F. Supp. 967.  Federal Civil Procedure 2548.

"Trial court may not enter judgment as matter of law, in manner similar to directed verdict at trial, where record presents genuine factual dispute." Hughes v. American Jawa Ltd.. C.A. 8 (Mo.) 1976, 529 F. 2d 21. Federal Civil Procedure 2470.

## B.  Plaintiff Opposition to Defendants Position that the Federal District Court has No Jurisdiction of Plaintiffs Retaliation Claim

Defendants allege that plaintiff retaliation claim had to be filed under 29 USCS § 660.  According to Defendants the above mentioned statute covers retaliation claims for making safety complaints to the Department of Labor. Said argument is not correct and is leading the court to error.

First of all, Defendant does not recall that on December 21st, 1998 said party filed as docket numbers 21 and 22 a *"Memorandum of Law in Support of Codefendant U.S. Department of Labor's Motion to Dismiss and/or for Summary Judgment"* in which contends to the contrary of what is now alleging.  (See Exhibits 18 or dockets number 21 and 22 of this complaint) *"Memorandum of Law in Support of Codefendant U.S. Department of Labor's Motion to Dismiss and/or for Summary Judgment"* pages 14, 15 and footnote 4).  In said memorandum defendant argues after citing precisely 29 U.S.C. sec. 660 (c) (1) that the act "does *not contain a similar provision for federal employees"*.

Moreover, Defendants in said memorandum allege that *"the procedures which the USPS has instituted pursuant to 29 C.F.R. § 1960.46 are the only protections available to its employees who believe they are being retaliated against as a result of safety activities at the workplace."* Therefore, Defendant can not allege now at his convenience that 29 USCS § 660 applies when it is clear that it does not by its own argument. Defendant is leading the court to error.

On October 1996 OSHA Director from the Office of Federal Agency Programs John Plummer informed "Morales" that the remedial action on behalf of federal employees who have suffered reprisals for reporting unsafe or unhealthy working conditions is vested with their employing agency. As it shows, OSHA nor the U.S. Department of Labor did not have jurisdiction for reprisal under 29 USCS § 660 therefore is not correct to allege in the contrary. (See Exhibit 9 Letter by OSHA Director of Federal Agency Program John Plummer)

This action by Defendant should be considered as to lead into error this Honorable Court. It has been clearly established that Defendants did know that said statute 29 USCA § 660 did not apply for this case. Additionally, it as been well established that "Morales" complied and exhausted all administrative steps requested by OSHA. (See Exhibit 23 paragraph 13 and 14 Angel D. Morales)

**C.  Plaintiff Opposition To Defendants Position That Plaintiff Cannot Prove Retaliation With Regard To His Claim That Certain Job Duties Were Rotated Among Other Employees.**

"Morales" was subject to an adverse employment action by USPS. Defendants very conveniently cited a limited portion of Marrero v. Goya of P.R., Inc., 304 F.3d 7 (1st Cir. 2002) as the definition of "adverse action". In citing the Marrero case, supra, Defendant gives the false impression that only demotions, transfers or separation from job are truly adverse actions or as said party own definition *"something of real consequence has been taken from him (ie. wages etc.)"*. The above mentioned case states a broad and subtle definition of adverse employment action and not Defendants own definition of *"something of real consequence has been taken from him (ie. wages etc.)"* as the Court defines said term as follows:

> *"At the same time, however, Title Vii does not limit adverse job action to strictly monetary considerations."* <u>Collins v. Illinois</u>, 830 F. 2d 692, 703 (7th Cir. 1987). *Congress recognized that job discrimination can take many forms, and does not always manifest itself in easily documentable sanctions such as salary cuts or demotions. Accordingly, Congress "cast the prohibitions of Title VII broadly" to encompass changes in working conditions that are somewhat more subtle, but equally adverse.* <u>*24 Rodríguez v. Bd. Of Educ.</u>, 620 F.2d 362, 364 (2d Cir. 1980). Consistent with that broad statutory mandate, courts have rejected any bright line rule that a transfer cannot qualify as an "adverse employment action" unless it results in a diminution in salary or a loss of benefits." Id.*

Therefore, according to Marrero, supra, adverse employment action includes changes in working conditions more subtle but equally adverse. In the instant case, Plaintiff was removed from his "Business Reply Clerk, Express Mail and Postage Due" duties assigned to him since 1993 as a reasonable

accommodation because his right arm condition.  Said removal action to rotate and cross train employees for a good management practice was a pretext that affected "Morales" health as he was requested to perform other clerk duties that worsened his arm condition.  (See Exhibit 1 Medical Evidence of arm condition)

It is very important to take notice that "Morales" duties as "Business Reply clerk" was the <u>only</u> one subject to rotation at Caparra Heights Station.  Plaintiff removal action perfectly fit in Marrero case, supra, definition of a more subtle change in working conditions but equally adverse.  (See Exhibit 13, 14 and 23 Angel D. Morales, Howard Hall and Raymond Ruiz statements)

Previously we have discussed that the removal action by Defendant was a pretext also because other employees like Porfirio Avilés, Héctor Ortiz and Mario Izquierdo had the training and knowledge for processing Plaintiff's postage due and business reply mail duties.  Said employees performed Plaintiff's duties on his rest days (Monday) and also when "Morales" was on vacation. "Morales" contrary to Defendants assertion was not included in the rotation.  (See Exhibit 13, 14 and 23 Howard Hall and Angel D. Morales)

As evidence that "Morales" was excluded from the rotation of his duties of postage due and business reply mail is evident that when he finally provided supervisor "López" for the second time of medical evidence related to his right arm condition in order to request said duties then "López" replied that he did not have work for him ("Morales").  It is when supervisor "López" sent "Morales" home. (See Exhibit 26 letter of expulsion by "López" to "Morales")

Defendants sustain that Plaintiff does not allege that his salary has been

affected in any way, nor then he was demoted, transfer or separated from the Postal Service.  Also said party allege that because "Morales" is still an employee from the postal service and is a beneficiary of the Office of Workers Compensation Program (O.W.C.P.) under the U.S. Department of Labor receiving an equivalent to sixty six percent (66%) of his salary since 1997 there is not an adverse action from USPS.  That is not correct.

Previously we have referred to the Marrero case, supra, in which the 1st Circuit defined the "adverse employment action" from the employer as a broad term which included changes in working conditions more subtle but equally adverse.  Moreover, said case stated that a mere loss of wages and/or income cannot be considered only an adverse action, in summary there is no "real consequence taken from him" theory of Defendant.  Notwithstanding, "Morales" salary was indeed affected, he was in a way demoted, also Plaintiff was transferred from Caparra Heights Station to the General Post Office (G.P.O.) in Hato Rey and finally constructively separated from his job at USPS.  Therefore, arguendo even if we acknowledge Defendant's *"real consequence taken from him"* definition the evidence shows that "Morales" was subjected to an adverse employment action.

For instance, since 1997 due to the continuous harassment and reprisals against "Morales" which included such criminal acts made by supervisor Enrique Lopez as: pouring sugar into his vehicle gas tank; unlawful opening of "Morales" mail; puncturing his vehicle tires;(see sworn statement of Samuel Cora exhibit 10) life threats and other administrative unlawful actions, an emotional condition

developed and for the first time in his career after two years of struggle. Plaintiff had to seek medical help and submitted his case to the "O.W.C.P." who approved his case.  (See Exhibit 23 Angel D. Morales' statement)

As a consequence of "Morales" appeal to O.W.C.P. benefits due to the reprisals from defendant because his OSHA and EEO complaints he suffered in addition to his emotional distress a substantial loss in his income equivalent to thirty-three percent (33%) annually since 1997. Moreover, since 1997 "Morales" economic loss included the end of benefit payments for his thrift savings plan (retirement plan or 401k) in addition to the exhaustion of all his savings and investments. (See Exhibit 23 Angel D. Morales' Statements)  Therefore, Plaintiff's income and/or salary were affected due to Defendants reprisals as a consequence of an adverse employment action.

Worse than been demoted, Plaintiff was unlawfully removed from his "Business Reply, Express Mail and Postage Due" clerk duties, where he was assigned since 1993 as a reasonable accommodation to perform other duties in detriment of "Morales" legitimate medical arm condition.  Said action of removal by Defendant is worse than a demotion because the former is detrimental to "Morales" health.

Defendant on February 20, 1997 was transferred from Caparra Heights Station to General Post Office (G.P.O.) in Hato Rey.  The transfer of "Morales" was ordered by USPS Operation Manager Virginia Matías who based her decision that Plaintiff was allegedly a safety hazard and a homosexual.  (See Exhibits 23 Angel D. Morales statement and Exhibit 38 document of transfer

signed by Virginia Matías)

On February 1997 as a direct result of Defendant systematic, repeated and continuous reprisal and harassment against Plaintiff a constructive discharge from employment took place as "Morales" endured a great mental suffering and emotional distress since his original notification of OSHA and EEO complaints after two years ago of struggle. Plaintiff had to leave because he had no choice; therefore he was forced to be separated from the Postal Service. (See Exhibit 23 Angel D. Morales statement)

Defendants try in a very subtly way to justify that because "Morales" is a beneficiary of the "O.W.C.P." he is not subject to an adverse employment action and/or that said benefits preclude "Morales" from pursuing Title VII remedies for discrimination. First of all, it should be noted by this Honorable Court that the 1st Circuit in the Morales-Vallellanes vs. Potter, et. als., 339 F.3d 9 (2003) decided to vacate the judgment entered on count I Retaliation and Discrimination. (See Exhibit 24 Judgment by 1st Circuit) Therefore, "Morales" claims for retaliation and discrimination remains. Therefore, said claim of Count I Retaliation and Discrimination of the Amended Complaint as it was remanded is also subject to trial.

Also in Miller vs. Bolger, 802 F.2d 660, (1986) the 3rd Circuit in regard to preclude from pursuing Title VII remedies for discrimination the court concluded:

*"We reject the Postmaster General's argument that allowing Miller to pursue Title VII remedies will usurp the Secretary of Labor's power under 5 U.S.C. § 8128 (b) to make final and unreviewable determinations of FECA benefits. Quite*

*simply, this court is in no way impinging on the Secretary's authority. The Secretary has determined that Miller should receive FECA benefits and has determined that amount. Those determinations are not at issue here. They cannot affect the federal courts' jurisdiction, granted by Congress under Title VII, to consider Miller's claim for additional and different relief. We thus agree with the district court's holding that Miller's recovery of FECA benefits does not preclude his resort to the federal court under Title VII."*

Therefore, it has been clarified that both FECA and Title VII remedies are different and apart so that their coexistence claims are supported by Law.

### D.  Opposition to Defendant's claim that Plaintiff cannot prove a Prima Facie Case of Gender Discrimination with Regard to His Claims that certain Job Duties were Rotated Among Other Employees or with Regard to the Coffee and Lunch Breaks Policy

#### Rotation of Job Duties

It should be noted that supervisor "López" showed a preference in terms of gender toward female employees. In particular, supervisor "López" as admitted in his declaration went to lunch with female employees and manually fixed their time card when they exceed the allotted time of their assigned lunch breaks so they would not be penalized. Supervisor "López" claim this was a special occasion but the policy of the USPS does not recognize Secretary's week as a special occasion. (See Exhibit 16) Also, supervisor "López" permitted, even when he does not admit it, to female employee to start their tour of duty late and abuse the coffee and lunch break. (See Exhibit 37 Deposition by Mayra Irene

and Exhibits 13, 14, and 23 statements by Raymond Ruiz, Howard Hall and Angel D. Morales)  The first substitute of "Morales" duties as "Business Reply" clerk was female employee Mayra Irene and when supervisor "López" was alerted then started to rotate men in said duties.  (See Exhibits 13, 14 and 23 Raymond Ruiz; Howard Hall; and Angel David Morales statements)

The alleged legitimate reason for rotating is a pretext which has been discussed before.  Evidently in view of all of the above circumstances in which supervisor "López" consistently gives special preference to female employees it is without doubt that a prima facie case of gender discrimination has been proven and the pretext of Defendant has been unveiled.

### Coffee Breaks

Once again Defendant interpretation of the Marrero case, supra, is misleading in terms that it does not request that an adverse employment action must be one "of significant consequence that has a material effect on the terms and conditions of employment (ie. termination, demotion, refusal to promote, etc.)"  To the contrary, the Marrero case established a broad definition of adverse employment action and recognizes changing conditions of employment more subtle but equally adverse.

As noted before, supervisor "López" conduct evidenced a consistent preference toward females employees and the abuse of the coffee and lunch breaks policy is evidence of the same.  The abuse of the breaks policy by females employee with the permission of "López" affected adversely in particular male employees which were the one's who started their tour of duty earlier at

6:00 a.m. or 5:30 a.m. who were entitled to get earlier coffee and lunch breaks and could not do so because the abuse permitted by "López" as stated above. (See Exhibits 13, 14 and 23 Raymond Ruiz; Howard Hall; and Angel D. Morales statements and Exhibit 37 Deposition of Mayra Irene)

The implication that supervisor "López" had a favorable treatment or some alleged implied intimate relationship with female employee Mayra Irene is not sustain by any evidence and, thus, said argument should not considered at all.

### III CONCLUSION

**WHEREFORE,** it is respectfully requested that Defendants Motion for Summary Judgment be dismissed.

**RESPECTFULLY SUBMITTED.**

**I HEREBY CERTIFY** that on November 14, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: **Fidel A. Sevillano-Del Río, Esq.**, Assistant U.S. Attorney, Federico Degetau Federal Build., 150 Carlos Chardón Av., Hato Rey, Puerto Rico 00918.

S/MIGUEL E. MIRANDA-GUTIERREZ
**MIGUEL E. MIRANDA-GUTIERREZ, ESQ.**
ATTORNEY FOR PLAINTIFF
PMB 132, 255 Ponce de León Ave. Suite 75
San Juan, Puerto Rico 00917-1919
TEL: (787) 282-0022
FAX: (787) 751-0883