## INDEX OF EXHIBITS

1) Angel David Morales Medical Evidence

2) Letter of Postmaster Odarit Tirado to OSHA Area Director José Carpena

3) Memorandum for John Malavé from USPS Manager Human Resources Neftalí Rivera

4) Letter of Radamés Sierra

5) Letter of OSHA Area Director José Carpena to Angel David Morales

6) Letter of OSHA Regional Administrator Patricia K. Clark to Angel David Morales

7) Award of arbitrator Roger E. Maher

8) Letter of OSHA Area Director José Carpena to Angel David Morales

9) Letter of OSHA Director for Federal Agency Programs John E. Plummer to Angel    David Morales

10) Sworn Statement of Samuel Cora

11) Sworn Statement of Alberto Otíz

12) Sworn Statement of Carmelo Montañez

13) Sworn Statement of Raymond Ruiz

14) Sworn Statement of Howard Hall

15) List of clerk employees at Caparra Heights Station for 1996

16) US Postal Service Management Instruction

17) Report of OSHA Inspector Efigenio Rivera

18) Motion to Dismiss filed by US Postal Service attorney Fidel Sevillano del Rio on December 21, 1998 (docket 21 and 22).

19) Reports of Hazard and/or Unsafe condition or practice US Postal Service form 1767 filed by several employees at Caparra Station

20) An OSHA complaint filed by Angel David Morales filed on April 7, 1995

21) Letter to Angel David Morales from OSHA Area Director José Carpena dated June 9, 1995

22) Letter to OSHA Area Director José Carpena from Angel David Morales

23) Sworn Statement by Angel David Morales

24) Judgment from the US Court of Appeals for the First Circuit

25) Deposition of USPS supervisor Enrique López

26) Letter from USPS supervisor Enrique López to Angel David Morales

27) Deposition of Carmen Rosa Perales

28) Letter to John Malavé from Angel D. Morales

29) Letter from John Malavé to Angel D. Morales

30) Letter of warning from Enrique López to Angel D. Morales

31) Letter of warning from Enrique López to Angel D. Morales

32) Letter of suspension from Enrique López to Angel D. Morales

33) Employee Probationary Period Evaluation Report of Angel D. Morales

34) Letter of appreciation to Angel D. Morales from Manager José Sepúlveda and Supervisors Pedro Reyes and Jaime Rivera

35) Letter of appreciation to Angel D. Morales from Manager José Sepúlveda and Supervisor Juan Rodríguez

36) Letter of recommendation from Manager Pedro Reyes to Angel D. Morales

37) Deposition of Mayra Irene

38) Assignment Order signed by Virginia Matías issued to Angel D. Morales

39) Letter from OWCP official Terry Friend

40)  United States Postal Service seniority list for the metropolitan area.

*Exhibit - 1 page - 2*



INSTITUTO DE MEDICINA FISICA
Y ELECTRO-DIAGNOSTICO
C/ 21 # 1785 LAS LOMAS
RIO PIEDRAS, P.R. 00921
787-783-8473

December 18, 1996.

Ref.: Angel D. Morales
Record Number : 15103

To whom it may concern:

    Mr.Angel D. Morales is a 36 y/o male without history
of systemic illness who came to my office by the first time
on August 29,1996. The patient complained of Rt. elbow pain
that started approximately 8 years ago. The pain is asso-
ciated to his work duties at the Postal Office. He refers
the pain never dissapears but exacerbate with the motion of
the wrist at work. He has been evaluated by several
physicians & has received physical therapies for the condi-
tion. Also an electrodiagnostic study was done on May 1992
and was normal.

    On his first visit he refers the RT. elbow pain in
occasions radiates to rt. shoulder & neck. Occasionally
he feels current sensation to forearm. On physical eva-
luation he present tenderness at RT. elbow laterally with
no sensory deficit and normal strength. The tinnel test
was positive at elbow but negative at wrist. A diagnosis of
Rt. Lateral Epicondylitis was done & Suspected Rt.Ulnar
Nerve Entrapment at elbow Vs. Posterior Interosseous
Syndrome. Eight sessions of physical therapies were
recommended in addition to anti inflammatory agents. The
EMG/NCV study was done in Sept.6,1996 and revealed no nerve
entrapment.

    At reevaluation in Sept.26, 1996 the patient referred
feeling better after the therapies. On physical exam he
still presented tenderness at Rt. elbow over the wrist
extensor muscles, normal strength. Eight more sessions of
physical therapies were recommended.

US DEPARTMENT OF LABOR    Office of Workers' Compensation Programs
PO Box 566
201 Varick Street – Room 750
New York, New York   10014
(212) 337-2075

Exhibit-1 page 1

October 20, 1993

Employee: Angel D. Morales
Claim Number: A2-645411
Occupational Disease Claim

Angel D. Morales
Calle Brisaida 35 Urb Munoz Rivera
Guaynabo, PR  00969

Dear Mr. Morales:

After further review, the Office of Workers' Compensation Programs has
approved your claim for the condition "right arm sprain" aggravated by
your Postal Service employment prior to April 2, 1992, based on the
evaluation performed by Norberto J. Arbona, M. D.

Dr. Arbona found you able to perform work eight hours per day in duties
not requiring "repetitive use of right arm, especially fingers."  It is
noted that you are working at present.

If any medical bills were returned to you for this condition, you may
now resubmit them to this office for processing.

If you lost time from work due to this condition, submit form CA-7
through your employer's injury compensation office.

If you have any questions, do not hesitate to write to us.

Sincerely,

David Parks

David Parks
Senior Claims Examiner

U S Postal Service
Injury Compensation Office
Box 3367  Main Post Office
San Juan, PR  00936

Exhibit-1 page 3

Page 2
Mr.Angel Morales
Record: 15103

    After ending sixteen sessions of therapies.  The patient
is again re-evaluated on Oct. 31, 1996.  The patient still
refered Rt. elbow pain.  He only received temporary relief
with therapies.  At physical exam he presented tenderness at
Rt. wrist extensor muscle mass, the patient was refered to
an 'Orthopedist for evaluation and to consider elbow
infiltration or other procedure.  The injury  suffered by the
extensor muscle mass and tendons at elbow is already chronic
and is not responding to conservative treatment.


    The lateral epicondylitis is on overuse injury.  The
repetitive motion of wrist especially at  extension and
supination causes a tendinitis of the extensor muscles of the
wrist, entity called lateral epicondilytis.  The continous
wrist hand motion that Mr.Morales has to do on his work in
addition to the use of a computer keyboard and a machine in
which he  used to apply  force are  causing cumulative
microtraumas to the extensor muscle mass & tendons.


    The activities that involves repetitive wrist and
digits extension, supination or forearm should be avoided.
A position in which can alternate the use of the upper
extremities is recomended.



                                    _____
                                    Enid Melendez, M.D.
                                    Lic.# 9853

Exhibit -1 page 4

## ASSESSMENT:

1. NORMAL CONDUCTION VELOCITY, LATENCY AND AMPLITUDE OF RT. MEDIAN EVOKED RESPONSE MOTOR AND SENSORY.

2. NORMAL CONDUCTION VELOCITY, LATENCY AND AMPLITUDE OF RT. ULNAR EVOKED RESPONSE MOTOR AND SENSORY, INCLUDING ACROSS THE ELBOW.

3. NORMAL INSERTIONAL ACTIVITY, NO SPONTANEOUS ACTIVITY, NO POLYPHASICS, FULL RECRUITMENT PATTERN ON MUSCLES TESTED OF RUE.

   NOTE:  IT WAS OBSERVED A 21% DROP IN AMPLITUDE WHEN COMPARING ABOVE THE ELBOW TO BELOW THE ELBOW AMPLITUDE OF ULNAR NERVE POTENTIAL.  UP TO 25% DROP IN AMPLITUDE IS NORMAL.

## Diagnostic Impression:

1. ESSENTIALLY NORMAL EMG/NCV OF RUE (SEE REPORT).

## Recommendations:

THANKS,

Rita L. Amadeo, M.D.

Exhibit-1 page 5

## INSTITUTO MEDICINA FISICA Y DIAGNOSTICO

*Rita L. Amadeo, M.D.*
Diplomate American Board of P.M.R.



Hospital Metropolitano, 2do. Piso
1785 Carr. 21, Las Lomas, P.V., P. 00921
Tels. 793-6200 Ext. 349 · 783-8473

### ELECTROMYOGRAPHIC and NCV Examination

Name  ANGEL D. MORALES          Sex  M   Age  36   Date  9/6/96

Address

Requested Procedures  EMG/NCV

Clinical Diagnosis  R/O NERVE ENTRAPMENT          Refered by  DRA. MELENDEZ

**History and Clinical Findings:**

HX:  36 Y/O MALE PT. W/O HISTORY SYSTEMIC ILLNESS.  NO
HISTORY OF ALLERGIES.  THE PATIENT DEVELOPED RT ELBOW PAIN
APPROXIMATELY  8 YEARS AGO SECONDARY TO HIS WORKING
ACTIVITIES.  MULTIPLE TX AND STUDIES WERE DONE FOR THE
CONDITION IN THOSE YEARS.

HE REFERS THE PAIN DIDN'T DISAPPEARS DURING THESE BUT
INTENSIFIES WITH RIGHT HAND MOTION AT WORK.

REFERS OCCASIONAL RADIATION TO RT. SHOULDER-NECK AND
OCCASIONAL SENSATION TO FOREARM.

INSP:  MOD ATROPHY OF RT UE.
PALP:  TENDERNESS AT RT ELBOW LATERALLY.
SENS:  NO DEFICIT.
MS:  WRIST FLEX AND EXT, HANDGRIP.
     DORSAL INTEROSSEOUS - N.
DTR'S: +2.
RT TINEL AT ELBOW (+)   TINEL AT WRIST (-)



RECIBIDO
JAN 2 8 1997
INJURY COMP. OFFICE
SAN JUAN, P.R.
00936-9430

Exhibit - 1 page 6

**centro**
**neurológico**
**metropolitano**

NEUROLOGIA Y ELECTROENCEFALOGRAFIA

CARRETERA 21 U3-1  LAS LOMAS, P.R.  00921 — TEL. 783-8081

10/29/96

Re: Angel A. Morales

Mr. Morales was evaluated on this date with complains of recurrent pain in right elbow and forearm. Has been treated with physical therapy.

On exam there is tenderness of the extensor and flexor muscles at the Rt elbow and forearm level.

The diagnostic impression is a strain of the forearm muscles. I agree with treatment and he should avoid repetitive use of the right arm, specially fingers.

RECIBIDO
JAN 28 1997
INJURY COMP. OFFICE
SAN JUAN, P.R.
00936-3430

Norberto J. Arbona, M.D.

Exhibit -1, Page 7

To whom it may concerrn:

I Howard Hall want to declare the following:

That during the months of May, June, July and August 1996, co-worker Angel David Morales was changed by supervisor Enrique López from his duties as a Postage due clerk, Express Mail clerk and Business Reply Mail clerk which he has performed for years excellently to Window clerk duties where it is required to exert a great amount of repetitive motion like keying the IRT computer keyboard, filling a lot of postal forms for Express Mail, C.O.D mail, Registry mail, Insured mail, Certified mail, etc. Most of this forms are in quadruplicate and duplicate so you need to exert a force more than usual to fill them. In addition it is required to exert a lot of repetitive motion for the every day money count and money exchange to customers.

Howard Hall
U.S. Postal Service
Distribution and Window Clerk
Caparra Heights Station
San Juan  Puerto Rico 00922
Phone # 787-749-4319

Exhibit - <u>1</u>, Page 8

To whom it may concerrn:

I Raymond Ruiz want to declare the following:

That during the months of May,June,July and August 1996, co-worker Angel David Morales was changed by supervisor Enrique López from his duties as a Postage due clerk,Express Mail clerk and Business Reply Mail clerk which he has performed for years excellently to Window clerk duties where it is required to exert a great amount of repetitive motion like keying the IRT computer keyboard, filling a lot of postal forms for Express Mail, C.O.D mail, Registry mail, Insured mail, Certified mail, etc. Most of this forms are in quadruplicate and duplicate so you need to exert a force more than usual to fill them. In addition it is required to exert a lot of repetitive motion for the every day money count and money exchange to customers.

_Raymond Ruiz_

Raymond Ruiz
U.S. Postal Service
Distribution and Window Clerk
Caparra Heights Station
San Juan  Puerto Rico 00922
Phone # 787-749-4319

Exhibit-1, Page 9

To whom it may concerrn:

I Julia Collado  want to declare the following:

That during the  months of May,June,July  and  August 1996, co-worker Angel David Morales was changed by supervisor Enrique López from his duties as a Postage due clerk, Express Mail clerk and Business Reply Mail clerk which he has performed for years excellently to Window clerk duties where it is required to exert a great amount of repetitive motion like keying the IRT computer keyboard, filling a lot of postal forms for Express Mail, C.O.D mail, Registry mail, Insured mail, Certified mail, etc. Most of this forms are in quadruplicate and duplicate so you need to exert a force more than usual to fill them. In addition it is required to exert a lot of repetitive motion for the every day money count and money exchange to customers.

Julia Collado
U.S. Postal Service
Former Distribution Clerk
Caparra Heights Station
San Juan  Puerto Rico 00922
Phone # 787- 767-2806

POSTMASTER

Exhibit - 2


**UNITED STATES
POSTAL SERVICE**

June 21, 1995

Mr. José A. Carpena
OSHA Area Director
Occupational Safety and Health Adm., USDL
US Federal Building and Courthouse
150 Ave Carlos Chardón Room 559
San Juan  PR  00918-1718

*06 23 95
(SATISFACTORY Response!)*

Dear  Mr. Carpena:

Thank you for allowing us the opportunity of investigating the alleged hazardous conditions existing at the Caparra Heights Post Office.  As you mentioned in your letter of June 9, 1995 the specific nature of the report involves a housekeeping issue concerning accumulation of dust, rodents, roaches and polluted air.

Ms. Elizabeth Rivera, Collateral Duty Safety officer, was sent to conduct an inspection of the facility on June 8, 1995 and to follow up on June 13, 1995, after receiving your letter.

In regard to the specific complaints, she determined that:

1.    The condition concerning the accumulation of dust did exist. Management was instructed to correct the situation with their local custodial employee.  The Maintenance Department at our main office was contacted and they will provide assistance.  At the time of our second follow-up (June 13, 1995) the situation was under control.

2.    Rodents and roaches - A pest control contract will be renewed and implemented permanently.

3.    Polluted Air - At the present time we understand that there are no reasonable grounds to believe that such a hazard exist to the extreme of jeopardizing our employees health.

Should you have any further questions, please do not hesitate to contact me or Mr. Cándido López of our Safety Staff at 767-2300.

Cordially,

Odant V. Tirado
Postmaster San Juan

voi:ot.osha

cc:    Mr. John Malavé, Caribbean District Manager
       Mr. Michael Smith, Plant Manager
       Mr. John Rios, Manager Maintenance Dept.
       Mr. Neftali Rivera, Manager Human Resources

585 Ave FD Roosevelt Ste 221
San Juan PR 00936-9998
809 767-3093
FAX 809-767-3279

*Siel*

*Exhibit-3, Page 1*


**UNITED STATES
POSTAL SERVICE**

**July 20, 1995**

**MEMORANDUM FOR   John Malave
                              District Manager Customer Services & Sales**

**SUBJECT:  <u>SAFETY INSPECTION  FOR THE FOLLOWING
STATIONS/BRANCHES AND POST OFFICES</u>**

During the month of June, 1995, Ms. Elizabeth Rivera, Collateral Duty Safety Officer
conducted an inspection and program evaluation of the following stations/branches
and post office:

Rio Piedras Station                    Bayamon Gardens
Bayamon Branch                       Old San Juan Station
Hato Rey Station                       Caparra Heights Station
Fernandez Juncos Station          Vega Baja Post office
Trujillo Alto Station

As a result of her inspection various safety & health deficiencies were detected
which require immediate attention by the local administration and our Maintenance
Department as well.

During the inspection Ms. Rivera was accompanied by  the Managers or
Supervisors representing management and bargaining employees representing the
employees.  Both were very receptive and cooperative.

Nettali Rivera
Manager Human Resources

xc:     Mr. Odarit Tirado - Postmaster San Juan
         Mr. John Rios - Manager Maintenance
         Mr. J. Antonmattei  - Manager Adm. Svs.
         Joint Labor Management S & H Committee
         Safety Advisory Team
         President - **APWU**, NALC & Mail Handlers Unions
         File - Chrono

585 FD ROOSEVELT AVE
SAN JUAN PR 00936-9441
(809) 767-2300
FAX: (809) 767-2389

Exhibit - 3, Page 2


**UNITED STATES**
**POSTAL SERVICE**

**July 20, 1995**


**MEMORANDUM TO:    Mr. J. Sepulveda**
**Manager Caparra Heights Station**


**SUBJECT:            SAFETY INSPECTION**


Enclosed is the Safety Inspection and Program Evaluation report of your facility conducted by Ms. Elizabeth Rivera, Collateral Duty Safety Officer on June 8, 1995.

Please be aware that all necessary corrections of the safety hazards shall be made within 30 calendar days after completion of the inspection. You are responsible for generating the necessary PS Forms 4805 "WORK RECORD SHEET" or any PS Form 7381, "REQUISITION FOR SUPPLIES, SERVICES, OR EQUIPMENT" or the implementation of any administrative action for the abatement of these hazards.

If corrections can not be made within the time period established, you must provide me with an abatement plan that shall include but is not limited to the following:

1.    All steps taken and the dates of such action to achieve compliance during the prescribed abatement period.

2.    The specific additional abatement time estimated to achieve compliance.

3.    The reasons such additional time is necessary, including the unavailability of professional or technical personnel or of materials and equipment, or because necessary construction or alteration of facilities cannot be completed by the original abatement date.

4.    Interim steps being taken to safeguard the employees against the cited hazard during the abatement period.


585 FD ROOSEVELT AVE
SAN JUAN PR 00936-9441
(809) 767-2300
FAX: (809) 767-2389

Exhibit 3, Page 3

- 2 -

Please inform of any action you have taken.  Your response must be detailed, stating specifically what corrective actions have been taken.

If you have any questions or need any assistance please do not hesitate to contact your Safety Office at 767-2300 or 2305.


John Malave
Caribbean District Manager
Customer Services and Sales

*Exhibit-3, Page 4*

# Safety and Health Deficiency Report

**UNITED STATES POSTAL SERVICE™**

## Instructions

Record all deficiencies noted on forms 1784-A or B on this report. Include the standard or requirement violated and description of the deficiency. Indicate the classification (imminent danger, serious, non-serious) of each deficiency in the fourth column. Submit the original copy of this report to the head of the installation inspected within 10 days after completion of the closing conference. Abatement of recorded deficiencies will be conducted in accordance with section 825.7 of the

*Employee and Labor Relations Manual (ELM).* Upon receipt of this report, the installation head must ensure that it is posted in a conspicuous place, at or near the location of the deficiency, for three working days, or until the deficiency is satisfactorily abated, whichever is longer. Where it is not practicable to post the report near such places, it must be posted in a prominent place where it is readily observable by all affected employees for the same periods of time as specified above.

Installation Inspected: CAPARRA HEIGHTS STATION

Check One: ☒ District Inspection  ☐ Local/Plant Inspection  ☐ Other *(Identify)*

Check One: ☒ Annual  ☐ Quarterly Fire  ☐ Semi-Annual

Abatement Committee (See ELM 825.7 for procedures)

Inspection Date: 06/08/95

| | Member's Name | Title | Office/Facility Represented |
|---|---|---|---|
| 1. | ELIZABETH RIVERA | COLLATERAL DUTY SAFETY OFFICER | SAFETY & HEALTH OFFICE |
| 2. | ENRIQUE LOPEZ | ACTING MANAGER | CAPARRA HEIGHTS STATION |
| 3. | ANGEL D. MORALES | CLERK | " |
| 4. | | " | " |

City, State, and ZIP + 4: SAN JUAN PR 00920

District/Local/Plant Manager's Signature, Title, and Date

## Corrective Action Recommended on Safety Deficiencies

| 1. Item Number | 2. Reference (OSHA, NFPA, etc.) | 3. Description of Deficiencies and Recommended Corrective Action | 4. Code (I, S, or N) | 5. Abatement Date | 6. Actual Completion Date | 7. Office Responsible for Abatement |
|---|---|---|---|---|---|---|
| 001 | ELM801 Chp' 4 | No OSHA poster - one must be posted on the Safety Bulletin | N | 30 Days | | Station |
| 002 | ELM801, 313, 613.11 | Safety Talks not given on a weekly basis. These must be given and documented on a daily basis. | N | 30 Days | | Station |
| 003 | | No current Safety Posters available. | N | 30 Days | | Station |
| 004 | ELM801.140 | No PS Form 1767 available for employees. Space designated was empty. | N | 30 Days | | Station |
| 005 | | | | | | |
| 006 | | | | | | |
| 007 | | | | | | |

PS Form **1784-C** September 1994 *(Page 1 of 2)*

*(Continue on Reverse)*

**Corrective Action Recommended on Safety Deficiencies**

| 1. Item Number | 2. Reference (OSHA, NFPA, etc.) | 3. Description of Deficiencies and Recommended Corrective Action | 4. Code (I, S, or N) | 5. Abatement Date | 6. Actual Completion Date | 7. Office Responsible for Abatement |
|---|---|---|---|---|---|---|
| 005 | OSHA 1910-1760 | DUST ACCUMULATION AT:<br>1. On top of Carrier cases, files, A/C ducts, tables etc. A/C filters must be changed and work areas must be dusted.<br>2. Vynil wall base in window area is loose mut be re-glued.<br>3. Ceiling tile over COD section has traces of leakage, must be replaced. | N | 30 Days | | Station |
| 006 | OSHA 1910.176C EL801, 2 | Platform is being used for storage, they are storing boxes and paper supplies, Area needs to be clean and organized. | N | 30 Days | | Station |
| 007 | MS-1, OSHA 1910 141 - MS-7 | Men's room door must be properly identified | N | 30 Days | | Station |
| 008 | EL801 Ap. 16, 19, 22, EL814 IB | ARTICLES ON TOP OF EQUIPMENT AT:<br>1. Box Section by Call Window<br>2. Carrier Case Rt. 42<br>3. Finance Area Shelves<br>4. Parcel Shelves<br><br>ALL ABOVE ITEMS MUST BE REMOVED. | N | 30 Days | | Station |
| 009 | NEC 240-3 NEC110-7 NEC 110-22 | ELECTRICAL DEFICIENCIES:<br>1. Electrical outlet for CTT Scanner is overloaded.<br>2. Braker outlet by electric time clock must be repaired.<br>3. Broken box by Parcel Section needs cover plate. | S | 3 DAYS | | Station |
| 010 | M-52, EL801, Ap. 26 | No 4584's on record. This form must be used according to Local Policy. | N | 30 Days | | Station |
| 011 | OSHA 1910.38 EL801 ELM 850 | Fire Prevention deficiencies:<br>1. Fire Evacuation Plans has misleading arrows pointing in opposite direction.<br>2. No documentation available on fire drills, or fire inspections. | N | 30 Days | | Station |

PS Form **1784-C**, September 1994 (Reverse)

*Exhibit 3, page 6*

CARIBBEAN DIVISION

## SAFETY & HEALTH PROGRAM EVALUATION QUESTIONNAIRE

POST OFFICE: *Caparra Station*

DATE AND TIME: *6/8/95 0900*

POSTMASTER/MANAGER/O.I.C.: *Acting Mgr. Enrique Lopez*

EMPLOYEE COMPLEMENT: *No ... and ... Angel Darus Morales*

EVALUATED BY: *Elizabeth Rivera*

1. IS THERE AN UPDATED LOCAL SAFETY & HEALTH POLICY PROMINENTLY POSTED ON THE BULLETIN BOARD? — (Y)   N

2. IS THE MOST RECENT OSHA POSTER PROMINENTLY POSTED? — Y   (N)

3. ARE PS FORMS 4584 (OBSERVATION OF DRIVING PRACTICES) AVAILABLE AND IN USE AS PER DIVISION POLICY? — Y   (N)

4. ARE PS FORMS 1767 READILY AVAILABLE ON THE WORKFLOOR? — Y   (N)

5. ARE WEEKLY SAFETY TALKS GIVEN AND DOCUMENTED? — (Y)   (N)

6. ARE SAFETY TALKS GIVEN ON ROTATING DAYS AND TIMES TO REACH ALL EMPLOYEES? — Y   (N)

7. ARE PS FORMS 1783 (ON THE JOB SAFETY ANALISIS) AVAILABLE AND IN USE? — (Y)   N

   a. ARE JSA'S USED AS TRAINING GUIDES FOR EMPLOYEES? — (Y)   N

   b. ARE JSA'S PREPARED AFTER EACH ACCIDENT TO PREVENT REOCCURENCE? — (Y)   N

8. ARE PS FORMS 1784 A OR B AVILABLE AND USED TO CONDUCT TIMELY LOCAL INSPECTIONS? — Y   (N)

9. ARE DAILY SAFETY INSPECTIONS OF WORKING AREAS CONDUCTED AND DOCUMENTED? — Y   (N)

10. ARE QUARTERLY FIRE INSPECTIONS CONDUCTED AND DEFICIENCIES RECORDED ON APPROPRIATE SECTION OF FORM 1784 A/B? — Y   (N)

11. IS LOCAL SMOKING POLICY IN ACCORDANCE WITH DIVISION POLICY, AND POSTED ON THE BULLETIN BOARD? — (Y)   N

Exhibit 3, Page 7

PAGE 2

12. IS THERE A FIRE BRIGADE IN THIS OFFICE? 

13. IS THERE AN EMERGENCY ACTION/FIRE PREVENTION PLAN? 

    a. DATE LAST REVIEWED?_____ 

14. HAS A FIRE DRILL BEEN CONDUCTED THIS YEAR? Y

    a. IS THERE DOCUMENTATION AVAILABLE? Y

15. ARE EMERGENCY TELEPHONE NUMBERS POSTED ON/NEAR ALL TELEPHONES? Y

16. ARE DOG ALERT CARDS AVAILABLE? Y

    a. ARE THEY BEING PREPARED AND CASED WITH THE MAIL FOR DELIVERY? Y

17. IS DOG SPRAY STOCKED AND ISSUED AS NEEDED? Y

18. IS THERE A DESIGNATED SAFETY CAPTAIN? Y

19. IS HE/SHE SUBMITTING REPORTS TO THE SUPERVISOR AS REQUIRED? Y

20. IS THERE ANY EMPLOYEE TRAINED IN CPR OR FIRST AID? Y

21. ARE THERE ANY OF THE FOLLOWING REFERENCE MATERIAL AVAILABLE? Y

    A. EL 801 SUPERVISORS SAFETY HANDBOOK Y
    B. SUBCHAPTER 810 - ELM Y
    C. PUBLICATION 52 - ACCEPTANCE OF HAZARDOUS/PERISHABLE ARTICLES Y
    D. FLEET MANAGEMENT M-52 Y

22. IS THE CARIBBEAN SAFETY RULES AND REGULATIONS BOOK ON THE BULLETIN BOARD? Y

23. ARE ALL ACCIDENTS INVESTIGATED BY THE IMMEDIATE SUPERVISOR ON DUTY AT THE TIME OF THE OCCURRENCE? Y

24. IS PS FORM 1769 COMPLETED BY THE IMMEDIATE SUPERVISOR ON THE DAY OF THE ACCIDENT AND SUBMITTED TO THE NEXT LEVEL OF MANAGEMENT FOR REVIEW AND SIGNATURE? Y

25. IS THERE AWARENESS OF MANAGING INJURIES PROCEDURES? Y

26. IS THERE AWARENESS OF ACCIDENT REPORTING PROCEDURES? Y

27. IS THERE AN ACCIDENT REPORT KIT WITH ALL OWCP FORMS AVAILABLE? 

Exhibit 3, Page 8

PAGE 3

28. IS THERE ANY LOCAL ACCIDENT PREVENTION PROGRAM OR STRATEGY IN EFFECT?    (Y)    N

29. ARE OF 346'S AND STATE DRIVERS LICENSE CHECKED PERIODICALLY BY SUPERVISORS?    Y N/AN

30. ARE SPOT CHECKS MADE TO ASSURE THAT POSTAL DRIVERS ARE INSPECTING THEIR VEHICLES EVERY MORNING, IMMEDIATELY AFTER CLOCKING IN?    (Y)    N

COMMENTS:

Exhibit - 4

2/22/96

I Radames Sierra employee at Caparra Heights believe that the posting of position # 2541417 was changed deliberatly in repraisal towards Angel D morales. Prior to the posting I Asked mr Juan Rodriguez Supervisor if he was planning to change this position in Any way. mr Rodriguez stated No, that there was to be no change in this position. This position on several occasi was posted with the days off (Sat-Sun) bat mr morales showed great Interest and management knew that he had this Interest. when this position was posted for bid It showed a change In days off showing Sunday and Thursday.

Exhibit - 5

**U.S. Department of Labor**

Occupational Safety and Health Administration
Federal Building, Room 559
Carlos Chardon Avenue
Hato Rey, Puerto Rico 00918



February 23, 1996

Mr. Angel David Morales
Calle Brisaida #35, Urb. Munoz Rivera
Guaynabo, PR 00657

Dear Morales:

In response to your complaint of health and/or safety hazards at:

US Postal Service
Caparra Height Station
San Juan, PR 00922,

the Occupational Safety and Health Administration (OSHA) has notified US Postal Service requesting that the appropriate action be taken to correct the situation. Enclosed is a copy of that letter for your information.

We have not revealed your identity to the employer. When we receive additional information from the employer, a copy of the response will be forwarded to you.

Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity. If you believe you are being treated differently or action is being taken against you because of your safety or health activity, you may file a complaint with OSHA. You should file this complaint as soon as possible, since OSHA normally can accept only those complaints filed <u>within 30 days of the alleged discriminatory action</u>.

Your continued interest in workplace safety and health is appreciated.

Respectfully,

Jose A. Carpena
Area Director

attachments

/usr/Wp/Ltrs/c74326257ltr

*Exhibit -6, Page 1*

**U.S. Department of Labor**

Occupational Safety and Health Administration
201 Varick Street
New York, New York 10014

Reply to the Attention of:

April 1, 1996

Mr. Angel David Morales
P.O. Box 10551
San Juan, Puerto Rico 00922

Dear Mr. Morales:

This is to acknowledge receipt of your March 19, 1996 letter to Mr. Jose Carpena, Area Director, regarding your allegation of harassment and discrimination as an employee of the U.S. Postal Service. Your report has been forwarded to Mr. John E. Plummer, Director, Office of Federal Agency Programs, for his consideration and appropriate action.

Should you wish to contact Mr. Plummer, he can be reached at the following address:

> John E. Plummer, Director
> Office of Federal Agency Programs
> U.S. Department of Labor/OSHA
> 200 Constitution Avenue, N.W.
> Room N3112
> Washington, D.C. 20210
> (202) 219-9329

If we can be of any additional assistance, please feel free to contact Mr. Jose Carpena, Area Director, Puerto Rico Area Office, or if you wish, Mr. Philip Mannheim, FAPO, at (212) 337-2359.

Sincerely,

Patricia K. Clark
Regional Administrator

Attachments

cc:    John E. Plummer, OFAP
       Puerto Rico Area Office

Exhibit "6, Page 2

**U.S. Department of Labor**

Occupational Safety and Health Administration
201 Varick Street
New York, New York 10014

Reply to the Attention of:

April 1, 1996

MEMORANDUM FOR:        John E. Plummer, Director
                       Office of Federal Agency Programs

THROUGH:               John B. Miles, Jr., Director
                       Directorate of Compliance Programs

FROM:                  Patricia K. Clark
                       Regional Administrator

SUBJECT:               U.S. Postal Service Employee Allegation of Discrimination

As outlined in Chapter #13 of the FOM, this transmits all documents received and generated in regard to the above subject. In response to a U.S. Postal Service employee report of unhealthy working conditions, concerning exposures to dusts and unsanitary conditions at the Caparra Heights Station. This report was handled by telephone as a Non-Formal Complaint. The U.S. Postal Service responded and stated that the situation would be corrected by the middle of May, 1996. The Area Director plans to conduct an inspection at that time.

The report originator, Mr. Angel David Morales, has notified the Area Director of the San Juan Area Office, by letter dated March 19, 1996, that he is the subject of harassment and possible termination based on his contact with OSHA. As we receive additional information regarding this subject, it will be forwarded to your office.

If we can be of any further assistance in this matter, please contact Jose Carpena, Area Director at (809) 766-5457 or Phil Mannheim, FAPO at (212) 337-2359.

Attachments

cc:    Mr. Angel D. Morales
       Puerto Rico Area Office

Exhibit - 7, Page 1

NORTHEAST REGIONAL REGULAR ARBITRATION PANEL
_____ x

IN THE MATTER OF ARBITRATION BETWEEN

UNITED STATES POSTAL SERVICE
**Employer**

and

NATIONAL ASSOCIATION OF LETTER CARRIERS
**Union**

GRIEVANT:
C. MONTANEZ

POST OFFICE:
SAN JUAN, PR

CASE NO.:
A94N-4A-C 96010961
GTS 15288

_____ x

BEFORE: ROGER E. MAHER, Arbitrator

**APPEARANCES:**

For The USPS:
Juan Delgado..........................Labor Relations Specialist
Antonio Benavides Jr..............Customer System Analyst
Antonio Whatts......................Supervisor Customer Services
Enrique Lopez.......................Supervisor Customer Services

For the NALC:
Jules Cohen.................Regional Administrative Assistant
Modesto Figueroa........President Branch 69
Ralph Hernendez.........President Branch 826
Obed Agosto...............Area Representative Eastern Region
Carmen Suarez............Letter Carrier
Carmelo Montanez......Grievant

Place of Hearing: 585 F.D. Roosevelt Avenue, San Juan, PR

Date of Hearing: May 31, 1996

**AWARD:**

On the substantial and credible evidence of the case as a whole, the Arbitrator finds the USPS violated the National Agreement and M-39 Handbook when it caused Route 54 to become an auxiliary route.

As and for the remedy, within fourteen (14) days of receipt of said Award, the USPS shall return Route 54 to its configuration that existed prior to 7/18/95, and reassign Carmelo Montanez to same.

Date of Award: July 15, 1996

Arbitrator:

1

*Exhibit 7, Page 2*

Pursuant to the arbitration procedures set forth under the National Agreement between the United States Postal Service and the National Association of Letter Carriers, (hereinafter referred to as the "USPS" and the "NALC" respectively) the undersigned was appointed Arbitrator to hear and decide the issue herein and to render a final and binding award.

A hearing in this matter was held before the undersigned Arbitrator at the office of the Postal Service at 585 F.D. Roosevelt Avenue, San Juan, PR, on May 31, 1996.

The evidence adduced and the position and arguments set forth at the hearing have been fully considered in preparation and issuance of this opinion and its accompanying award. The parties were afforded ample opportunity to present evidence and testimony germane to their positions on the following disputed issue:

### Issues:

**NALC Issue:**

"Did management violate the National Agreement and the M-39 Handbook when it abolished Route 54 worked by Carmelo Montanez and reduced it to an auxiliary route? And if so, what shall be the remedy?"

**USPS Issue:**

"Does management have the right, pursuant to Article 3 of the National Agreement, to abolish a full time route because of a route inspection? And if not, what shall the remedy be?"

### NALC POSITION

This instant arbitration is the result of the NALC contending that the USPS violated Article 19 (Handbooks and Manuals) of the National Agreement, specifically the M-39 Handbook. The NALC asserts the management at the Caparra Heights Post Office, San Juan,

2

Exhibit-7 Page 3

Puerto Rico, arbitrarily and capriciously abolished Carmelo Montanez's, a letter carrier and shop steward (Grievant) Route, i.e., Route 54 to an auxiliary route.

The NALC submits that normally it would only have indirect evidence to suggest that management was arbitrary in its decision, however, in this matter there is also direct evidence.

The NALC states its indirect evidence is as follows. The Grievant was the only carrier at Caparra Heights Post Office to have his route inspected, and to have it inspected twice. There were routes at this Post Office with less than eight hours that were not abolished. Additionally even after a portion of the Grievant's route (Route 54) was removed to Route 37, the Grievant provides auxiliary assistance on Route 37 for the portion of his old route that was removed. Furthermore the fact is that the station manager, Jose Sepulveda, did not appear at this hearing to offer an affirmative defense or rebut the testimony of the NALC.

The NALC states while this indirect evidence may be sufficient to sustain this grievance it is also offering the direct and unrebutted testimony of Carmen Suarez, letter carrier, and the Grievant that Sepulveda told them both that he would abolish the Grievant's route because the Grievant had gone over his head and convinced Post Master Odarit Tirado, to grant the Grievant's request to have Saturdays off.

The NALC contends the credible testimony of both the Grievant and Suarez unequivocally establish that Sepulveda intentionally and deliberately in contravention of the National Agreement, used a route inspection in order to abolish the Grievant's route in retaliation. The stated reason for Sepulveda's retaliation was because on several occasions in 1994 and 1995, the Grievant had requested of him to have Saturdays off because his route was a commercial one wherein most of his customers were closed on Saturday and did not want mail delivered.

JUL-17-1996  10:18  FROM NBA'S OFFICE, NALC        TO      1 809 277 0381    P.03

Exhibit 7, Page 4

The Grievant's testimony established that Sepulveda made it clear that in no uncertain terms would anybody at this Post office get Saturdays off permanently. Despite this admonition by Sepulveda, Modesto Figueroa, President Branch 69, and the Grievant made several requests to Post Master Tirado to allow the Grievant to have Saturdays off. Subsequently the Grievant, at Post Master Tirado's urging, had collected signed statements from a majority of his customers on his commercial route that acknowledged the Grievant was to hold their mail received on Saturday for a Monday delivery. As a result in early 1995, Tirado had granted the Grievant's request to have Saturdays off, and so informed Sepulveda.

The NALC asserts the testimony of both the Grievant and Suarez established that Sepulveda was determined to retaliate against the Grievant for going over his head and abolish the Grievant's route.

The NALC argues whether management's decision to intentionally abolish the Grievant's route was because of his position of shop steward or because he had the temerity to request Saturdays off which was granted by the Post Master, the unrebutted fact remains that the Grievant's route inspections were arbitrary and capricious and in violation of the National Agreement and M-39 Handbook.

The NALC adds that management at Caparra Heights, in further contravention of the National Agreement, declined to meet with it and the Grievant in his capacity as shop steward in connection with this grievance, or to answer Step Two or Three of the grievance procedure.

The facts and position of the NALC regarding this grievance are as follows.

1. Route 54 was inspected at the Caparra Heights Station on May 4th - 10th, 1995.

2. Route 54 showed on PS Form 1840 an average of 8.06

4

Exhibit 7, Page 5

3. This constitutes a full time duty assignment.

4. Management deducted Avenue Andalucia (approximately 2 hours 30 minutes, from Route 54 and transferred it to Route 37, thus creating Route 53 as an auxiliary route.

5. Management's deductions were excessive in that time was deducted for the Grievant making drops, deliveries and relays, yet the actual time necessary to deliver that section of Route 54 was not properly added.

6. Management's figures and deductions were deliberate and intentional in purpose to abolish Route 54.

The NALC states that Route 54 showed 8:06 on Inspection, therefore it is a full time duty assignment. The NALC does not dispute the fact that management has the prerogative to adjust routes, but argues what has occurred in this instant matter, was a unilateral reassignment of a regular senior carrier which is a unequivocal violation of the National Agreement. The NALC states that M-39 specifies that routes are to be as near 8 hours as possible (Section 242.122).

The NALC points out that the Hempstead National Arbitration Award dealt with the issue of the USPS taking 8 hour assignments and creating auxiliary assignments, and ruled in favor of the NALC; Case # H7N-1T-C39547. Furthermore the M-39 only calls for reducing a regular route to an auxiliary status if the evaluated time is less than eight hours. The NALC also argues had the USPS been within its right in this instant matter, it would have nonetheless been found to have violated Article 41.3.0 and 41.3.5.

As remedy in this matter, the NALC seeks that Route 54 be returned to the Grievant in its original configuration, and that the Grievant be awarded $50.00 for every day since 7/18/95, the date his route was abolished; and he otherwise be made whole.

Exhibit 7, Page 6

## POSITION OF THE USPS

The USPS argues it did not violate the National Agreement and or the M-39 Handbook,

when in May 1995, two route inspections by separate inspectors that were performed on Route

54 (the Grievant's route) determined that 2.0 - 2.5 hours of time were to be deducted from the

route because of the Grievant's unproductive actions on the route and a determination was made

to transfer that portion of Route 54 to Route 37, resulting in Route 54 becoming an auxiliary

route.

The USPS argues it has the contract right and prerogative, pursuant to Article 3 of the

National Agreement , to determine when or if a route needs to be inspected and to be guided by

the route inspector's findings and adjust the route accordingly  if it is overburdened and or to

abolish a full time route causing it to be an auxiliary route, if it is determined that the route is less

than six hours.

Article 3 (Management's Rights ) in relevant part states,

"The Employer shall have the exclusive right subject to the provisions of this Agreement and

consistent with applicable laws and regulations;: a) to direct employees of the Employer in the

performance of official duties; b) to hire, promote, transfer, assign, and retain employees in

positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary

actions against such employees; c) to maintain the efficiency of the operations entrusted to it; d)

to determine the methods, means and personnel by which such operations are to be conducted."

The USPS submits that contrary to the NALC's position there was no hidden agenda by

the station manager to abolish the Grievant's route  because the Post Master has granted the

Grievant's request to be off on Saturdays. Rather the Grievant's route was inspected on two

*Exhibit 7, Page 7*

different occasions by two different inspectors who did not work for the station manager. The USPS asserts a review of these inspector's documentation credibly establish that the Grievant's route was significantly less than eight hours. As a result a determination was made to make the Grievant's route an auxiliary one.

Further evidence that the station manager did not have a hidden agenda because the Grievant was off on Saturdays, is the fact the Grievant is still enjoying Saturdays off, still works as a full time carrier on his route while giving assistance to Route 37. The USPS states the net result is that the Grievant has not suffered any diminution of wages or benefits.

Accordingly the USPS respectfully requests that the Arbitrator deny this grievance in its entirety and further find that management, pursuant to Article 3, has the right to abolish a full time route when a route inspection finds it appropriate to do so.

## OPINION

Upon a review of the parties' arguments, evidence, and testimony adduced at the hearing, the Arbitrator finds that local management at the Caparra Heights Post Office violated the National Agreement and M-39 Handbook when it abolished the Grievant's full time route to an auxiliary one and transferred a portion of same to Route 37. The Arbitrator adds that subsequent to the aforesaid transfer of part of his original route, the Grievant has and continues to deliver that portion that was removed from his route.

This Arbitrator's finding does not preclude management from inspecting routes and after a fair and independent review determines that a route adjustment is warranted which results in a transfer of work from a particular route to another from doing so; as that right is clearly within

Exhibit 7, Page 8

Management's Rights as set forth in Article 3 subject to the provisions of the National Agreement.

However, the NALC's direct testimony and indirect evidence clearly establish that the inspection of the Grievant's route was tainted by the station manager's animus towards the Grievant. This evidence strongly suggests that the station manager intended and deliberately sought to abolish the Grievant's route by using a route inspection as retaliation because the Grievant sought and was granted Saturdays off by Post Master Tirado over his objections. Clearly station manager, Sepulveda, did not order the route inspections because he was interested in maintaining the efficiency of the operation.

The station manager's statements, as testified by the Grievant and Carmen Suaréz, was that he, the station manager, took offense to the Grievant's going over his head to the Post Master, who granted him Saturdays off even though the station manager had repeatedly denied the Grievant this consideration. The Arbitrator finds this was the sole grounds for abolishing the Grievant's full time route to that of auxiliary one.

Given the direct testimony of the Grievant and Suarez and the USPS's failure to call station manager's Sepulveda as a witness to refute this damaging testimony, the Arbitrator adopts the NALC's version that the Grievant was singled out for a route inspection. The indirect testimony establishes that as no one else at this post office was subject to a route inspection. Furthermore even though the Grievant's route was more than eight hours, other carrier routes with less than eight hours were not inspected. This speaks to no more or no less than the station manager's intent to punish the Grievant for going over his head.

Exhibit 7, Page 9

The Arbitrator could expound further on the minutia of both route inspections and the inspectors failure to properly inspect the Grievant's route pursuant to the M-39 Handbook regulations. However he believes it is unnecessary upon his finding that the USPS's grounds for a route inspection in this instant matter was arbitrary and capricious because the credible testimony established the station manager's personal animus towards the Grievant.

The mendacious position of the USPS on behalf of the station manger, who did not appear at the hearing, that the route inspections of the Grievant were done in good faith, pursuant to the M-39 Handbook and that it 's determination in this instance was a management's right guaranteed by the contract is simply incredulous and of no value, especially when it was established that management used its right as a retaliatory weapon to inflict hardship upon the Grievant because of his temerity to ask and be granted Saturdays off.

The convincing testimony and evidence established that the decision to inspect the Grievant's route was intended for retaliatory purposes. The Arbitrator holds the USPS can not use the guise of maintaining efficiency, its contract right, when it has been shown by convincing testimony and evidence that the decision to inspect the Grievant's route was purposely for retaliatory purposes.

It is the Arbitrator's understanding that the Grievant still enjoys Saturdays off. Even with the transfer of 2.0 - 2.5 hours of his route, the Grievant has not endured an economic hardship. Accordingly the Arbitrator returns the Grievant's route to its original configuration without imposing a cash penalty on the USPS as he believes such would be punitive. The Arbitrator believes he has righted the wrong to the Grievant by awarding the status quo ante.

9

**U.S. Department of Labor**

Occupational Safety and Health Administration
BBV Plaza Building, Suite 5B
1510 F.D. Roosevelt Avenue
Guaynabo, Puerto Rico  00968



Exhibit - 8, Page 1

October 1, 1996

Mr. Angel David Morales
Calle Brisaida #35, Urb. Munoz Rivera
Guaynabo, PR  00969

Dear Mr. Morales:

In response to your report of alleged hazardous working conditions at

US Postal Service
1505 F.D. Roosevelt
San Juan, San Juan 00922

the Occupational Safety and Health Administration (OSHA) has conducted a workplace inspection. The inspection was completed on June 13, 1996.

We found some conditions that violated OSHA standards. Therefore, a notice was sent to your establishment official stating that hazards identified by OSHA must either be eliminated or addressed by an abatement plan to OSHA.  The notice (enclosed) reflects the dates by which the hazards must be corrected.  The contents of the notice must be posted near the hazardous conditions for three working days or until the hazard is abated, whichever is later.

Thank you for your concern about workplace safety and health.

Sincerely,

Jose A. Carpena
Area Director

Enclosure

/usr/Wp/Ltrs/h74326257ltr

**U.S. Department of Labor**
Occupational Safety and Health Administration
BBV Plaza Building - Suite 5B
1510 F.D. Roosevelt Avenue
Guaynabo, PR 00968
Phone: (787)277-1560  FAX: (787)277-1567



*Exhibit-8, Page 2*

## Notice of Unsafe or Unhealthful Working Conditions

**To:**
US Postal Service
1505 F.D. Roosevelt
San Juan, PR 00922

**Inspection Number:** 106896079
**Inspection Date(s):** 06/13/96-06/13/96
**Issuance Date:** 09/20/96

*The violation(s) described in this Notice is (are) alleged to have occurred on or about the day(s) the inspection was made unless otherwise indicated within the description given below.*

**Inspection Site:**
Caparra Heights Station
San Juan, PR  00922

This Notice of Unsafe or Unhealthful Working Conditions (Notice) describes violations of the Occupational Safety and Health Act of 1970, the Executive Order 12196, and 29 CFR 1960, Basic Program Elements for Federal Employee Occupational Safety and Health Programs and Related Matters. You must abate the violations referred to in this Notice by the dates listed unless within 15 working days (excluding weekends and Federal holidays) from your receipt of this Notice you request an Informal Conference with the U.S. Department of Labor Area Office at the address shown above.

**Posting** - The law requires that a copy of this Notice be posted immediately in a prominent place at or near the location of the violation(s) cited herein, or, if it is not practicable because of the nature of the employer's operations, where it will be readily observable by all affected employees. This Notice must remain posted until the violation(s) cited herein has (have) been abated, or for 3 working days (excluding weekends and Federal holidays), whichever is longer.

**Notification of Corrective Action** - You should notify the U.S. Department of Labor Area Office promptly by letter that you have taken appropriate corrective action within the time frame set forth on this Notice. Please inform the Area Office in writing of the abatement steps you have taken and of their dates, together with adequate supporting documentation, e.g., drawings or photographs of corrected conditions, purchase/work orders related to abatement actions, air sampling results, etc.

**Employer Discrimination Unlawful** - The law prohibits discrimination by any person against an employee for filing a complaint or for exercising any rights under this Act. An employee who believes that he/she has been discriminated against may file a complaint with the U.S. Department of Labor Area Office at the address shown above.

U.S. Department of Labor    Occupational Safety and Health Administration
Washington, D.C. 20210



OCT _ 8 1996    Reply to the Attention of:

Mr. Angel David Morales    *Exhibit -9*
P.O. Box 10551
San Juan, Puerto Rico  00922

Dear Mr. Morales:

The Occupational Safety And Health Administration (OSHA), Office
of Federal Agency Programs, has received your report of alleged
reprisal against you for your occupational safety and health
activities.

The options available to Postal employees who believe they have
been discriminated against for reporting unsafe or unhealthful
working conditions are:

    1.  To have an investigation conducted by their agency.

    2.  To follow agency grievance and arbitration proce-
       dures which have been established to resolve dis-
       putes, differences, disagreements or complaints
       between parties concerning conditions of employment.

Pursuant to item number one (above) we have requested your agency
to conduct an investigation and take appropriate action.  You
should be aware, however, that under Executive Order 12196 and
29 CFR Part 1960, which establish safety and health programs for
Federal employees, OSHA's authority is limited.  Specifically,
OSHA does not have the authority to take remedial action on
behalf of Federal employees who believe that they have suffered
reprisal for reporting unsafe or unhealthful working conditions.
That authority is vested with their employing agency.

We have forwarded your letter to this agency for handling,
however you may also write directly to:

        Ms. Gail Sonneberg
        Vice President
        Human Resources Department
        U.S. Postal Service
        Room 9012
        475 L'Enfant Plaza West, S.W.
        Washington, D.C.  20260-4200

        Telephone:  202-268-3784

Sincerely,

John E. Plummer, Director
Office of Federal Agency Programs

Exhibit-10, Page-1

## SWORN STATEMENT

I, Samuel Cora-Rivera, of legal age, married, property owner and resident of San Lorenzo, Puerto Rico, with Social Security number 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, being duly sworn and state:

1.   That my name and other circumstances are as above indicated.

2.   That I have been employed by the United State Postal Service since May 1993 at Caparra Heights Station.

3.   That I have performed the position of letter carrier and later on as acting supervisor at said station.

4.   That I personally know and was a co-worker and later on supervisor of Mr. Angel David Morales at Caparra Heights Station.

5.   That I personally know Mr. Enrique López who was a Manager at Caparra Heights Station and chief of all employees at said station including Angel David Morales. Also I know William Morales and Eliezer Báez who were my co-workers at Caparra Heights Station.

6.   That I used to socially share with employees William Morales, Eliezer Báez and Manager Enrique López after finishing our tour of duties.

7.   That in two of such reunions I heard Manager Enrique López, employees William Morales and Eliezer Báez when they admitted to have punctured the tires of Mr. Angel David Morales automobile. Also I heard when they admitted they poured sugar into the fuel tank of Mr. Angel David Morales' car.

8.   That I know that Manager Enrique López used to withhold and inspect the private mail of Mr. Angel David Morales that was addressed to the P.O. Box that Mr. Angel David Morales had in Caparra Heights Station.

9.   That Manager Enrique López wanted to know where Mr. Angel David Morales was living.

10.  That Manager Enrique López used to constantly watch Mr. Angel David Morales. In one occasion I remember that López ordered to move Mr. Angel David Morales desk to an area where he and other supervisors could watch him constantly.

11.  That Manager Enrique López persecuted, harassed and was very angry with Mr. Angel Morales. It was known by everybody at the Caparra Heights Station that Manager López was angry due to the complaints that Mr. Angel David Morales had

Exhibit - 10, Page 2

filed with O. S. H. A. (Occupational Safety and Health Administration).

12.   That Manager Enrique López suspended Mr. Angel David Morales because he was

wearing a US Postal Service jacket which had the US Postal Service logo.  Such

suspension was unnecessary since there was no problem with Mr. Morales jacket.

On several occasions I had to wear a jacket due to the cold temperature in the station.

Many employees worn jackets of any kind or with any logo although they weren't

from the Postal Service.  Such employees did not receive any disciplinary action for

wearing those jackets.

13.   That I was present in a supervisors meeting where Manager Enrique López began to

talk in a negative way about Mr. Angel David Morales.  The purpose was to

influence and to set at odds Mr. Luis Hernández against Morales.  Later on, Mr. Luis

Hernández was Manager of Caparra Heights Station for about two months.

14.   That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this19th day of June 2000.

S C R

SAMUEL CORA-RIVERA

AFFIDAVIT NO. _345_

Sworn and subscribed before me by **SAMUEL CORA-RIVERA**, of the above stated

personal circumstances, who I identify by drivers licence number 1145197, this 19th day of June

2000, in San Juan, Puerto Rico.

NOTARY PUBLIC

Exhibit - 99

# SWORN STATEMENT

I, **Alberto Ortíz-Torres**, of legal age, single, property owner and resident of Coamo, Puerto Rico, with Social Security number 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, being duly sworn and state:

1.  That my name and other personal circumstances are as above indicated.

2.  That I have been employed by the United States Postal Service since 1969.

3.  That I personally know Mr. Angel David Morales.

4.  That on or about March 1996 I represented Angel David Morales as a Union Shop Steward in a letter of warning given to him by Supervisor Enrique López. That on or about March 1996 I had a meeting with Supervisor Enrique López in order to settled or resolve the above mentioned letter of warning given to Angel David Morales. Supervisor Enrique López answer was that he was not going to withdraw the letter of warning because Morales has filed an EEO and OSHA complaints against him. Also Supervisor Enrique Lopez said that Morales was "fucking up" a lot with his EEO and OSHA complaints and that from now on supervisor Lopez was going to take care of Morales and watch him very closely.

5.  That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this 4th day of November 2005.

_____
**ALBERTO ORTIZ-TORRES**

Affidavit # _561_

Sworn and subscribed before me by **Alberto Ortiz-Torres**, of the above circumstances, who I identify by drivers license number 971097. In San Juan, Puerto Rico, this 4th day of November 2005.

_____
**NOTARY PUBLIC**

Exhibit -12, Page-1

# SWORN STATEMENT

I, **Carmelo Montañez**, of legal age, married, property owner and resident of Caguas, Puerto Rico, with Social Security number 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, being duly sworn and state:

1.  That my name and other personal circumstances are as above indicated.

2.  That I have been employed by the United States Postal Service since 1988.

3.  That I worked in Caparra Heights Station form 1991 to January 2002 as a letter carrier.

4.  That I personally know and was co-worker of Mr. Angel David Morales at Caparra Heights Station.

5.   That the undersigned is currently the President of the National Association of Letter Carriers Branch 869 Puerto Rico.

6.  That Manager José Sepúlveda and Supervisor Enrique López discriminated and retaliated in any manner to employees that dare to complaints against them in the EEO office, union grievance or any other forum.

7.  That the procedure to retaliate against an employee was to cover up his retaliatory and illegal practices behind a cloak of legality always alleging that any action taken against the target employee was made for the better efficiency of postal operation using this as a pretext.

8.  That as an example of the above, on or about January of 1995, in order to improve the efficiency of the postal service, I asked manager Sepúlveda to change my days off from rotating to Saturday and Sunday since all the clients in my letter carrier route were stores, shops and business that were

Exhibit (12) page-2

closed on Saturdays. I was not able to deliver letters in my route on Saturday because all my clients were closed.

9. That Manager Sepúlveda refused to change my days off notwithstanding that the postal service were loosing money because I could not deliver any letter on Saturdays and the postal service was paying me for nothing to do.

10. That I decided to go to the District manager Odarit Tirado who was manager's Sepúlveda superior by that time. District manager Odarit Tirado accepted and found very logical my point of view and he decided to order manager Sepúlveda to change my days off to Saturday and Sunday.

11. That after manager Sepúlveda received the order from District Manager Odarit Tirado, he (Sepúlveda) became very angry and requested me to meet him in his office. Once I was in his office he threatened me saying "now that we are alone and have no witness I am not going to rest until I kick you out of here". After this, persecution against me was on a daily basis up to the point that Manager Sepúlveda decided to abolish my assigned position as a letter carrier.

12. That I decided to file a grievance in which a hearing was held on May 31, 1996, before arbitrator Roger E. Maher. Supervisor Enrique López served as a witness to the manager José Sepúlveda. In said hearing, the postal service used as a pretext that:

> "The employer shall have the exclusive right subject to the provisions of this Agreement and consistent with applicable laws and regulations; a) to direct employees of the Employer in the performance of official duties; b) to hire, promote, transfer, assign, and retain employees in positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary actions

Exhibit 12, Page 3

> *against such employees;  c) to maintain the efficiency of the operations entrusted to it; d) to determine the methods, means and personnel by which such operations are to be conducted."*

13.   However, arbitrator Roger E. Maher found that manager Sepúlveda abolished my position in retaliation for going over his head when he stay:

> *"However, the NALC's direct testimony and indirect evidence clearly establish that the inspection of the Grievant's route was tainted by the station manager's animus towards the Grievant. This evidence strongly suggest that the station manager intended and deliberately sought to abolish the Grievant's route by using a route inspection as retaliation because the Grievant sought and was granted Saturdays off by Post Master Tirado over his objections. Clearly station manager, Sepúlveda, did not order the route inspections because he was interested in maintaining the efficiency of the operation.*

14.   USPS Manager José Sepúlveda used to take as a pretext a legitimate mean for an illegitimate purpose.  In the above mentioned case the opinion of the Arbitrator about José Sepúlveda's decision over the grievant to abolish Route 54 and reduce it to an auxiliary route in accordance to Article 3 of the National Agreement (Management's Rights) at page 9 is as follows:

> *"The Arbitrator could expound further on the minutia of both route inspections and the inspector s failure to properly inspect the Grievant's route pursuant to the M-39 Handbook regulations. However he believes it is unnecessary upon his finding that the USPS's grounds for a route inspection in this instant matter was arbitrary and capricious because the credible testimony established the station manager's personal animus towards the Grievant.*
>
> *The mendacious position of the USPS on behalf of the station manager, who did no appear at the hearing, that the route inspections of the Grievant were done in good faith, pursuant to the M-39 Handbook an that it's determination in this instance was a management right guaranteed by the contract is simply incredulous and of no value, especially when it was established that management used its right as a retaliatory weapon to inflict*

hardship upon the Grievant because of his temerity to ask and be granted Saturdays off.

The convincing testimony and evidence established that the decision to inspect the Grievant's route was intended for retaliatory purposes. The Arbitrator holds the USPS can not use the guise of maintaining efficiency, its contract right, when it has been shown by convincing testimony and evidence that the decision to inspect the Grievant's route was purposely for retaliatory purposes."

15.    It is my understanding and personal experience that Manager José Sepúlveda and Enrique López used management's rights as a retaliatory weapon in a vengeful manner towards any employee whom he has a problem with EEO.

16.    That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this 4th day of November 2005.

_____
**CARMELO MONTAÑEZ**

Affidavit # 544

Sworn and subscribed before me by **Carmelo Montañez**, of the above circumstances, who I identify by drivers license number 1530331. In San Juan, Puerto Rico, this 4th day of November 2005.

_____
**NOTARY PUBLIC**

Exhibit-13, Page 1

# SWORN STATEMENT

I, **Raymond Ruiz Vega**, of legal age, married, property owner and resident of Toa Baja, Puerto Rico, with Social Security number 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, being duly sworn and state:

1. That my name and other personal circumstances are as above indicated.

2. That I have been employed by the United States Postal Service since 1989 to present.

3. That I worked in Caparra Heights Station from 1995 to present.

4. That I personally know and was co-worker of Mr. Angel David Morales.

5. That I was witness and can testify of several discrimination and retaliation practices committed by Supervisor Enrique López against Angel David Morales due to Morales EEO and OSHA complaints, however I was never interviewed by the EEO office.

6. That it was well known by workers in Caparra Station the animosity of Supervisor Enrique López against Angel David Morales for Morales EEO's and OSHA complaints.

7. That on May 18, 1996 I was present when Supervisor Enrique López said in an angry manner that ***"because somebody have filed and EEO complaint against me, now everybody must use timecard and punch in each time an employee takes a break".***

8. That on or about May 1996 Supevisor Enrique López remove Angel David Morales from his duties as Postage Due Clerk, Business Reply Mail Clerk and Express Mail Clerk alleging that from now on all employees were going to rotate their respective duties with all other clerks, however I noticed that



Exhibit 13, Page 2

this was only a pretext to make harm (due to his right arm condition)and discriminate against Angel David Morales since López only rotate Morales' duties mostly to Mayra Irene.  No other employee was removed from his regular duties, only Angel David Morales was removed.  For instance, I was never removed or rotated to do other duties I was historically assigned to do. Neither any other employee were removed or rotated.

9.     Angel David Morales never left accumulate his work as a postage due clerk, business reply mail clerk and express mail clerk since Morales almost never was absent, in fact Morales was the clerk with best assistance record.  When Morales were on vacation, there were other employees like Hector Ortiz, Mario Izquierdo or Porfirio Aviles that performed Morales duties without causing any delay.  This was in that way for several years without causing any problems until Supervisor Enrique López began to discriminate and retaliate Morales.  In fact the business reply, express mail and postage due work began to accumulate when Supervisor Enrique López removed Morales from his regular duties.

10.    That I can also testify about the preferences by Supervisor Enrique López in favor of co-worker Mayra Irene at such point that this affected the postal operations and caused undue hardship to other male workers.

11.    That Mayra Irene's tour of duty was from 8:00 a.m. to 5:00 p.m. and she almost always arrived late to Caparra Station.

12.    That notwithstanding that Mayra Irene almost always arrived late, she had the guts and bare face of taking a breakfast in the swing room after she

Exhibit 13, Page 3

punched in her time card.  All of this were allowed and promoted by
Supervisor Enrique López; however this behavior was not tolerated to any
other employees specially males employees.  Mayra Irene took her lunch
break at about 11:00 a.m. or 11:30 a.m. this is three or three hours and a
half after she begins her tour of duty at 8:00 a.m.  Then she took more coffee
breaks during the afternoon, always abusing of her coffee breaks and with
the knowledge of Supervisor Enrique López.  In fact most of the coffee
breaks taken by Mayra Irene were taken in the Enrique López office while
she had fun with Supervisor López.

13.    That even though almost all clerks were distribution and window clerk, the
duties among the clerks in Caparra Station were assigned according to their
tour of duties.  For instance, clerks that begins their tour of duties at 5:30
a.m. (like Morales) were assigned to do distribution clerk duties since it was
better for the Postal operations to do such duties early in the morning.
Employees that begans their tour at 8:00 a.m. (like Mayra Irene) were
assigned to window clerk duties because windows operations began at 8:00
a.m. This is why it was very impractical to change duties to any clerk that
began his duties early in the morning like Morales.

14.    That on August 24, 1996 Supervisor Enrique López reunited me and co-
worker Angel David Morales in order to warn us that he was going to watch
us very close but specially Morales.  Supervisor Enrique López said that he
was going to check our coffee breaks.  Also he said to Morales in an angry
manner *"you think you are very smart because you filed an EEO*

*Exhibit 13, Page 4*

*complaint against me"* co-worker Morales told him several times that *"please do not mention the EEO complaints in this meeting because that only shows that you make your decisions against me because the E.E.O. issue and that issue does not have anything to do with this".* But supervisor Lopez continued speaking about the E.E.O. issue in my presence. However Supervisor Enrique López allowed co-worker Mayra Irene to abuse her coffee breaks.

15.    That the secretary's day was never celebrated in Caparra Station because it was not an official holiday and we at Caparra did not have any secretary.

16.    That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this 7th day of November 2005.

*(signature)*

**RAYMOND RUIZ VEGA**

Affidavit # -547-

Sworn and subscribed before me by **Raymond Ruiz Vega**, of the above circumstances, who I identify by drivers license number 1272926. In San Juan, Puerto Rico, this 7th day of November 2005.

*(signature)*

**NOTARY PUBLIC**

*(notary seal: GERMAN ROBERTO ANTONIO MONROIG POMALES — ABOGADO-NOTARIO)*

# SWORN STATEMENT    Exhibit-14, Page 1

I, **Howard Hall Ramírez**, of legal age, married, property owner and resident of Carolina, Puerto Rico, with Social Security number 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, being duly sworn and state:

1.  That my name and other personal circumstances are as above indicated.

2.  That I have been employed by the United States Postal Service since 1989 to present.

3.  That I worked in Caparra Heights Station from 1993 to 1997.

4.  That I personally know and was co-worker of Mr. Angel David Morales.

5.  That I was witness and can testify of several discrimination and retaliation practices committed by Supervisor Enrique López against Angel David Morales due to Morales EEO and OSHA complaint, however I was never interviewed by the EEO office.

6.  That it was well known by workers in Caparra Station the animosity of Supervisor Enrique López against Angel David Morales for Morales EEO's and OSHA complaints.

7.  That by on or about May 1996 Supevisor Enrique López remove Angel David Morales from his duties as Postage Due Clerk, Business Reply Mail Clerk and Express Mail Clerk alleging that from now on all employees were going to rotate their respective duties with all other clerks however I noticed that this was only a pretext to make harm (due to his right arm condition) and discriminate against Angel David Morales since López only rotate Morales' duties mostly to Mayra Irene. No other employee was removed from his regular duties, only Angel David Morales was removed. For instance, I was never removed or rotated from my duties as a mark up clerk. Neither any other employee were removed or rotated.

8.  That Angel David Morales never left accumulate his work as a postage due

clerk, business reply mail clerk and express mail clerk since Morales almost never was absent, in fact Morales was the clerk with best assistance record. When Morales were on vacation, there were other employees like Hector Ortiz, Mario Izquierdo or Porfirio Aviles that performed Morales duties without causing any delay. This was in that way for several years without causing any problems until Supervisor Enrique López began to discriminate and retaliate Morales. In fact, the business reply, express mail and postage due work began to accumulate when Supervisor Enrique López removed Morales from his regular duties.

9.    That I can also testify about the preferences by Supervisor Enrique López in favor of co-worker Mayra Irene at such point that this affected the postal operations and caused undue hardship to other male workers.

10.   That Mayra Irene's tour of duty was from 8:00 a.m. to 5:00 p.m. and she almost always arrived late to Caparra Station.

11.   That notwithstanding that Mayra Irene almost always arrived late, she had the guts and bare face of taking a breakfast in the swing room after she punched in her time card. All of this were allowed and promoted by Supervisor Enrique López, however this behavior was not tolerated to any other employees specially males employees. Mayra Irene capriciously took her lunch break at about 11:00 a.m. or 11:30 a.m. this is three or three hours and a half after she begins her tour of duty at 8:00 a.m. affecting in that way the lunch breaks of other employees like me which began their tour of duties at 5:30 a.m. or 6:00 a.m. Then she took more coffee breaks during the afternoon, always abusing of her coffee breaks and with the knowledge of Supervisor Enrique López. In fact, most of the coffee breaks taken by Mayra Irene were taken in the Enrique López office while she had fun with Supervisor López.

12.    That even though almost all clerks were distribution and window clerk, the duties among the clerks in Caparra Station were assigned according to their tour of duties. For instance clerks that begins their tour of duties at 5:30 a.m. (like Morales) were assigned to do distribution clerk duties since it was better for the Postal operations to do such duties early in the morning. Employees that begans their tour at 8:00 a.m. (like Mayra Irene) were assigned to window clerk duties because windows operations began at 8:00 a.m. This is why it was very impractical to change duties to any clerk that began his duties early in the morning like Morales.

13.    That the secretary's day was never celebrated in Caparra Station because it was not an official holiday and we at Caparra did not have any secretary.

14.    That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this 7th day of November 2005.

HOWARD HALL-RAMIREZ

Affidavit #  562

Sworn and subscribed before me by **Howard Hall-Ramirez**, of the above circumstances, who I identify by drivers license number 1961735. In San Juan, Puerto Rico, this 7th day of November 2005.

NOTARY PUBLIC

Exhibit –15

| CAPARRA HEIGHTS STATION | | | | | CLERKS DAILY WORKSHEET | | | | | | |
| DAY: | | | DATE: | | | A/P | | P/P | | WK | |
| LDC | NAME | H/W | OT | POT | 45 | 43 | 44 | 48 | A/L | S/L | SDO |
| 48 | ALVAREZ, A. | | | | | | | | | | SAT/SUN |
| 48 | CALDERA, LA. | | | | | | | | | | SUN/WED |
| 48 | COLLADO, J. | | | | | | | | | | SAT/SUN |
| 48 | COLON, JU. | | | | | | | | | | SAT/SUN |
| 48 | HALL, H. | | | | | | | | | | SUN/THU |
| 48 | IRENE, M. | | | | | | | | | | SUN/MON |
| 48 | IZQUIERDO, M. | | | | | | | | | | SAT/SUN |
| 48 | LOPEZ, AM. | | | | | | | | | | SUN/WED |
| 48 | MALDONADO, R. | | | | | | | | | | SUN/MON |
| 48 | MORALES, AD. | | | | | | | | | | SUN/MON |
| 48 | MURIEL, N. | | | | | | | | | | SUN/FRI |
| 48 | NIEVES, M. | | | | | | | | | | SUN/TUE |
| 48 | ORTIZ, H. | | | | | | | | | | SAT/SUN |
| 48 | PADRO, JA. | | | | | | | | | | SUN/TUE |
| 48 | PERIERA, AM. | | | | | | | | | | SAT/SUN |
| 48 | RAMOS, L. | | | | | | | | | | SUN/MON |
| 48 | RUIZ, R. | | | | | | | | | | SUN/FRI |
| 48 | SIERRA, R. | | | | | | | | | | SUN/TUE |
| 48 | | | | | | | | | | | |
| 48 | | | | | | | | | | | SUN/WED |
| 48 | | | | | | | | | | | |
| | | | | | | | | | | | |
| | MAILHANDLER | | | | | | | | | | |
| 48 | FUENTES, O. | | | | | | | | | | SUN/TUE |
| 48 | NEGRON, H. | | | | | | | | | | SAT/SUN |
| | TOTAL HRS | | | | | | | | | | |
| | CUSTODIAL | | | | | | | | | | SAT/SUN |
| 38 | BIRRIEL, E. | | | | | | | | | | |
| | REHABILITATION | | | | | | | | | | SAT/SUN |
| 69 | PAGAN, I. | | | | | | | | | | |

Santos Jose ⟩ Special Delivery
Luis Pratts
T.I. Garcia

Exhibit - 16

# Working Meals

## Definition

Working meals include lunch and dinner served for the purpose of continuing official Postal Service business meetings at the meeting site (on-site or off Postal Service premises) with Postal Service employees or with a mix of Postal Service employees and individuals representing outside organizations (not primarily contractors). *When practicable, schedule business meetings to preclude overlapping the normal lunch or dinner period.*

## Approval

Officers and PCES executives may authorize Postal Service funds to purchase and pay for working meals. All purchase requests (e.g., PS Form 7381, *Requisition for Supplies, Services, or Equipment)* must clearly state the business necessity for continuing the meeting through the meal period. The benefit to be derived by the Postal Service must be indicated.

## Exclusions

The following exclusions apply:

1. Purchase and payment of refreshments and working meals from Postal Service funds is not authorized for routine meetings such as weekly or biweekly staff meetings.

2. Purchase and payment of refreshments and working meals from Postal Service funds is not authorized for retirement parties, holiday gatherings, events for employees changing assignments, and gatherings celebrating personal events such as secretary's day, birthdays, weddings, anniversaries, and births. These are not considered to be official Postal Service functions.

## Exceptions

The following exceptions apply:

1. Officers and PCES managers may authorize Postal Service funds to purchase and pay for meals (breakfast, lunch, or dinner) for employee recognition and group appreciation meetings.

2. Officers may authorize Postal Service funds to purchase and pay for refreshments or meals (breakfast, lunch, or dinner) to recognize a postmaster appointment.

3. Officers may authorize Postal Service funds to purchase and pay for alcohol to be served in conjunction with officer-approved functions. The vice president, controller, Finance, may designate additional individuals to authorize these funds.

Management Instruction FM-640-2001-4

Page 7
US Postal Service

*Report from OSHA Inspector Efigenio Rivera* (handwritten)

Fri Dec 13, 1996 11:14am
Inspection Nr. 300653607

CLOSING CONFERENCE NOTES:  *Exhibit - 17* (handwritten)

Were any unusual circumstances encountered such as, but not limited to, abatement problems, expected contest and/or negative employer attitude? If yes, explain below.

[x] Yes    [ ] No

At least on two occasions during the walkaround, Mr. ___ ( ___ had questioned our motives to be there (he had already done so during the OC). During the closing conference (CC), I proceeded to once again, explain the reason of our presence there and told both Mr. ___ and Mr. ___ that even though the agency had sent us photos of the conditions apparently corrected, at the time of this inspection only one item (citation 1, item 1) was in fact abated. Mr. ___ then proceeded to say that I was not paying attention to his argument, that we were (CSHO ___ and ___ ) on a "witch hunt", that he felt that this alleged employee that had called us was setting him up, and that the conditions we were observing that day were as a result of strenuous circumstances. He said that the employee who was reporting or would report a false condition to us will be severely punished. ___ explained to him the rights of the employees to present to us what they consider to be a hazard, whether it is or not, and that no reprisal should be taken against any employee for exercising his right to complaint to us.

During the walkaround (W/A), Mr. ___ said that the reason for the inside storage room not being organized as the inside passageways be blocked was because a private contractor was repairing a broken glass window, inside the room. He also stated that the access to the storage room was blocked to prevent employees from entering the room as they were not authorized to do so. Moreover, he stated that he had the only key to that storage and that if an employee needed any particular form or supply stored in that room, he will get it for him/her, but that the employee will not enter the room. However, while interviewing an "ee", the "ee" stated he would enter daily, if needed, into the storage room to get forms for the employees and that he had a key to the storage room.

Also, during the W/A, Mr. ___ had indicated that employees wearing dust masks were going to be severely admonished/punished because they, by USPS rules, are not to be using masks unless so recommended by their physician. This comment came as a result of various employees wearing dust masks allegedly due to the dusty conditions of the workplace. However, an employee interviewed during the inspection stated that the dust mask was using had been provided by Mr. ___

Concerning the outside storage area, he stated that due to the high volume of packages received due to the holiday season it was practically impossible to have the area better organized. However, while we (the CSHOs) had been interviewing some employees, the area had been organized. That action was considered a CDI (Corrected During Inspection).

As I was explaining to Mr. ___ and Mr. ___ the conditions we had observed and what was needed to correct them, Mr. ___ continued to interrupt me until such point at which CSHO ___ suggested I continued the discussion of the conditions observed (in other words, to ignore Mr. ___ allegations). Nevertheless, Mr. ___ continued to indicate that we were there because of the alleged call; at that point, I said to Mr. ___ that it was apparent that we should address what was left of the CC with Mr. ___. CSHO ___ proceeded to state that he felt insulted because Mr. ___ had called him a liar and that there was not reason for him, a GS-12 Federal employee, to lie about the reasons why we were there. After discussing abatement and abatement periods with Mr. ___, the CC was concluded.

19. Closing Conference Checklist ("x" as appropriate)

[ ] No Violations Observed

[ ] Gave Copy Employer Rights

[x] Reviewed Hazards & Standards

[x] Discuss Employer Rights/Obligations

OSHA-1A(Rev.)

Exhibit-18, Page-1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANGEL DAVID MORALES-VALLELLANES,                    :

                    Plaintiff,                      :

          v.                                        :        Civil No.

UNITED STATES POSTAL SERVICE, MARVIN                :        97-2459 (HL)
T. RUNYON, POSTMASTER GENERAL; UNITED
STATES DEPARTMENT OF LABOR-OCCUPATIONAL             :
SAFETY AND HEALTH ADMINISTRATION (OSHA),
U.S. ATTORNEY GENERAL, AMERICAN POSTAL              :
WORKERS UNION, PUERTO RICO AREA LOCAL
(APWU-PRAL) AFL-CIO, DANIEL SOTO,                   :
PRESIDENT APWU-PRAL; ENRIQUE LOPEZ,
                                                    :
                    Defendants.
-----------------------------------------------:

### CODEFENDANT U.S. DEPARTMENT OF LABOR'S
### MOTION TO DISMISS AND/OR FOR SUMMARY JUDGMENT

To:  Honorable Hector M. Laffitte, U.S.D.J.
     U.S. District Court for the District of Puerto Rico
     Federico Degetau Federal building
     150 Carlos Chardón Avenue
     Hato Rey, Puerto Rico 00918

     COMES NOW, the codefendant U.S. Department of Labor-

Occupational Safety and Health Administration, which moves pursuant

to Rule 12(b)(1), 12(b)(6) and 56 of the Federal Rules of Civil

Procedure for an Order dismissing codefendant U.S. Department of

Exhibit -18, Page -2

certain evaluations and recommendations with respect to the programs of the various agencies. In addition, each Federal agency -- as well as OSHA -- is authorized to conduct inspections at the agency premises and ensure abatement of safety and health hazards. The provisions of Section 19 of the Act and the corresponding regulations are applicable to the USPS. See 29 CFR § 1960.2(b).

With respect to private sector employees, Section 11(c)(1) of the Act provides that "[n]o person shall discharge or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this Act...or because of the exercise by such employee on behalf of himself or others of any right afforded by this Act." 28 U.S.C. §660(c)(1). The Act does not contain a similar provision for federal employees. However, the Department of Labor has developed an internal policy to process discrimination/retaliation complaints from federal employees who are not otherwise subject to the provisions of Section 11(c) of the Act or the Civil Service Reform Act. The Department of Labor's internal policy provides as follows: "Reports of reprisal or discrimination from Federal employees who are not covered by the Special Counsel, should be sent to the Designated Agency Safety and Health Officer" (See OSHA Instruction FAP 1.3(5)(b) annexed hereto as Exhibit B).[4] The Department of Labor in issuing this internal

---

[4]In order to seek protection from the discriminatory actions of their supervisors as a result of safety activities at the
(continued...)

Exhibit-18, Page-3

ANGEL DAVID MORALES-VALLELLANES vs.
 U.S. Postal Service, et al. - CV 97-2459 (HL)
               Page 15

directive   has   exercised   its   discretion   consistent   with   the

regulatory  scheme  to  promote  the  policy  of  the  United  States

---

[4](...continued)
workplace, postal employees may only resort to the internal
protections provided by the USPS. Most employees of the federal
government otherwise enjoy protection from prohibited personnel
practices (e.g., discrimination/retaliation) which occur as a
result of reporting violations of law or regulation pursuant to the
Whistle blower Protection Act, 5 U.S.C. §§ 1221 et seq., which
authorizes the employee to bring an independent action before the
Merit Systems Protection Board. See 5 U.S.C. § 1221. Many federal
employees are also able to file a complaint of reprisal or
discrimination with the Office of Special Counsel which also has
jurisdiction to "receive and investigate allegations of prohibited
personnel practices". See 5 U.S.C. § 1212. Pursuant to 5 U.S.C.
§ 2302, however, the Civil Service Reform Act only provides
protection against specified "personnel actions" with respect to an
employee in, or applicant for, a covered position "in an agency".
The Federal Circuit has held that the definition of "agency" in
§2302(a)(2)(c) "does not include the United States Postal Service
which is specifically excluded from the generally applicable
definition of 'executive agency' in 5 U.S.C. §105 ... It is a
unique entity. Where Congress intended the Postal Service to be
included within the definition of agency or to be subject to
particular provision of Title 5, it explicitly so provided."
Booker v. Merit Systems Protection Board, 982 F.2d 517, 519 (Fed.
Cir. 1992). Accordingly, employees of the USPS are not covered by
the Whistle blower Protection Act and are outside the jurisdiction
of the Office of Special Counsel.
       On February 26, 1980 Executive Order 12196 was issued. This
Executive order states: "[t]he head of each agency shall establish
procedures to assure that no employee is subject to restraint,
interference, coercion, discrimination or reprisal for filing a
report of an unsafe or unhealthy working condition or other
participation in agency occupational safety and health program
activities." Pursuant to this Executive Order regulations which
effect all executive agencies, including USPS employees, were
issued at 29 C.F.R. Part 1960. Pursuant to these regulations and
the Executive Order, the Postal Service is required to establish
procedures to safeguard its employees from reprisals taken as a
result of the employee's exercise of any right afforded by section
19 of the Act. See Executive Order 12196 (February 26, 1980); 29
C.F.R. § 1960.46. Consequently, the procedures which the USPS has
instituted pursuant to 29 C.F.R. § 1960.46 are the only protections
available to its employees who believe they are being retaliated
against as a result of safety activities at the workplace.

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

## I. Employee's Action

Area *(Specify Work Location)*

Exhibit 19, Page 1

Describe Hazard, Unsafe Condition or Practice. Recommend Corrective Action.

See ATTacHed PAPeR

| Employee | Signature  *Angel Daniel Morale* | Date and Tour  3/20/95 |
| --- | --- | --- |

## II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. *(If Corrective Action Has Been Taken, Indicate the Date of Abatement.)*

Forward To Maintenance Office

| Supervisor | Signature | Date  3/21/95 |
| --- | --- | --- |

## III. Approving Official's Action
### (Check One and Complete)

| | The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice *(Indicate Date of Abatement)*. |
| --- | --- |
| | A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change: |
| | There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon: |

| Approving Official | Signature | Date | Date Employee Notified |
| --- | --- | --- | --- |

## IV. Maintenance Action *(Complete If Necessary)*

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |
| --- | --- | --- | --- |

PS Form 1767, Dec. 1982      WHITE – Local Safety Office *(After Abatement)*      PINK – Local Safety Office *(Initial Notice)*
YELLOW – Approving Official      BLUE – Employee

Exhibit-19, Page 2

Date: March 19, 1995
To: Supervisor Juan Rodríguez and / or Maniger José Sepúlveda
From: Angel D. Morales, Distribution Clerk
Subject: Report of Hazard, Unsafe Condition or Practice

Due to lack of maintenance personnel, the cleaning process in a lot of places at Caparra Station have not been done for several years. In consecuence, the accumulation of dust, fungus, mice and rats, cockroach eggs and excrements, in addition to others, have done a very polluted environment of inminent danger. The white air conditioner filters are changed frequently and in just 24 hours it takes the dust color, showing the very high density of particles in the air that sometimes seems like a fog or cloud. The air conditioner is recycling the same dusted air causing this fog phenomenon. The registry section have accumulated great quantities of dust in the roof. When somebody open, close or hit the door, the cage roof shake provoking a "rain" of dust that falls over the people working at the area. This situation is causing me and other employees symptoms like sore throath; eyes, roof of the mouth and throath itching; eye irritation and respiratory problems. These health problems are being presented by most of the employees in this station.

As a corrective action I am requesting:

1. Dust measure test in order to know the range of contamination in this "sick building". Although I know that the minimum concentration of dust, even when it is within the OSHA parameters, can cause allergies and illness to sensitive people.

2. A more accurate or effective housekeeping program.

3. At least two more maintenance persons because this station is too big and there are a lot of things to clean for the maintence employee we already have.

Exhibit-19, Page 3          2

4. A ventilation and extraction air conditioner system in order to avoid
   to breath the same polluted air that comes from cars that pass thru
   Roosevelt Avenue causing the dispersing of dust, smoke and fungi
   particles.


                                    Waiting for your reply

                                    Angel D. Morales
                                    Distribution Clerk
                                    U.S Postal Service
                                    Caparra Heights Station 00922

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

### I. Employee's Action

*Exhibit-19, Page 4*

Area (Specify Work Location) SR area and work Floor

Describe Hazard, Unsafe Condition or Practice, Recommend Corrective Action:

I would like to inform that the Capsan Station in health is poor, because the air is always full of dust particle we can smelled. In one year and half that I have work at Capan took more days off by sick leave that all the 5 year working for the Postservice, the mayor reason was throat irritation and are caused by the dust and the poor maintenance of the air co and sitting

| Employee | Signature | Date and Tour |
|---|---|---|
| | Howard Guy | 3/6/95   II |

### II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. (If Corrective Action Has Been Taken, Indicate the Date of Abatement.)

Forward To Maintenance Office

| Supervisor | Signature | Date |
|---|---|---|
| | | 3/21/95 |

### III. Approving Official's Action
#### (Check One and Complete)

| | |
|---|---|
| | The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice. (Indicate Date of Abatement) |
| | A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change: |
| | There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon: |

| Approving Official | Signature | Date | Date Employee Notified |
|---|---|---|---|
| | | | |

### IV. Maintenance Action (Complete If Necessary)

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |
|---|---|---|---|
| | | | |

PS Form 1767    WHITE - Local Safety Office (After Abatement)    PINK - Local Safety Office

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

## I. Employee's Action

Exhibit-19, Page 5

Area (Specify Work Location)

Describe Hazard, Unsafe Condition or Practice. Recommend Corrective Action.

Debido a la falta de personal de limpieza, el area de trabajo se ha ido Acumulando mucho polvo, lo que me esta ocasionando: Alergias, problemas respiratorios, etc. Además debido a que no se fumiga con regularidad se ven ratones y cucarachas alrededor.

| Employee | Signature | Date and Tour |
|---|---|---|
| | V. Rivera | 3/?/?4 |

## II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. (If Corrective Action Has Been Taken, Indicate the Date of Abatement.)

Forward To Maintenance office

| Supervisor | Signature | Date |
|---|---|---|
| | | 3/21/95 |

## III. Approving Official's Action
### (Check One and Complete)

| | The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice (Indicate Date of Abatement) |
|---|---|
| | A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change: |
| | There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon: |

| Approving Official | Signature | Date | Date Employee Notified |
|---|---|---|---|
| | | | |

## IV. Maintenance Action (Complete If Necessary)

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |
|---|---|---|---|
| | | | |

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

(Assigned by Safety Officer)

## I. Employee's Action

Exhibit-19, Page 6

**Area** (Specify Work Location)

Describe Hazard, Unsafe Condition or Practice. Recommend Corrective Action.

DUE TO THE LACK OF UNSUFFICIENT CLEANING MAINTENANCE ON THE STATION, SINCE WE ONLY COUNT WITH ONE CUSTODIAL, THE ACCUMULAT OF DUST AND DIRT HAVE AGGRAVATED MY SINUS CONDITION, CAUSIN ME TO MAKE USE OF MY SICK LEAVE A SEAKING FOR MEDICAL CONSULTATION, AND SPENDING MONEY ON MEDICATIONS.

| Employee | Signature | Date and Tour |
|---|---|---|
| | | 3-8-95  II |

## II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. (If Corrective Action Has Been Taken, Indicate the Date of Abatement.)

FORWARD TO MAINTENANCE office

| Supervisor | Signature | Date |
|---|---|---|
| | | 3/21/95 |

## III. Approving Official's Action
### (Check One and Complete)

The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice (Indicate Date of Abatement)

A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change:

There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon:

| Approving Official | Signature | Date | Date Employee Notified |
|---|---|---|---|
| | | | |

## IV. Maintenance Action (Complete If Necessary)

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |
|---|---|---|---|
| | | | |

PS Form 1767 · · · WHITE – Local Safety Office (After Abatement)   PINK – Local Safety Office
YELLO · · · · · · · · ·   BLUE – Employee

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

Exhibit-19, Page 7

## I. Employee's Action

Area *(Specify Work Location)*

Carolina Heights Station 00977

Describe Hazard, Unsafe Condition or Practice. Recommend Corrective Action.

The Dust, Dirt on Bathrooms etc. Due to not having the correct cleaning Personnel is cause of the problems in allergies, colds and other symptoms in the personnel working in the station. We need more than one person making the Cleaning in the station. Other problem in the station is not enough space for the storage of Boxes or Packages.

| Employee | Signature | Date and Tour |
|---|---|---|
| | *(signature)* | 3-1-95 |

## II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. *(If Corrective Action Has Been Taken, Indicate Date of Abatement.)*

Forward To Maintenance Office

| Supervisor | Signature | Date |
|---|---|---|
| | *(signature)* | 3/21/95 |

## III. Approving Official's Action
*(Check One and Complete)*

The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice *(Indicate Date of Abatement).*

A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change:

There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon:

| Approving Official | Signature | Date | Date Employ Notified |
|---|---|---|---|
| | | | |

## IV. Maintenance Action *(Complete If Necessary)*

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |
|---|---|---|---|
| | | | |

PS Form 1767, Dec 1982    WHITE – Local Safety Office *(After Abatement)*    PINK – Local Safety Office *(Initial Notice)*
YELLOW – Approving Official    BLUE – Employee

# REPORT OF HAZARD, UNSAFE CONDITION OR PRACTICE

(Approved by Safety Office)

### I. Employee's Action

Exhibit - 19, Page 8

Area *(Specify Work Location)*

CLERKS + CARRIER Section

Describe Hazard, Unsafe Condition or Practice, Recommend Corrective Action.

THE SITUATION OF THE CLEANING +DUST AT CAPARRA STATION HAS BEEN THE SAME SINCE 1991, VERY LITTLE HAS BEEN don- TO SOLVE THE PROBLEM. THERE IS ONLY ONE PERSON TO Clef- THE WHOLE STATION. MANY EMPLOYEES HAS become SICK WITH ALLERGIES, COLDS, FEVER SORE THROAT, MOST OF THE TIME, Including ME.

| Employee | Signature *Hector Ortz.* | Date and Tour 3/1/95 |

### II. Supervisor's Action

Recommend or Describe Specific Action Taken to Eliminate the Hazard, Unsafe Condition or Practice. *(If Corrective Action Has Been Taken, Indicate Date of Abatement.)*

Forward To Maintenance Office

| Supervisor | Signature | Date 3/21/95 |

### III. Approving Official's Action
*(Check One and Complete)*

| | The Following Corrective Action was Taken to Eliminate the Hazard, Unsafe Condition or Practice *(Indicate Date of Abatement)* |
| | A Work Order Has Been Submitted to the Manager, Plant Maintenance, to Effect the Following Change: |
| | There Are No Reasonable Grounds to Determine Such a Hazard Exists. This Decision is Based Upon: |

| Approving Official | Signature | Date | Date Employe Notified |

### IV. Maintenance Action *(Complete If Necessary)*

| Maintenance Supervisor | Signature | Date | Date Hazard Abated |

PS Form 1767, Dec. 1982    WHITE—Local Safety Office *(After Abatement)*    PINK—Local Safety Office *(Initial Notice)*
                            YELLOW—Approving Official    BLUE—Employee

MOD Date 4/7/95

1. Complaint Number

2. Employer Name
U.S. Postal Service, Caparra Heights Station          Exhibit-20, Page 1

3. Site Location (Street, City, State, ZIP)
1505 Ave Roosevelt  San Juan  P.R.  00920

4. Mailing Address (If different) (Street, City, State, ZIP)

5. Management Official
Jose Sepulveda

6. Telephone Number
749-4319

7. Type of Business
Deliveries

8. Hazard Description  Describe briefly the hazard(s) which you believe exist  Include the approximate number of employees exposed to or threatened by each hazard

I am reporting a reincidence of a violation founded by OSHA on 7/10/91 Inspection #1798I838 (see attached papers) to U.S. Postal Service at Caparra Heights Stat. Due to lack of maintenance personnel, the cleaning process in a lot of places at Capa Station have not been done for several years. In consequence, the accumulation of dust, fungus, mice and rats, cockroach eggs and excrements, in addition to a lot of dust within the air conditioner conducts, have done a very polluted enviroment of inmin danger. When the air conditioners are changed, it takes just 24 hours to takes th dust color, showing the very high density of particles in the air that sometim seems like a fog or cloud. The air conditioner is recycling the same dusted air causing this fog phenomenon. The Registry section have accumulated great quanti of dust in the Roof. When somebody open, close or hit the door the Registry c Roof shake provoking a rain of dust that falls over the people working at the ar This situation is causing me, other employees and customers symptoms like sore thro eyes, mouth and throath itching, eye irritations and respiratory problems cau A high use of sick leave. These health problems are being presented by most of the employees every weeks, causing absences for sickness every weeks.

I think that as a solution to this problem we need a more accurate or effec house keeping program and at least two more maintenance persons because this st is too big and there are a lot of things to clean for the maintenance emplo we already have.

9. Hazard Location  Specify the particular building or worksite where the alleged violation exists
All the building  Caparra Heights Station

OSHA-7 (Rev. 1/84)

☒ Employer   ☐ Other Government Agency (specify)

**11.** Please indicate your desire

☐ Do not reveal my name to the Employer     ☒ My name may be revealed to the Employer

*Exhibit-20, Page 2*

**12.** The Undersigned (Mark "X" in one box)

☒ Employee

☐ Representative of Employees

☐ Federal Safety and Health Committee

☐ Other (specify) _____

believes that a violation of an Occupational Safety or Health standard exists which is a job safety or health hazard at the establishment named on this form

**13.** Complainant Name (Type or print name)

ANGEL DAVID MORALES

**14.** Telephone Number

789-7157

**15.** Address (Street, City, State, ZIP)

BRISAIDA #35 URB MUÑOZ RIVERA GUAYNABO P.R. 00969

**16.** Signature

*Angel David Morales*

**17.** Date

4/7/95

**18.** If you are an authorized representative of employees affected by this complaint, please state the name of the organization that you represent and your title

Organization Name _____        Your Title _____

**OFFICIAL USE ONLY**

| | | |
|---|---|---|
| **19.** Reporting ID | **20.** Previous Activity?  ☐ Yes  ☐ No  If Yes enter Type ___ Number ___ | **21.** Optional Complaint Number |

| **Identification** | **22.** Establishment Name Change? ☐ | **23.** Site Address Change? ☐ | **24.** Employer ID (Sats x optn) | **25.** City Code | **26.** County Code |
|---|---|---|---|---|---|

| **Receipt Information** | **27.** Received by | **28.** Send OSHA-7?  ☐ Yes  ☐ No | **29.** Date | **30.** Time ___ AM ___ PM a | **31.** Supervisor(s) Assigned  a ___  b ___ |
|---|---|---|---|---|---|

| **Industry & Ownership** | **32.** Primary SIC | **33.** Ownership (Mark "X" in one box)  a ☐ Private Sector  b ☐ Local Government  c ☐ State Government  d ☐ Federal Agency/Code ___ |
|---|---|---|

**Complaint Evaluation**

**34.** Evaluated by _____

**35.** Subject and Severity

Discrimination ☐

| | Imminent Danger | Serious | Other |
|---|---|---|---|
| Safety | ☐ | ☐ | ☐ |
| Health | ☐ | ☐ | ☐ |

**36.** Is This a Valid Complaint?  ☐ Yes  ☐ No

**37.** Formality  ☐ Formal  ☐ Nonformal

**38.** ☐ Migrant Farmworker Camp

**Complaint Action**

**39.** Send Letter

a ☐ No Inspection — for Invalid Complaints
   ☐ Too Vague or Unsubstantiated
   ☐ Recent Inspection or Objective Evidence
   (Date of Inspection ___ )
   ☐ Not in OSHA's Jurisdiction

b ☐ No Inspection — for Nonformal Complaints
   ☐ No Imminent Danger or No Standard
   ☐ No Direct Relation to S&H
   ☐ Not Enough Information To Evaluate

c ☐ OSHA-7 for Signature With Letter
   ☐ Complete or ☐ Partial

d ☐ Nonformal Complaint Notification to Employer
   ☐ Complainant Notified  ☐ Explanation of 11(c)

e ☐ Complainant Notification With Letter d
   ☐ Name Not Revealed  ☐ Explanation of 11(c)

f ☐ Acknowledgement to Complainant (Optional)

g ☐ Other (specify) _____

**40.** Date Letter Sent _____

**41.** Date Response Due (For letters c or d) _____

**42.** Inspection Planned?  ☐ Yes  ☐ No     If Yes Priority ___     If No Reason ___

**43.** Transfer to (Name) _____

**44.** Transfer Date _____

**45.** Transfer to (Category)

a ☐ Federal OSHA/Reporting ID _____

b ☐ State OSH/Reporting ID _____

c ☐ Other Federal Agency/Code _____

d ☐ State/Local Government

e ☐ Other

**46.** Optional Information

| Type | ID | Value | Type | ID | Value |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |

**47.** Total Entries

| **Close Complaint** | **48.** ☐ Close Complaint |
|---|---|

**49.** Comments

**CASE FILE COPY**

OSHA-7 (Rev. 1/84)

**U.S. Department of Labor**

Occupational Safety and Health Administration
Federal Building, Room 559
Carlos Chardon Avenue
Hato Rey, Puerto Rico  00918

Exhibit 21
Page-1



June 9, 1995


Mr. Angel David Morales
#35 Brisaida Street
Urb. Munoz Rivera
Guaynabo, PR  00969

Dear Mr.Morales:

In response to your report alleged hazards in your workplace, the Occupational Safety and Health Administration (OSHA) has sent a letter to your establishment requesting that appropriate action be taken to correct the situation.  Enclosed is a copy of that letter for your information.

We have requested that your Agency provide us with a copy of the investigation findings and actions taken.

Please let me know if the hazard has not been corrected in the time allowed as shown in the enclosed letter to your agency.

We appreciate your continued interest in workplace safety and health.

Sincerely,


Jose A. Carpena
Area Director

Enclosures

/usr/Wp/Ltrs/e74325804ltr

**U.S. Department of Labor**        Occupational Safety and Health Administration
Federal Building, Room 559
Carlos Chardon Avenue
Hato Rey, Puerto Rico 00918



*Exhibit 21, Page 2*

June 9, 1995


Mr. Odarit Tirado, General Postmaster
U.S. Postal Service
P. O. Box 363367
San Juan, PR 00936


Dear Mr. Tirado:

On April 4, 1995, the Occupational Safety and Health Administration (OSHA) received a report of alleged hazardous working conditions in your workplace. The specific nature of the report involves a housekeeping issue concerning accumulation of dust, rodents and roaches, and polluted air at the Caparra Height Station. We notified Mr. Candido Lopez by telephone today, and notified him that we would be faxing a letter stating these alleged hazards. Please be advised that on July 10, 1991 citations were issued for identical type of violations (see attachment #1).

We have not determine whether the hazards, as alleged, exist at Caparra Height Station; and we do not intend to conduct an inspection at this time. However, since allegations of violations have been made, we request that you immediately investigate the alleged conditions and make any necessary corrections or modifications. Please advise me in writing, no later than June 19, 1995 of the results of your investigation. You must provide supporting documentation of your findings, as well as a description of any corrective action you have taken or are in the process of taking.

This letter is not a citation or a notification of proposed penalty which, according to the OSH Act, may be issued only after an inspection or investigation of the workplace. It is our goal to assure that hazards are promptly identified and eliminated. Please take immediate corrective action where needed. We encourage employee participation in investigating and responding to any alleged hazard. **If we do not receive a response from you by the stated date indicating what appropriate action has been taken or that no hazard exists and why, an OSHA inspection will be conducted.** An inspection may include review of the following: injury and illness records, hazard communication, personal protective equipment, emergency action or response, bloodborne pathogens, confined space entry, lockout, and related safety and health issues.

Please note however, that OSHA selects for inspection some cases where we have received letters in which employers have indicated satisfactory corrective action. This is to ensure that employers have actually taken the action stated in their letters.

You are requested to post a copy of this letter where it will be readily accessible for review by all of your employees and return copy of the signed Certificate of Posting (attachment #2) to this office. In addition, you are requested to provide a copy of this letter and your response to it to a representative of any recognized employee union or safety committee, if these are at your facility. Failure to do this may result in an on-site inspection. The complainant has been furnished a copy of this letter and will be advised of your response. Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity.

If you have any questions concerning this matter, please contact me or Madelline Medina at our office. Your personal support and interest in the safety and health of your employees is appreciated.

Sincerely,

José A. Carpena
Area Director

Enclosures

/usr/Wp/Ltrs/743258041tr

Notice of Unsafe or Unhealthful Working Conditions

US Department of Labor – OSHA
US Courthouse & FOB  – Room 559
Carlos Chardon Avenue
Hato Rey, PR  00918

*Exhibit 21, Page-5*

| | |
|---|---|
| 3. Issuance Date | 4. Inspection Number |
| 07/10/91 | 017981838 |
| 5. Reporting ID | 6. CSHO ID |
| 0215300 | R2692 |
| 7. Optional Report No | 8. Page No |
| 327 | 1 of 1 |

The violation(s) described in this Notice are alleged to have occurred on or about the day the Inspection was made unless otherwise indicated within the description given below

| 1. Type of Violation(s): | 2. Notice Number |
|---|---|
| Other | 01 |

10. Inspection Date(s)

11. Inspection Site:      4/25/91 – 4/25/91

9. To:

U.S. Postal Service
GPO Box 3667
San Juan, PR  00936

Caparra Heights Sta., 1505 F. D. Roosevelt Ave.
San Juan, PR  00922

29 CFR Part 1960 requires that a copy of this Notice be posted in a prominent place at or near the location of the violation(s) cited below. This Not posted until the unsafe or unhealthful working conditions have been abated, or for 3 working days (excluding weekends and Federal holidays), whe This Notice describes violations of Federal Regulations. You must abate the violation(s) by the date(s) listed below, or in accordance with an established

| 12. Item Number | | |
|---|---|---|
| 13. Standard, Regulation, or Section of the Executive Order Violated | 14. Description | 15. Date by Which Viol Must Be Abated |
| 1 | | |
| 29 CFR 1910.22(a)(1):  Places of employment were not kept clean and orderly, or in a sanitary condition: | | 07/30/91 |
| | a.  At the U.S. Postal Service, Caparra Heights Station, where the general public is serviced and mail is handled, settled dust was observed all over exposed surfaces, like walls, tables, mail carts, AC ducts, among others. | |
| 2 | | |
| 29 CFR 1910.141(a)(5):   A continuing and effective extermination program was not instituted where rodents, insects or other vermin were detected. | | 07/30/91 |
| | a.  At the U.S. Postal Service, Caparra Heights Station, where the general public is serviced and mail is handled, cockroaches were observed at the employees' rest room. | |

16. Area Director    Francisco Encarnacion – Rosa

NOTICE OF UNSAFE OR UNHEALTHFUL WORKING CONDITIONS

ESTABLISHMENT OFFICIAL

Exhibit - 21, PAge 6

## CERTIFICATE OF POSTING
## OSHA NOTIFICATION OF ALLEGED HAZARD(S)


Employer Name:
Complaint Number:

Date of Posting:

Date Copy Given to
an Employee Representative:


On behalf of the employer, I certify that a copy of the complaint letter received from the
Occupational Safety and Health Administration (OSHA) has been posted in a conspicuous place,
where all affected employees will have notice, or near such location where the violation
occurred, and such notice has been given to each authorized representative of affective
employees, if any. This notice was or will be posted for a minimum of ten (10) working days
or until any hazardous conditions found are corrected.


Signature


Title

**U.S. Department of Labor**

Occupational Safety and Health Administration
Federal Building, Room 559
Carlos Chardon Avenue
Hato Rey, Puerto Rico 00918

Exhibit -21, Page 7

June 9, 1995

Mr. Candido Lopez
Safety Manager
U.S. Postal Service
Human Resources Room 109
GMF San Juan, PR 00936-9441

Dear Mr. Lopez:

On April 4, 1995, the Occupational Safety and Health Administration (OSHA) received a report of alleged hazardous working conditions in your workplace. The specific nature of the report involves a housekeeping issue concerning accumulation of dust, rodents and roaches, and polluted air at the Caparra Height Station. We notified you by telephone today, and advised you that we would be faxing a letter stating these alleged hazards. Please be advised that on July 10, 1991 citations were issued for identical type of violations (see attachment #1). Also, a letter was sent today to Mr. Odarit Tirado pertaining this matter.

We have not determine whether the hazards, as alleged, exist at Caparra Height Station; and we do not intend to conduct an inspection at this time. However, since allegations of violations have been made, we request that you immediately investigate the alleged conditions and make any necessary corrections or modifications. Please advise me in writing, no later than June 19, 1995 of the results of your investigation. You must provide supporting documentation of your findings, as well as a description of any corrective action you have taken or are in the process of taking.

This letter is not a citation or a notification of proposed penalty which, according to the OSH Act, may be issued only after an inspection or investigation of the workplace. It is our goal to assure that hazards are promptly identified and eliminated. Please take immediate corrective action where needed. We encourage employee participation in investigating and responding to any alleged hazard. **If we do not receive a response from you by the stated date indicating what appropriate action has been taken or that no hazard exists and why, an OSHA inspection will be conducted.** An inspection may include review of the following: injury and illness records, hazard communication, personal protective equipment, emergency action or response, bloodborne pathogens, confined space entry, lockout, and related safety and health issues.

Please note however, that OSHA selects for inspection some cases where we have received letters in which employers have indicated satisfactory corrective action. This is to ensure that employers have actually taken the action stated in their letters.

*Exhibit-21, Page 8*

You are requested to post a copy of this letter where it will be readily accessible for review by all of your employees and return copy of the signed Certificate of Posting (attachment #2) to this office. In addition, you are requested to provide a copy of this letter and your response to it to a representative of any recognized employee union or safety committee, if these are at your facility. Failure to do this may result in an on-site inspection. The complainant has been furnished a copy of this letter and will be advised of your response. Section 11(c) of the OSH Act provides protection for employees against discrimination because of their involvement in protected safety and health related activity.

If you have any questions concerning this matter, please contact me or Madelline Medina at our office. Your personal support and interest in the safety and health of your employees is appreciated.

Sincerely,

Jose A. Carpena
Area Director

Enclosures

/usr/Wp/Ltrs/74325804ltr

Exhibit-22

Date: August 1, 1995
To: José A. Carpena (Area Director)
Occupational Safety and Health Administration
Federal Building, Room 559
Carlos Chardón Avenue
Hato Rey, P.R.  00918


Dear Mr. Carpena:

Enclosed you will find your letter sent to me for your reference.

The purpose of this letter is to inform you that the safety hazard condition at Caparra Heights Post Office have not been corrected. Letter sended to you from Post Master Odarit Tirado (See enclosed copy) is not correct and is not telling the truth. In addition, they never posted your letter regarding safety violation on bulletin boards as the law require, neither gave a copy to union representative.

As a result, I am requesting that O.S.H.A should follow the investigation and make a visit to Caparra Post Office to investigate what we are suffering.


                                        sincerely:

                        Angel David Morales

                        Angel David Morales

Exhibit-23, Page 1

# SWORN STATEMENT

I, **Angel David Morales-Vallellanes**, of legal age, single, property owner and resident of Guaynabo, Puerto Rico, with Social Security number 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, being duly sworn and state:

1.    That my name and other personal circumstances are as above indicated.

2.    That I was employed by the United States Postal Service since 1988 to 1997.

3.    That I worked in Caparra Heights Station since 1990 to 1997.

4.    That I was victim of several brutal acts by the US Postal Service by management and Supervisors like José Sepúlveda, John Malavé, Enrique López, Frank Girau, Carmen Rosa etc. in retaliation and discrimination due to complaints I filed in OSHA and the EEO office.

5.    That among this retaliation acts were included criminal acts like to puncture the tires of my car several times, pour sugar in the fuel tank of my car, dead threats, removal of my job duties, suspensions, expulsions, humiliations, etc.

6.    That It was well known by workers of Caparra Station the animosity of Supervisor Enrique López against me for my complaints. Supervisor Enrique López did not made an effort to hide his fury against me for my EEO and OSHA complaints, in fact, on several occasions López expressed clearly in front of other co-workers his fury and animosity for OSHA and EEO complaints. I am including several Sworn Statements by co-workers: Howard Hall; Raymond Ruíz; Samuel Cora; Carmelo Montañez; Alberto Ortíz and OSHA inspector Efigenio Rivera that confirms my allegations.

ADMV

Exhibit -23, Page 2

7. That at all times Supervisor Enrique López and all management in the Caparra Station were aware of my involvement in OSHA complaints due to the poor unsanitary conditions in Caparra Heights Station. As early as June 8, 1995, Supervisor Enrique López and me were involved in a safety inspection done by USPS Safety officer Elizabeth Rivera (See Exhibit 3, page 4). In such inspection I told Elizabeth Rivera in presence of Supervisor López about all the unsanitary conditions in Caparra Station and about my complaint in OSHA that I filed on April 7, 1995. Supervisor López got very angry and whispered in my ear *"sooner of later I am going to take care of you and you are going to pay for this".*

8. That few days after I spoke to Manager José Sepúlveda about my OSHA complaints and in retaliation for the previous EEO I filed against him, Sepúlveda ordered to change the days off of Job Id 2541417 from Saturday and Sunday to Sunday and Thursday. Such job position was awarded to employee Antonio Lopez who was a very junior employee that later were going to accuse me of a Safety Hazard and homosexual, making the dirty job in this way to the US Postal Management together with supervisor "Lopez" and Manager Sepulveda. Antonio López was identified by Samuel Cora as one of the employees that unlawfully open my private mail. (see exhibit 10) Employee Antonio López was later rewarded with a position of acting supervisor.

9. Management at Caparra knew that I was very interested and that I was waiting for several years a position with Saturday and Sunday. Manager

ADMV

Exhibit-23, Page 3

José Sepúlveda and Supervisors Juan Rodríguez and Enrique Lopez knew that I had a good chance to get this position because I was the second successful bidder last time this position was posted for bidding. Supervisor López alleged that Manager José Sepúlveda and Juan Rodríguez change days off because there were so much people with Saturday and Sunday at Caparra. If that was the case, why he did not change the position when it was posted for bidding about six month ago and employee Luis Rivera was the successful bidder or when employee Ivette Fajardo was the successful bidder about 7 months ago or when employee Mario Izquierdo was successful bidder one year ago or Laura Torres at about 2 years ago. In addition there were 3 employees at Caparra that were assigned to Caparra with Saturday and Sunday who did not have a bided position. Such employees were; Antonio Hernández, Julia Collado and Iván Pagán. Supervisor Juan Rodríguez López and Manager Sepúlveda did not change days off to these employees notwithstanding they were unassigned or not had a bid in Caparra Station so management could easily change days off because they were unassigned.

10.    Manager José Sepúlveda, Supervisor Juan Rodríguez and Enrique López waited until I had a good chance to get this position to change days off (Exhibit 4 Statement of Radamés Sierra.)  In such statement Radamés Sierra declare that position Id 2541417 was changed deliberately in reprisal against me.  Also he said that management was not planning to change this position until they knew that I was interested and had a good chance to get

Exhibit-23, Page 4

such position.

11.   As an evidence that Manager José Sepúlveda and Supervisor Enrique López were able to discriminate against any employee who filed complaints; I am submitting a decision made on July 15, 1996 (See Exhibit 7) by arbitrator Roger I Maher where he found that Manager Sepulveda discriminate and retaliate against co-worker Carmelo Montañez.  In such decision the US Postal Service is alleging the same management prerogatives as a pretext to discriminate and retaliate.

12.   On or about March 1996 union representative Alberto Ortíz went to Caparra Station to settled a letter of warning that Supervisor Enrique López gave me as a retaliation for my OSHA and EEO's complaints.  In such meeting supervisor López said to Alberto Ortiz that he was not going to withdraw the letter of warning because Morales has filed an EEO and OSHA complaints against him and that from now on López was going to take care of Morales and watch him very close because Morales was fucking up a lot with his EEO and OSHA complaints.  (see Exhibit 11)

13.   During my first complaints to OSHA, said agency made me believe that I was protected by the 11(c) of the OSH act and that in case of retaliation I must filed a complaint within 30 days. (See Exhibits 5, 6 and 8 page 2)

14.   At all times I followed OSHA instructions regarding the procedure to file a complaint in this way I exhausted all remedies.  Surprisingly on or about October 8, 1996 about a year and a half since my first OSHA complaint I received an incredible letter from OSHA telling me that I was not protected

ADMV

Exhibit-23, Page 5

by OSHA and that OSHA decided to send my discrimination and retaliation complaints letters to the US Postal Service. (See Exhibit 9) With this action OSHA revealed to the Postal Service my name and all the allegations I was making against the US Postal Service, leaving me defenseless.

15. On May 18, 1996 I was present when Supervisor Enrique López said in a meeting an angry manner that *"because somebody have filed an EEO complaint against me, now everybody must use timecard and punch in each time an employee takes a break."* (See also Exhibit 13 page 1, paragraph 7)

16. That since October 20, 1993, I was assigned to make the duties of Business Reply Mail, Express Mail and postage due clerk as a reasonable accommodation due to a right arm injury (See Exhibit 1 page 1)

17. That on or about May 18, 1996 Supervisor Enrique López removed me from my duties as Postage Due Clerk, Business Reply Mail Clerk and Express Mail Clerk alleging that from now on all employees were going to rotate their respective duties with all other clerks, however I noticed that this was only a pretext to make me harm (due to my right arm condition) and discriminate against me since López only rotated my duties mostly to Mayra Irene. No other employee was removed from his regular duties, only I was removed without returning to do my duties. Neither any other employee were removed or rotated.

ADMV

18. I never left accumulate my work as postage due clerk, business reply mail clerk and express mail clerk since I almost never was absent, in fact I was the clerk with best assistance record. When I was on vacation, there were

Exhibit -23, Page 6

other employees like Hector Ortiz, Mario Izquierdo or Porfirio Aviles that performed my duties without causing any delay. This was in that way for several years without causing any problems until Supervisor Enrique López began to discriminate and retaliate against me. In fact the business reply, express mail and postage due work began to accumulate when Supervisor Enrique López removed me from my regular duties.

19.  That I can also testify about the preferences by Supervisor Enrique López in favor of co-worker Mayra Irene at such point that this affected the postal operations and caused undue hardship to other male workers.

20.  That Mayra Irene's tour of duty was from 8:00 a.m. to 5:00 p.m. and she almost every day arrived late to Caparra Station.

21.  That notwithstanding that Mayra Irene almost every day arrived late, she had the guts and bare face of taking a breakfast in the break room after she punched in her time card. All of this were allowed and promoted by Supervisor Enrique López; however this behavior was not tolerated to any other employees specially males employees. Mayra Irene took her lunch break at about 11:00 a.m. or 11:30 a.m. this is three or three hours and a half after she began her tour of duty at 8:00 a.m. Then she took more coffee breaks during the afternoon, always abusing of her coffee breaks and with the knowledge of Supervisor Enrique López. In fact most of the coffee breaks taken by Mayra Irene were in the Enrique López office while she had fun with Supervisor López.

22.  That even though almost all clerks were distribution and window clerk, the

AD.M V

Exhibit -23, Page 7

duties among the clerks in Caparra Station were assigned according to their tour of duties. For instance, clerks that began their tour of duties at 5:30 a.m. (like me) were assigned to do distribution clerk duties since it was better for the Postal operations to do such duties early in the morning. Employees that began their tour at 8:00 a.m. (like Mayra Irene) were assigned to window clerk duties because windows operations began at 8:00 a.m. This is why it was very impractical to change duties to any clerk that began his duties early in the morning like me.

23. That on August 24, 1996 Supervisor Enrique López reunited me and co-worker Raymond Ruiz in order to warn us that he was going to watch us very close but specially me. Supervisor Enrique López said that he was going to check our coffee breaks. Also he said to me in an angry manner *"you think you are very smart because you filed an EEO complaint against me"* I told him several times that *"please do not mention the EEO complaints in this meeting because that only shows that you make your decisions against me because the E.E.O. issue and that issue does not have anything to do with this".* But supervisor Lopez continued speaking about the E.E.O. issue in my presence. However Supervisor Enrique López allowed co-worker Mayra Irene to abuse her coffee breaks.

24. That the secretary's day was never celebrated in Caparra Station because it was not an official holiday and we at Caparra did not have any secretary.

25. On June 6, 1996 and July 10, 1996 Supervisor Enrique López punctured several tires of my car and of two other employees, (See Exhibit 10,

AD MV

Exhibit-23, Page 8

paragraph 7) I reported everything to the Postal Inspection Service by they never investigated.

26.   On January 4, 1997 Supervisor Enrique López and two other employees pour sugar in the fuel tank of my car (See Exhibit 10 paragraph 7) I reported everything to the Postal Inspection Service by they never investigate.

27.   Supervisor Enrique López used to open and inspect my private mail (See Exhibit 10 paragraph 8).

28.   That on or about February 1997, after two years of struggle and due to the brutal and criminal acts by US Postal Service management against me, I was constructively discharged. I mentally "broke up" and had to look for medical psychiatryc treatment. I filed a claim before Office of Workers Compensation Program (O.W.C.P.). My case was approved since O.W.C.P. decided that there was a hostile work environment against me (See Exhibit 39 Letter of O.W.C.P. official Tery Friend).

29.   As a consequence of my constructive discharge I only receive 66% af my salary based on the salary rate I had by 1997. I also suffered the end of benefits payments for my Thrift Savings Plan (retirement plan or 401k), I am not accumulating benefits for the Social Security and I suffered the exhaustion of all my savings and investments like mutual funds and IRA's. I still receiving medical treatment for my mental condition provoked by the retaliation and discrimination of the US Postal Service.

30.   That after two years of struggle denouncing the safety hazards in Caparra Heights Station, I was removed on February 20, 1997 from Caparra Station

Exhibit-23, Page 9

by USPS Postal Manager Virginia Matias. Incredibly Matias told me that she was removing me because I was the safety hazard in Caparra and a homosexual.

31.     This is only a brief summary of all the actions committed by the US Postal Service against me.  There are other actions like unfair suspensions, letter of warning, expulsions etc.

32.     That all of the above indicated is true under my best knowledge and understanding.

In San Juan, Puerto Rico, this 14 day of November 2005.

**ANGEL DAVID MORALES-VALELLANES**

Affidavit # - 39 -

Sworn and subscribed before me by **Angel David Morales-Vallellanes**, of the above circumstances, who I identify by drivers license number 1272516.  In San Juan, Puerto Rico, this 14 day of November 2005.

**NOTARY PUBLIC**

Abogada Notario

Karem M. Rodriguez

window clerk at the Caparra Heights, Puerto Rico, Station of the United States Postal Service. On April 7, 1995, plaintiff [**3] filed a letter with OSHA complaining of dust accumulation, rodent infestation, and other unsanitary conditions at the Caparra Heights station. OSHA ordered the station manager to correct the violations by June 19, 1995, but to no avail. Morales renewed his OSHA complaint through certified letters to the OSHA Area Director on August 1, 1995, February 23, 1996, and April 6, 1996. Finally, on June 14, 1996, OSHA conducted a formal inspection of the Caparra Heights station and confirmed plaintiff's allegations. OSHA cited the Caparra Heights station for at least five violations, and directed the station to remedy the safety and health hazards by October 9, 1996.

At this point, we bifurcate our chronology of the subsequent events for purposes of clarity, turning first to the circumstances that spawned Morales's claims against the Postal Service, and concluding with an account of the events underlying plaintiff's claims against the Union.

**A. Events underlying the claims against USPS**

Throughout the OSHA complaint process, the agency assured Morales that his identity as an OSHA complainant would be kept confidential, and that federal law forbade USPS from retaliating or discriminating [**4] against him for whistle-blowing. Nevertheless, plaintiff's amended complaint alleges that by July 1995 other employees at the Caparra Heights station were aware that he had filed OSHA complaints, and were retaliating against him. That month, Morales alerted the Postal Inspection Service that he had received two threats from co-workers, but no remedial steps were taken.

In January 1996, plaintiff expressed interest in an available distribution and window clerk position with Saturdays and Sundays off. n1 USPS then allegedly re-classified the position to offer only Sundays and Thursdays off so as to decrease its desirability to plaintiff. On March 23, 1996, Enrique Lopez, the Caparra Heights station supervisor, issued a letter of warning to Morales for unsatisfactory performance, citing the plaintiff's "abuse of coffee breaks." Two months later, Lopez removed Morales from his position as a Business Reply Mail Clerk, Postage Due [*13] Clerk and Express Mail Clerk, n2 and replaced him with a female co-worker. In July 1996, tires on Morales's car were punctured on two separate occasions while the car was parked in the secured Caparra Heights station parking lot.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 At oral argument, plaintiff's counsel explained that the Caparra Heights station operates twenty-four hours a day, seven days a week. While employees at the post office typically work only five days a week, the allotted days off for many positions do not correspond with the weekend. [**5]

n2 Morales alleges that he was assigned to this position as a reasonable accommodation for a job-related injury. It appears that plaintiff suffered from a physical disability that limited the stress he could place on his right arm. This disability restricted the tasks that plaintiff could painlessly perform at work, and allegedly provided USPS with a pretext for excluding him from the workplace in February 1997. See infra.

- - - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

On October 10, 1996, Morales's contact at OSHA informed him that the agency had no authority to protect postal employees from retaliation, and urged the plaintiff to request USPS to conduct an internal investigation. Without seeking Morales's consent, OSHA forwarded his file to the Postal Service, thereby confirming to USPS that plaintiff was in fact the whistle-blower. From that point on, the retaliation and discrimination directed at plaintiff worsened considerably. Morales alleged that in December 1996 he was victimized by episodes of name-calling and bullying, and later that month he was suspended one week for violating a new uniform policy instituted by Lopez. In [**6] January 1997, a postal employee poured sugar into the gas tank of plaintiff's car, nearly resulting in a traffic accident. On at least three occasions in February, plaintiff's supervisor dismissed him from work without pay because "there was no work available for him." Finally, on February 20, 1997, plaintiff was transferred from the Caparra Heights station to the General Post Office in San Juan. Morales alleges that he was removed from the Caparra Heights station because co-workers accused him of being "a safety hazard and a homosexual."

These events prompted Morales to file four Equal Employment Opportunity (EEO) complaints with the USPS. n3 Plaintiff filed his first precomplaint on February 15, 1996, in the aftermath of USPS's decision to alter the allotted days off for the available distribution and window clerk position. His second EEO precomplaint, submitted April 25, 1996, alleged that a new coffee and lunch break policy instituted at the Caparra Heights station unfairly discriminated against male postal employees. After the USPS failed to respond to his first precomplaint, Morales filed a formal EEO complaint on April 3, 1996, alleging that USPS unlawfully retaliated against [**7] him by posting the available window clerk position with Thursday/Sunday rest days rather than Saturday/Sunday rest days. He subsequently filed a second formal EEO complaint on September 5, 1996, citing the discriminatory break policy and another episode of retaliation. Plaintiff finally left the employ of the USPS in early September 1997, allegedly as the result of a constructive discharge.

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

Get a Document - by Name - Morales v Marchand And Potter    Case 3:97-cv-02459-GAG-CVR    Document 265-2    Filed 11/14/2005    Page 86 of 114    10/31/05 10:04 AM

Exhibit 27, Page 2

binding grievance procedures in the Postal Service collective bargaining agreements." <u>Id. at 386</u> (quoting <u>Ellis v. U.S. Postal Service, 784 F.2d 835, 839-40 (7th Cir. 1980)</u>). Accordingly, Roman's recourse was limited to the procedural rights enshrined in that agreement:

> Roman's allegation that the Postal Service violated his due process rights in threatening him and forcing him to resign does not provide jurisdiction. Where Congress has created an elaborate, remedial scheme which adequately and comprehensively addresses the protection of constitutional rights in the employment context, an employee whose rights are protected through that scheme cannot [**20] bring a new, non-statutory action.

<u>Id. at 385-86</u> (emphasis added).

However, HN7 just as Congress may limit an employee's avenues of redress for certain constitutional claims by establishing "an elaborate remedial scheme" that adequately addresses such claims, it also has the power to create multiple rights of action to redress other types of employment injuries. [*18] Thus, as the Supreme Court ruled in Alexander, the legislative history of Title VII reflects Congress's intent to provide employees victimized by retaliation or discrimination with an additional statutory right of action wholly independent of the CBA. <u>Alexander, 415 U.S. at 48-49</u>. The district court therefore erred in concluding that the collective bargaining agreement between USPS and APWU furnished Morales's sole avenue of recourse for his retaliation and discrimination claims.

HN8 Judicial recourse under Title VII, however, is not a remedy of first resort. See <u>Jensen v. Frank, 912 F.2d 517, 520 (1st Cir. 1990)</u> ("Title VII requires exhaustion of administrative remedies as a condition precedent to suit in federal district court."). USPS's EEO Guidelines, promulgated pursuant [**21] to <u>42 U.S.C. § 2000e-5</u>, prescribe a lengthy administrative process that plaintiffs must exhaust prior to filing a Title VII action in district court. Here, Morales argues that USPS failed to provide any formal disposition of his two formal EEO complaints within the established 180-day window, see <u>29 C.F.R. § 1614.107(c)</u>, thereby entitling him to pursue his claims in district court. Plaintiff buttresses his assertions with two letters from USPS formally dismissing his EEO complaints. Each letter informed Morales that "if you are dissatisfied with the Postal Service's final decision in this case, you may file a civil action in an appropriate U.S. District Court . . ."

USPS argues on appeal that even if plaintiff may theoretically look outside the collective bargaining agreement to an alternative source of relief under Title VII, he forfeited his right of action by neglecting to file any EEO complaints addressing the vast majority of the discriminatory and retaliatory incidents described in the amended complaint.

We agree with USPS that Morales's Title VII cause of action is limited to those discrimination and retaliation [**22] allegations in his amended complaint that were previously the subject of a formal EEO complaint. As we read the EEO dismissal letters, this universe is limited to the following three allegations:

> (1) Morales's allegation that Job Bid # 2541417 was posted with Thursday/Sunday rest days rather than Saturday/Sunday rest days in retaliation for plaintiff's OSHA complaints

> (2) Morales's allegation of sexual discrimination and retaliation arising from an April 9, 1996 incident in which plaintiff's duties and responsibilities were awarded to a female employee and he was given window clerk duties to perform

> (3) Morales's allegation that the "coffee and lunch breaks" policy was not applied in an equal and nondiscriminatory matter

We reject USPS's insinuation on appeal that summary disposition of these surviving claims is appropriate at this time. While HN9 it is within our discretion to affirm the district court's entry of summary judgment on any ground revealed by the record, <u>Houlton Citizens' Coalition v. Town of Houlton, 175 F.3d 178, 184 (1st Cir. 1999)</u>, any determination of whether Morales's Title VII claims can survive summary judgment is premature. [**23] As a consequence of the district court's erroneous presumption that Morales's claims were solely actionable under the CBA, no court has analyzed the record to determine whether Morales has raised a material dispute of fact that compels a trial on his surviving Title VII claims. Under these circumstances, we believe the preferable practice is to remand to the district court. See <u>United States v. Gell-Iren, 146 F.3d 827, 831 [*19] (10th Cir. 199)</u> ("A factual record must be developed in and addressed by the district court in the first instance for effective review."). However, Morales is precluded on remand from seeking relief for a plethora of other acts of discrimination and retaliation alleged in his amended complaint, including the discrete acts of bullying, intimidation, and vandalism by his co-workers, his seven-day suspension for violating the USPS uniform policy, his transfer from the Caparra Heights station, his day-long "expulsions" from work in February 1997, his constructive discharge, and his internal grievances against APWU. n7

- - - - - - - - - - - - Footnotes - - - - - - - - - - - -

n7 Plaintiff's internal grievances against APWU are theoretically actionable under Title VII, which provides that "it shall be an unlawful employment practice for a labor organization to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1); see, e.g., Thorn v. Amalgamated Transit Union, 305 F.3d 826, 831-32 (8th Cir. 2002). However, the district court correctly adopted the magistrate judge's determination that Morales failed to exhaust the administrative remedies provided by the Union's bylaws:

> Plaintiff should have exhausted the contractual remedies provided to him as to any claim against the Union and/or its agents which is not established as a breach of its duty of fair representation, such as his removal from shop steward position. He failed to exhaust internal union appeal process.

Consequently, Morales has forfeited any Title VII claim arising from his internal union grievances. In reaching this conclusion, we reject as untenable Morales's complaint that he was unfairly surprised by the magistrate judge's partial reliance on an exhaustion rationale for disposing of his claims against APWU. The record conclusively demonstrates that APWU put the exhaustion point at issue throughout the litigation before the magistrate judge. For this reason, the exhaustion arguments and supporting exhibits raised for the first time before the district court were inadmissible due to Morales's failure to present these materials to the magistrate judge. See Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co., 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated and the magistrate's role reduced to that of a mere dress rehearsal if a party were allowed to feint and weave at the initial hearing, and save its knockout punch for the second round.").

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - -

**[**24]**

## C. Residual Claims

Our resolution of Morales's CBA and Title VII claims disposes of his conspiracy claim. HN10 "A civil conspiracy is a combination of two or more persons to do an unlawful or criminal act or to do a lawful act by unlawful means for an unlawful purpose." Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974); see also Maryland Casualty Co. v. Hosmer, 93 F.2d 365, 366 (1st Cir. 1937). The only predicate acts cited in the amended complaint that possibly establish a basis for conspiracy liability are 1) APWU's removal of plaintiff as shop steward, 2) USPS's decision to transfer plaintiff out of the Caparra Heights station, and 3) plaintiff's alleged constructive discharge. We have concluded, however, that Morales failed to preserve a right of action for any of these three alleged offenses. Morales's surviving Title VII claims, see supra, implicate only unilateral decisions or policies of USPS that cannot form the gravamen of a civil conspiracy claim. See Ammlung, 494 F.2d at 814.

With regard to Morales's emotional distress claim, even assuming the truth of the surviving Title VII allegations, USPS's [**25] conduct does not rise to the level of "extreme and outrageous," "beyond all possible bounds of decency," or "utterly intolerable in a civilized community." Santiago-Ramirez v. Sec'y of Dept. of Defense, 62 F.3d 445, 448 (1st Cir. 1995). Consequently, plaintiff's intentional infliction of emotional distress claim fails as a matter of law.

**[*20] IV.**

We affirm the judgment entered for defendants on counts II, III, and IV of Morales's amended complaint. We vacate the judgment entered on count I and remand for proceedings not inconsistent with this decision. All parties shall bear their own costs.

**So ordered.**

Exhibit 25, Page 1

# CERTIFIED TRANSLATION
__18-Mar-05    T. #05-906 #3    Pg. 1 of 186__

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

ANGEL DAVID MORALES
VALLELLANES

    Plaintiff

v.

UNITED STATES POSTAL
SERVICES, ET AL

    Defendants

CASE NO.: 97-2459
        (JAG) (GAG)

ORAL EXAMINATION DEPOSITION TRANSCRIPT

OF

MR. ENRIQUE LÓPEZ MOLINA

| | | |
|---|---|---|
| Date | : | Thursday, May 20, 2004 |
| Time | : | 9:00 a.m. |
| Place | : | OFFICE OF MIGUEL MIRANDA GUTIÉRREZ, ESQ. #22 Mayagüez Street Hato Rey, Puerto Rico |
| Taken by | : | Miguel E. Miranda Gutiérrez, Esq. |
| Notary Public | : | Miguel E. Miranda Gutiérrez, Esq. |

This is the transcript of the proceedings related to the
taking of deposition of the same and the testimony given.

*ADVANCED COMPUTYPE BUSINESS SUPPORT SERVICES*
*#64 Ponce Street*
*Hato Rey, Puerto Rico 00917*
*(787) 758-7029*

Exhibit 25, page 2

CERTIFIED TRANSLATION
18-Mar-05    T. #05-906 #3  Pg. 21 of 186

1     track, the official talk, a letter of admonishment,

2     afterward suspension, well, usually I would do it on three

3     occasions, when I would verbally say to him, "Look, you

4     have to do this, please, fix it." And if I saw that the

5     person, well, I don't know, had woken up on the wrong side

6     of the bed and wanted to do it his way, well, one had to

7     do, his performance had to be satisfactory.

8              Q    One question, then, based on what you

9     indicate, the unsatisfactory performance...

10             A    Yes.

11             Q    ...does not necessarily have to do with

12    the way that an employee handles his job or the duties

13    of...?

14             A    Well, also.

15             Q    Are they included there?

16             A    Yes, yes, because if I tell you to take

17    the, this box from A to B, and I give you some

18    instructions as they are established and it so happens

19    that you, prior to arriving to area B, stop to do other

20    things, well, I'll tell you that your performance should

21    be the way that has been established.

22             Q    Did you ever reprimand Maria Irene due to

23    unsatisfactory performance?

24             A    No, not to my recollection.

25             Q    No. Do you know if she was in the habit

Exhibit 25, page 3

CERTIFIED TRANSLATION
<u>18-Mar-05     T. #05-906 #3  Pg. 22 of 186</u>

1    of arriving late in the morning when she came in to

2    work?

3              A    No, not that I recall.

4              Q    You don't recall.

5              A    No, no.

6              Q    No?

7              A    No.

8              Q    And is your best recollection that she did

9    not come in late?

10             A    No, because...

11             Q    To your recollection, Mr. Enrique.

12             A    Yes, yes, no, because then, hum, María

13   Irene, if I'm not mistaken, that young lady would come in

14   around nine.

15             Q    Okay.

16             A    At nine. The Letter Carriers in Caparra,

17   if I recall correctly, come in at seven thirty.

18             Q    Yes.

19             A    Seven thirty, seven, around that, I don't

20   recall the time. For me, the critical time is as soon as

21   they come in, from the time that the Letter Carriers start

22   until they distribute all the mail, or at least to have on

23   paper that that is going to be the action plan of the

24   morning. And that would take me from seven, seven thirty

25   until ten thirty to eleven. That is, if I was unable to do

Exhibit 25, Page 4

CERTIFIED TRANSLATION
18-Mar-05    T. #05-906 #3   Pg. 23 of 186

1    it in that period of time, I would lose the game.

2         Q    Yes.

3         A    You know, if she came in at nine, and

4    came in, you know, there would be no way for me to know

5    that because I could not, with all the rush that I have

6    for everything to come out right, the operation, I cannot

7    be standing in front of a clock to see who clocks in and

8    at what time. Because my main thing was to see the Letter

9    Carriers that had reported in and that the work be done.

10        Q    But did you supervise María Irene at any

11   time?

12        A    Yes, as I told you, during those times

13   that I would go to provide support to my coworker, when he

14   went away on vacation.

15        Q    To your recollection, did you ever correct

16   María Irene's card manually because of the arrival time,

17   to your recollection?

18        A    Hum, I remember that on one specific

19   occasion...

20        Q    Yes.

21        A    ...Yes, it was corrected, it was Rita

22   Maldonado. Because it was during Secretary's Week and

23   I took three females that were around at that time,

24   she was there, Rita Maldonado was there. And for

25   Secretary's Week I took them to out to eat.

Exhibit 25, Page 5

CERTIFIED TRANSLATION
18-Mar-05        T. #05-906 #3  Pg. 24 of 186

1      Q      You took them out to eat.

2      A      Yes.

3      Q      Okay. And on that occasion, then, but it

4   was Secretary's Week, but, were her duties those of a

5   secretary?

6      A      No, no, but since they were females so as

7   not to... If I took Rita Maldonado and left the other one

8   alone, well, it was going to seem, not right. And also I

9   don't tend to go out alone with anyone, that is, I always,

10  thank the Lord, I've known how to take care of myself,

11  well, it was going to seem a little bit out of place if I

12  took one and left the other. Well, so that everything

13  would come out right, I took both of them and that

14  wouldn't give rise to anything.

15     Q      Did the Caparra station have a secretary

16  position as such, whether as...?

17     A      Well, Rita, no she was... hum... not as

18  such, no.

19     Q      No?

20     A      No, she was General Clerk.

21     Q      General Clerk. So, and Office Clerk.

22     A      Office clerk, if you want to put it that way.

23     Q      And what was María Irene?

24     A      She was Window Distribution Clerk.

Exhibit 25, page 6

CERTIFIED TRANSLATION
18-Mar-05      T. #05-906 #3  Pg. 25 of 186

1          Q    Window Distribution Clerk.

2          A    Yes.

3          Q    And you were telling me that during that

4    Secretary's Week there could have been, or I believe you

5    remembered, some correction or whatever, some note from

6    you concerning her arrival time?

7          A    Yes, yes, because I think that Rita had

8    half an hour, and half an hour was not going to be long

9    enough to have lunch. And then it was not feasible, after

10   I invited them to lunch for Secretary's Week for me to

11   penalize them and say to her, "Well, you're going to have

12   to charge that half hour to vacation time."

13         Q    Yes.

14         A    Because that wouldn't be fair.

15         Q    Okay. I would like you to review this

16   document. Before anything else. Do you know Angel David

17   Morales?

18         A    Yes, yes.

19         Q    In what capacity?

20         A    As such, yes, he was, or is, but he was in

21   the Caparra Heights Station.

22         Q    I would like to know, I would like for you

23   to examine this first. Let's go off the record for a

24   moment, please.

25                         [OFF THE RECORD]

| U. S. POSTAL SERVICE ROUTING SLIP | DEPT., OFFICE OR ROOM NO. | |
|---|---|---|
| TO: 1 A.D. Morales | Exhibit 26 | ☐ APPROVAL<br>☐ SIGNATURE<br>☐ COMMENT<br>☐ SEE ME |
| 2 | | ☐ AS REQUESTED<br>☐ INFORMATION |
| 3 | | ☐ READ AND RETURN<br>☐ READ AND FILE |
| 4 | | ☐ NECESSARY ACTION<br>☐ INVESTIGATE |
| 5 | | ☐ RECOMMENDATION<br>☐ PREPARE REPLY |

Exhibit 26

FROM: ENRIQUE LOPEZ

EXTENSION

DATE 1/10/97

ROOM NO.

REMARKS:

Mr. Morales, I instructed you to notify parcels. You refuse, because you allege that you can not fullfill the responsibility of your position. You have the right to request a light duty assignment. I don't have work that you can do as you allege. Therefore, I'm sending you home until you can fullfill your duties and responsibility

ITEM 0-13
Aug. 1976 (Formerly Form 13)      (Additional Remarks on Reverse)      U S G P O 1984-554-232

Exhibit-27, Page 1

## CERTIFIED TRANSLATION
18-Mar-05      T. #05-906 #1      Pg. 1 of 138

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANGEL DAVID MORALES VALLELLANES | CASE NO.: 97-2459 (JAG) (GAG) |
| Plaintiff | |
| v. | |
| UNITED STATES POSTAL SERVICES, ET AL | |
| Defendants | |

ORAL EXAMINATION DEPOSITION TRANSCRIPT

OF

MRS. CARMEN ROSA PERALES

Date          :     Thursday, May 6, 2004

Time          :     9:25 a.m.

Place         :     OFFICE OF MIGUEL MIRANDA GUTIÉRREZ, ESQ.
                    #22 Mayagüez Street
                    Hato Rey, Puerto Rico

Taken by      :     Miguel E. Miranda Gutiérrez, Esq.

Notary Public :     Miguel E. Miranda Gutiérrez, Esq.

This is the transcript of the proceedings related to the taking of deposition of the same and the testimony given.

*ADVANCED COMPUTYPE BUSINESS SUPPORT SERVICES*
*#64 Ponce Street*
*Hato Rey, Puerto Rico 00917*
*(787) 758-7029*

Exhibit-27, Page-2

**CERTIFIED TRANSLATION**
18-Mar-05    T. #05-906 #1    Pg. 58 of 138

1          Q      Once the case is approved, that's what I'm

2     talking about.

3          A      Correct.

4          Q      The procedure, let's say, Mrs. Carmen, let's

5     say that X employee, who filed a complaint and formally

6     requested the complaint, right?, and it was approved in the

7     United States and the investigative process began, my

8     question is, did you normally begin with the allegations

9     that the employee made, or not necessarily was it that way?

10    In general, how does the investigation begin?

11         A      One would let management know who was named

12    as the party that was discriminating against the employee,

13    and one let it know that, "the employee's case has been

14    accepted for investigation"...

15         Q      Okay.

16         A      ... "and I need to get an affidavit from you

17    and these are the allegations," and one would let them know

18    what were the allegations and the managerial employee had to

19    make an affidavit related to those allegations.

20         Q      Okay. I'm going back a little bit. Since the

21    first thing, before demanding the affidavits from the

22    managerial employee, right?, what you had previously, while

23    the acceptance arrived, right?, that comes from the United

24    States, you would begin the investigation with the

25    allegations that the employee made to ascertain whether they

26    were true or not, right?

Exhibit-28

March 23,1996

John Malave
District Manager-Postmaster San Juan
585 Ave Roosevelt
San Juan P.R. 00936-9998

Dear John Malave:

   On March 5,1996 we have a safety captain meeting in which
I made you aware about the poor health, safety and
unsanitary conditions at Caparra Heights Station.Also, I
made you aware about my several complaints that I have
filed with O.S.H.A.(**Occupational Safety and Health
Administration**)and all the sufferings and Illness that
have all employees at Caparra Station due to these
unsanitary conditions. I remember that you made a
compromise to enforce very strictly the safety regulations
and to support all the safety captains at the meeting. In
addition, you told me that you were going to take care
about the Caparra Station problem.


   Same day afternoon, you went to Caparra Station
supposedly to investigate my allegations about Caparra's
Health and sanitary conditions. Next day(**March 6,1996**) I
felt very happy when my fellow co-workers told me that you
were at Caparra Station the day before. Next day(**March
7,1996**) I was being investigated by the Postal Inspection
service for third time about the Luis Ramos issue. The
first two occasions that this issue was investigated
nothing was found, but surprisingly, a third investigation
was opened. **However,the unsanitary conditions at
Caparra Station have not been investigated and
remain intact.**

   I am wondering if this is the support that we the safety
captains are going to receive from the Postal Service due
to our safety involvement. As you told us,**Safety is
First.**

                              Sincerely

                              Angel David Morales

                         Angel David Morales
                    Distribution and window clerk
                       and Safety Captain at
                       Caparra Heights Station

Exhibit-29

DISTRICT MANAGER
CARIBBEAN DISTRICT


**UNITED STATES**
**POSTAL SERVICE**

March 26, 1996

Mr. Angel David Morales
Safety Captain
Caparra Heights Station
San Juan  PR   00922-9998

Dear Angel David:

The safety and health of all the postal employees in the Caribbean is our number one
priority.  The Safety Captain Program is composed of employees who have a  genuine
desire to improve the working conditions of their fellow employees, by identifying and
informing their supervisors of known safety hazards.

On March 5, 1996, I participated in the initial Safety Captain's meeting and I made it my
personal commitment to visit all the sites where a safety hazard was identified;  that same
day, I visited Caparra Heights station to investigate the safety hazard you had identified.
Supervisor José Rodriguez informed me that he had knowledge of the report you had
submitted, and was in the process of correcting it.  As a follow-up, I informed the manager
of maintenance to expedite supervisor's Rodriguez request.

The visit to the Caparra Heights Station by the Inspection Service has no relations what-so-
ever with the Safety Captain Program.  Instead, the Postal Inspectors are investigating a
series of complaints given by distribution clerk, Luis Ramos, about violence in the workplace
which together with safety hazards are the biggest deterrent of a productive working
environment.

Remember, the Safety Captain Program is a management tool, for both management and
bargaining unit employees to work together towards the overall improvement of the
workplace environment.  Bargaining unit employees perform this task voluntarily, but
SAFETY is everyone's responsibility.

John Malave
District Manager/PM

585 F D ROOSEVELT AVE
SAN JUAN  PR  00936-9991
(809) 767-2159
FAX:  (809) 250-8065

CAPARRA HEIGHTS STA
1505 AVE FD ROOSEVELT
SAN JUAN PR 00920-9998

Exhibit-30

 **UNITED STATES POSTAL SERVICE**

---

Subject:     **Letter of Warning**

To:     Angel D. Morales                          Date: March  23, 1996
            Full-Time Window/Distribution Clerk
            Caparra Heights Station

This official Letter of Warning is being issued to you for the following reason(s):

<u>Charge 1</u>:     You are charged with Unsatisfactory Performance.

Mr. Morales, on March 22, 1996, you were away from you assigned work area  without authorization from your immediate supervisor.

Your immediate supervisor Mr. Enrique Lopez, was monitoring the box section when he notice that you were not present. He searched all over the Caparra Heights Station including the lobby and the platform section. Your absence was noticed at 1335 and it wasn't until 1350 that you walk in through the platform entrance.  You approach Mr. Lopez and you stated, "Lopez, I went to my car and I fell asleep. During the time mention above you were not on official break.

"All employees must give a full day's labor for a full day's pay; giving to the performance of duties earnest effort and best thought."

It is hoped that this official Letter of Warning will serve to impress upon you the seriousness of your actions and that future discipline will not be necessary.  If you are having difficulties which I may not be aware of or if you need additional assistance or instructions for improving your performance, please call on me, or you may consult with other supervisors and we will assist you where possible.  However, I must warn you that future deficiencies will result in more severe disciplinary action being taken against you.  Such action may include suspensions, reduction in grade and/or pay, or removal from the Postal Service.

You have a right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of the letter.

Enrique Lopez
**Customer Services Supervisor**

I have received the original of this letter on:  _3/23/96_

**Employee Signature:** _Angel David Morales_  Soc. Sec. No. 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

CAPARRA HEIGHTS STA.
1505 AVE FD ROOSEVELT
SAN JUAN PR 00920-9998

Exhibit-31 page 1

 *UNITED STATES POSTAL SERVICE*

Subject:     **Letter of Warning**

To:     Angel D. Morales                                    Date: December 13, 1996
        Full-Time Window/Distribution Clerk
        Caparra Heights Station

This official Letter of Warning is being issued to you for the following in reason(s):

Charge 1:     You are charged with failure to follow instructions.

Mr. Morales, on October 26, 1996, I gave you a Work Restriction Evaluation Form for Light Duty. This action was a result of your refusal to compile with the duties assigned to you as a Window Distribution Clerk. You have stated that you have a limitation on one of your hands. Mr. Morales, I gave you specific and direct instructions to have the form complete and return it to me during the following week. These instructions were witnessed by Mr. Hector Ortiz and Mr. William Morales.

On November 7, 1996, I ask you for the medical evaluation and informed you that the information was needed in order to determine what your limitations were. When I requested the form you answered "cuando llegue yo te la entrego" (when it gets here, I will give it to you). My request and your response was witnessed by Mr. William Morales. At this moment I informed you that a fitness for duty would be scheduled and for a second time I requested the form. Mr. Morales, to this date you have refuse to obey and follow direct instructions given to you.

"Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a supervisor's order, the individual will nevertheless carry out the order and immediately file a protest in writing to the official in charge of the installation, or appeal through official channels." ELM 666.51

It is hoped that this official Letter of Warning will serve to impress upon you the seriousness of your actions and that future discipline will not be necessary. If you are having difficulties which I may not be aware of or if you need additional assistance or instructions for improving your performance, please call on me, or you may consult with other supervisors and we will assist you where possible. However, I must warn you that future deficiencies will result more severe disciplinary action being taken against you. Such action may include suspensions, reduction in grade and/or pay, or removal from the Postal Service.

Exhibit 31, Page-2

- 2 -

You have a right to file a grievance under the grievance/arbitration procedure set forth in Article
15 of the National Agreement within 14 days of your receipt of the letter.

Enrique Lopez
**Customer Services Supervisor**

I have received the original of this letter on: _____

**Employee Signature:**_____    **Soc. Sec. No. 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**

CAPARRA HEIGHTS STA.
1505 AVE FD ROOSEVELT
SAN JUAN PR 00920-9998

Exhibit - 32

 **UNITED STATES**
**POSTAL SERVICE**

Subject:  **Notice of Suspension of seven days.**

To:  Angel D. Morales                    Date: December 20, 1996
     Full-Time Window/Distribution Clerk
     Caparra Heights Station

You are hereby notified that you will be suspended for a period of seven (7) calendar days effective at 0530 a.m. on January 18, 1997. You are to return to duty at your regularly scheduled reporting time on your first regularly scheduled day following January 24, 1997. The reason for the suspension is.

Charge 1:    You are charged with failure to follow instructions.

Mr. Morales, prior to December 17, 1996, two service talks were given regarding the correct usage of the clerks uniform. On December 17, I gave official talk regarding the proper usage of the uniform to all clerks in the station. You were present at this meeting, Mr. Hemandez was also present. I instructed that clerks are not allowed to wear any part of the carrier's uniform. On December 18, 1996, A/Manager, Luis A. Hemandez, gave you a specific and direct instruction, that you are not to wear any part of the carrier's uniform. I was present when the instruction was given to you. Mr. Morales, you refuse to follow instructions given to you.

Mr. Morales, on December 13, 1996, you were issued a letter of warning for failure to follow instructions.

"Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a supervisor's order, the individual will nevertheless carry out the order and immediately file a protest in writing to the official in charge of the installation, or appeal through official channels." ELM 666.51

You have a right to file a grievance under the grievance/arbitration procedure set forth in Article 15 of the National Agreement within 14 days of your receipt of the letter.

Enrique Lopez
Customer Services Supervisor

I have received the original of this letter on: _____

Employee Signature:_____    Soc. Sec. No. 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

WITNESS JUAN R. Rodriguez
12/20/96

U.S. Postal Service

# EMPLOYEE PROBATIONARY PERIOD EVALUATION REPORT

*(See Instructions on Reverse)*

Exhibit - 33

7/95

| 1a. Employee's Name | 1b. Employee ID | 1c. Title or D/A | 1d. Pay Loc. | 2a. Date Appointment | 2b. Prob. Ends |
|---|---|---|---|---|---|
| Morales, Angel | 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 | Dist. Clk | | 07-02-88 | 09-29-88 |

| 3a. Return 30-Day Report by | 3b. Return 60-Day Report by | 3c. Return 80-Day Report by |
|---|---|---|
| 08-01-88 | | |

**Overall Rating at 30 / 60** *(circle one)* **Days**

Also Rate Specific Factors ⟶

☒ Meets or Exceeds Expectations at this Time

☐ Does Not Fully Meet Expectations at this Time

☐ Fails to Meet Expectations. Separation Recommended. *(See NOTE in Instructions.)*

**Factor Ratings** *(Circle Number)*

| A | B | C | D | E |
|---|---|---|---|---|
| ②  | ②  | ②  | 3 | 3 |
| 1 | 1 | 1 | ② | ② |
| | | | | 1 |

3 = Exceeds Expectations
2 = Meets Expectations
1 = Does NOT Meet Expectations

**Final Overall Rating** *(80-Day Report Only)*

⟵ Also Rate Specific Factors

☐ Meets or Exceeds Expectations. Retention is Recommended.

☐ Does Not Meet Expectations. Separation Recommended. *(See NOTE in Instructions.)*

## Section II — Performance Evaluation

Provide Supporting Comments for Your Factor Ratings & Recommendations

Mr. Morales has performed his workrelated duties in an efficient manner he follows instructions very well, he has a positive attitude toward his work and he gets along very well with fellow-employees and his superiors as well.

Mr. Morales has demonstrated his eagerness to learn other responsibilitie and ,e is very cautious about our safety standards, He is very cooperativ and his attendance so far has been excellent, I consider this employee to be an asset to the postal service.

| Supervisor's Signature | Date | Employee's Signature, Indicating that the Evaluation has been Reviewed |
|---|---|---|
| *Louis Froche* | 7-24-88 | *Angel Daniel Morales* |

## Section I — Performance Expectations for ____-Day Period

**Factor A:** Attendance/Punctuality

Employee has been punctual his attendance has been excellent so far -, and must maintain this consistency.

**Factor B:** Following Directions

Employee is very cooperative, follows instructions well, he is always willing to help his fellow-employees, and is very alert in our safety policy.

**Factor C:** Compliance with Regulations *(safety, dress/footwear, conduct)*

Employee complies with the rules and regulations, his conduct has been excellent, he wears the proper work clothes and footwear to perform his work in a safely manner.

**Factor D:** Task Performance

Employees performance has been v very good, he gets involve in the overall work-related operations and meets objectives. He seeks other responsibilities.

**Factor E:** Job Knowledge

Employees performs very well in a all the related work areas, and c contributes very effective to the operation,

A.D.M.

| Initial to Indicate that Expectations have been Jointly Discussed: | Session Date: |
|---|---|

PS Form 1750, February 1984

Exhibit-34

UNITED STATES POSTAL SERVICE
CAPARRA HEIGHTS STATION
SAN JUAN, PUERTO RICO 00922


Letter of appreciation.


To: Morales, A.D.
SS# 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
    Regular Clerk



    This is to express our appreciation for the support and
assistance given by you to the Caparra Heights Station
daily operations in the Customer Service area. During the
past Fiscal Year 1990 and during the Christmas Season.

    Due to your interest and concern to our customers and
initiative in assuming additional workload we were able to
deliver the mail without delay.

    Thank you for a job well done.

    A copy of this letter will be filed in your official
Personnel folder (OPF).


Jose E. Sepulveda                    Pedro R. Reyes
Manager                              Supt. Postal Oper.


        Jaime O. Rivera
        Sup. Mails & Del.

Exhibit-35

UNITED STATES POSTAL SERVICE
CAPARRA HEIGHTS STATION
SAN JUAN, PUERTO RICO 00922


Letter of appreciation.


To:Morales A.D.
    SS# 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
    Regular Clerk


    This is to express our appreciation for the support and
assistance given by you to the Caparra Heights Station
daily operations, in the Customer Service area. During the
past Fiscal Year 1992 and during the Christmas Season.

    Due to your interest and concern to our customers and
initiative in assuming additional workload we were able to
deliver the mail without delay.

Thank you for a job well done.

    A copy of this letter will be filed in your official
Personnel folder (OPF).


Jose E. Sepulveda
Manager

Juan R. Rodriguez
Supt. Postal Oper.

Supervisor 1 Recommendations

Exhibit-36

Position Applied For <u>POSTAL INSPECTOR</u>                    Grade <u>19</u>

NOTE:  Application Must Be Received at Vacancy Office by Closing Date.

▶ | *Include a discussion of the employee's qualifications in relation to the requirements stated in the vacancy announcement.*

| Immediate Supervisor/Manager | Next Higher-Level Supervisor/Manager |
|---|---|
| I have reviewed the position requirements stated in the vacancy announcement, and:  *(Check one)* | I have reviewed the position requirements stated in the vacancy announcement, and:  *(Check one)* |
| [X] I recommend the employee for the position without reservation. *(State reasons below)* | [ ] I concur.  *(Additional comments are optional.)* |
| [ ] I recommend the employee for the position with the reservation(s) described below. | [ ] I do NOT concur.  My reason(s) and recommendation are stated below. |
| [ ] I do NOT recommend the employee for the position at this time for the reason(s) stated below. | |

Employee Angel David Morales is been
under my direct supervision since Nov.,
1990.

He had demostrated his ability to per-
form efficiently his task with little or
no direct supervision.  He also have the
ability to learn new tasks or assignments
with a mimimum of training.

He is an employee with a great sence of
responsibility and moral.

I recommend him for the position he is
applying and for any position that he
may qualify.

-------------------------------------------
NOTE:
---- As a matter of information please
note that there is no evaluation of next
higher-level Supervisor/Manager.  The
reason is because the undersigner is
coverying the position of Station Manager
for more than a year and the position of
superintendent is been covered by 204-B's

Due to this situation an objective and
fair evaluation can't be made at a lower
level supervisor

| Typed Name and Signature of Immediate Supervisor/Manager | Typed Name and Signature of Next Higher-Level Supervisor/Manager |
|---|---|
| PEDRO R. REYES | |
| Title  ACTING MANAGER | Title |
| Office Address  Caparra Heights 1505 Franklin D Roosevelt Ave. San Juan, Puerto Rico 00920-2607 | Office Address |
| Office Phone *(Area Code/FTS and No.)*  (809) 782-0075 | Date 06/03/92 | Office Phone *(Area Code/FTS and No.)* | Date |

▶ | *If on page 2 the employee has requested a copy of the evaluation, it must be provided after the immediate supervisor and the next higher-level manager have signed this page.*

*Exhibit-37, Page-1*

**CERTIFIED TRANSLATION**

<u>18-Mar-05</u>    <u>T. #05-906 #8</u>    <u>Pg. 1 of 72</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| ANGEL DAVID MORALES VALLELLANES | CASE NO.: 97-2459 (JAG) (GAG) |
| Plaintiff | |
| v. | |
| UNITED STATES POSTAL SERVICES, ET AL | |
| Defendants | |

ORAL EXAMINATION DEPOSITION TRANSCRIPT

OF

MRS. MAYRA IRENE GARCÍA

Date          :    Friday, July 2, 2004

Time          :    12:30 p.m.

Place         :    OFFICE OF MIGUEL MIRANDA GUTIÉRREZ, ESQ.
                   #22 Mayagüez Street
                   Hato Rey, Puerto Rico

Taken by      :    Miguel E. Miranda Gutiérrez, Esq.

Notary Public :    Miguel E. Miranda Gutiérrez, Esq.

This is the transcript of the proceedings related to the taking of deposition of the same and the testimony given.

*ADVANCED COMPUTYPE BUSINESS SUPPORT SERVICES*
*#64 Ponce Street*
*Hato Rey, Puerto Rico 00917*
*(787) 758-7029*

Exhibit 37, Page 2

**CERTIFIED TRANSLATION**
18-Mar-05      T. #05-906 #8      Pg. 46 of 72

1       Q      I ask you whether you had problems being

2    off balance at the window.

3              A      If I had off balance problems?

4       Q      Yes.

5              A      No.

6       Q      No? You were never... issued a Letter

7    of Demand because of... being off balance at the

8    window?

9              A      No.

10      Q      No?

11             A      Not to my recollection.

12      Q      No. Your best recollection is no.

13             A      Uh-huh.

14      Q      Very well. I ask you whether you had

15   problems with absenteeism and tardiness, Mrs. Mayra Irene.

16             A      At some point, because of personal

17   problems...

18      Q      Uh-huh.

19             A      ...well, yes, I had some problems with

20   tardiness. I talked about it with different supervisors

21   that I had at the time...

22      Q      Uh-huh.

23             A      ...they spoke with me until, well,

24   everything was stabilized and...

25      Q      Yes.

Exhibit 37, Page 3

CERTIFIED TRANSLATION

18-Mar-05     T. #05-906 #8    Pg. 47 of 72

1          A      ...well, it came down to my needing some

2    days during the month because of some appointments I had...

3          Q      Yes,

4          A      ...and it came down to that.

5          Q      And was that tardiness frequent, Mrs.

6    Irene. Tardiness or absences.

7          A      The tardiness, yes.

8          Q      Yes?

9          A      Yes, I had them at some point... during a

10   stage at work.

11         Q      I ask you whether somehow any of the

12   supervisors in relation to the tardiness... They were...

13   Before anything else, was the tardiness reflected at the

14   time you punched in your card?

15         A      What do you mean if it was reflected?

16         Q      It was reflected, that is, you would punch

17   in the card and the time... appeared there...

18         A      That's correct.

19         Q      ...the arrival time.

20         A      That's correct.

21         Q      Yes. I ask you whether at any time any of

22   the supervisors who was there... to whom you reported,

23   right, as an employee there, whether at some point they

24   fixed one of your cards because of the tardiness, I'm

25   asking.

Exhibit 37, Page 4

**CERTIFIED TRANSLATION**

18-Mar-05     T. #05-906 #8     Pg. 48 of 72

1     A     What do you mean fix the card, I don't

2     understand.

3         Q     They somehow tampered with it. They

4     somehow gave the okay. Somehow they signed the fact that,

5     for example, the time to enter is eight thirty (8:30) and

6     you arrived at eight forty-five (8:45), well, somehow,

7     they worked your card so it would show that you entered at

8     eight thirty (8:30).

9         A     That they fixed my card...

10        Q     Yes.

11        A     Like I didn't come in at... one...

12        Q     That is the question.

13        A     ...hour and came in at another...

14        Q     Of that nature.

15        A     ...no.

16        Q     No?

17        A     To my best recollection, to me, just like

18    any employer that made a mistake when punching in...

19        Q     Uh-huh.

20        A     ...well, the supervisor must enter the

21    correct date. But that is a daily procedure with anyone

22    who makes a mistake when punching in.

23        Q     Okay. I ask you whether somehow the

24    entries that you made when you arrived late, specifically

25    any of your supervisors, specially, Enrique López,

EXHIBIT-38

U.S. Postal Service

## Assignment Order

*If temporary assignment includes hours outside of (paid) FLSA workweek, enter FLSA workweek and send copy to FLSA coordinator.

**For qualified LSM/FSM operator who works intermittently on higer level, enter "None."

| To: (Name) | | Position Title | Employee ID | | | |
|---|---|---|---|---|---|---|
| | | | 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 | | PP | PSDS Entry |
| ANGEL D. MORALES | | FTR WDCLERK | Home Installation | | | YR |
| | | | CAPARRA STATION | | Day | Init. | Hours |

| Employee Regular Tour | | Off Days | FLSA E/N | Des/Act Code | LDC | Rate Sched. | Level | Pay Loc. | |
|---|---|---|---|---|---|---|---|---|---|
| Begin Tour 05:50 | Lunch-Retn. 12:00 | Sun. Mon. | | | | | | | Sat 01 |
| Lunch-Out 11:50 | End Work 14:00 | | N | 11-0 | 48 | | PS05 | 920 | Sun 02 |

| | | | | | | | | | Mon 03 |
|---|---|---|---|---|---|---|---|---|---|

You Are Assigned and Directed to Perform the Duties as Follows:

| Position Title | FLSA Workweek* | FLSA E/N | Des/Act Code | LDC | Rate Sched. | Level | Pay Loc. | |
|---|---|---|---|---|---|---|---|---|
| WINDOW DIST CLERK | F | | | | | | | Tue 04 |
| | S | N | 11-0 | 48 | | PS05 | 004 | Wed 05 |
| | | | | | | | | Thur 06 |

| Assignment Tour | | Off Days | Location (Give exact worksite. If route, give number.) | | Finance No. | | |
|---|---|---|---|---|---|---|---|
| Begin Tour 05:50 | Lunch-Retn. 12:00 | Sun. Mon. | | | | | Fri 07 |
| Lunch-Out 11:50 | End Work 14:00 | | GPO SAN JUAN | | 42-8460 | | Sat 08 |

| Beginning of Assignment | | | Approximate Ending of Assignment | | | | Sun 09 |
|---|---|---|---|---|---|---|---|
| Date 02/15/97 | | Time 05:50 AM | Date** 05/10/97 | | Time 14:00 AM | | Mon 10 |

| Reason for Assignment | | | Check if Applicable | | | Tue 11 |
|---|---|---|---|---|---|---|
| ☐ Other (Explain): | ☐ Vacancy | ☐ Scheduled Day Off | ☒ Bargaining Unit Employee Notified by Wednesday of Week Preceding Change (Not Required for clerk craft if detailed to a nonbargaining position.) | | | Wed 12 |
| | ☐ Annual Leave | | | | | Thur 13 |
| | ☐ Sick Leave | ☒ Detail | ☐ Nonbargaining Employee Given 7 Days Notice | | | Fri 14 |

| Supervisor's Signature | Date 02/14/97 | Employee's Signature *Employee refused to sign* | Date 02/14/97 | ☐ Continued on Reverse |
|---|---|---|---|---|

PS Form 1723, January 1995 (Older Editions Not Usable)

(Fold Line)

Original to Employee
Copy to Timekeeper

## Instructions

1. **Purpose.**    Complete this form to record management-directed assignment changes involving:

   a. Temporary assignments to perform duties other than those in employee's official job description, including higher level and training assignments.

   b. Scheduled hours and/or days off when schedule change is not posted.

2. **Frequency.**    Prepare a new form for each accounting period.

3. **Approvals.**    Assignments and changes may be approved by immediate supervisor.

4. **Signatures.**    If employee is unable to sign the form, the supervisor should indicate and also identify how the employee was notified in the employee signature space.

| PP | PSDS Entry | YR |
|---|---|---|
| Day | Init. | Hours |
| Sat 01 | | |
| Sun 02 | | |
| Mon 03 | | |
| Tue 04 | | |
| Wed 05 | | |
| Thur 06 | | |
| Fri 07 | | |
| Sat 08 | | |
| Sun 09 | | |
| Mon 10 | | |
| Tue 11 | | |
| Wed 12 | | |
| Thur 13 | | |
| Fri 14 | | |

TransFORM PS Form 1723, January 1995 (Reverse)

Exhibit-39

This case was accepted because, although
there are no EEO, grievance or Labor Board
resolutions in file (as these complaints are
still pending) the claimant submitted clear
proof of retaliation by his Employer to
his OSHA complaints + evidence that a
lettr of Warning was recinded. He was moved
from his duties without explanation + his
car was vandalized several times in the
Employers parking lot. He was threatened
and the list goes on + on. At the very
least I feel a Hostile Work Environment
was established. In addition the medical
report described the work incidents in detail
+ gave a rationizied opinion on CR.
After reading the whole case file + finding
no controversion from the agency, I called
Miss Burgos the ICS + she stated the agency
did not prepare a controversion.

TJF
9/24/97

Exhibit-40 page-1

Antonio Lopez →

TDM9 CARIBBEAN CUST SVC DISTRICT
R0125
SENIORITY LIST TO POST

HUMAN RESOURCES INFORMATION SYSTEM
SENIORITY ROSTER

REQUESTING INSTALLATION: NB42
BIDDING INSTALLATION: NB42 ALL
SAN JUAN POST OFFICE

REQUESTED: 10/06/05 08:01:19
PRODUCED: 10/06/05 08:01:44
PAGE:

| CRAFT | EMPLOYEE NAME | | CLERK EMPLOYEE ID | SENIORITY | RANK | FULL TIME/PTR REMARKS | DES/ACT |
|---|---|---|---|---|---|---|---|
| 361 | RIVERA PEDRO | JOSE A | 9701 | 12/11/93 | 14 | FSMQ | 110 |
| 362 | RIVERA FELIX | A | 2094 | 12/11/93 | 17 | | 110 |
| 363 | ORELLANO IDARIS | C | 0919 | 12/11/93 | 18 | | 110 |
| 364 | BRINDLE JOHN | D | 0714 | 12/11/93 | 20 | | 110 |
| 365 | CRUZ LYDIA | | 1755 | 12/01/94 | 1 | | 110 |
| 366 | OTERO CRISTOBAL | | 2720 | 01/08/94 | 4 | | 110 |
| 367 | STELLA GLADYS | | 0295 | 01/22/94 | 1 | | 110 |
| 368 | CARRERA JOSE | J | 0441 | 01/22/94 | 3 | | 110 |
| 369 | SANTIAGO IVAN | V | 6239 | 01/22/94 | 2 | LSMQ | 110 |
| 370 | SANTIAGO IVAN | V | 0971 | 01/22/94 | 4 | FSMQ | 110 |
| 371 | MARTINEZ HAYDEE | | 9648 | 01/22/94 | 5 | FSMQ | 110 |
| 372 | MAUSER NORMA | I | 7138 | 02/19/94 | 2 | FSMQ | 110 |
| 373 | GARCIA NELSON | | 7405 | 02/19/94 | 1 | | 110 |
| 374 | SOSTRE JOSE | | 7010 | 04/30/94 | 2 | | 110 |
| 375 | MELENDEZ NEREIDA | | 0443 | 04/30/94 | 1 | LSMQ | 110 |
| 376 | GARCIA NANCY | | 2800 | 05/14/94 | 1 | | 110 |
| 377 | CORDERO RICARDO | | 2924 | 06/25/94 | 2 | | 110 |
| 378 | AVILES ELIEZER | | 8674 | 06/25/94 | 5 | | 110 |
| 379 | CALDERON LUZ | | 5624 | 06/25/94 | 1 | FSMQ | 110 |
| 380 | EMERSON CARMEN | E | 7785 | 07/09/94 | 5 | | 110 |
| 381 | LOCO RUBEN | | 9424 | 07/23/94 | 1 | | 110 |
| 382 | QUINONES CARMEN | | 3401 | 10/01/94 | 1 | | 110 |
| 383 | RIVERA ORLANDO | N | 6237 | 10/15/94 | 2 | | 110 |
| 384 | MATOS RIVERA LETICIA | | 2584 | 11/12/94 | 2 | | 110 |
| 385 | ORTIZ CARMEN | M | 0335 | 10/15/94 | 1 | | 110 |
| 386 | CORRERA ANGEL | O | 7058 | 11/12/94 | 2 | | 110 |
| 387 | CONCEPCION NOEL | | 9294 | 11/26/94 | 4 | FSMQ | 110 |
| 388 | COLON BIENVENIDO | | 5538 | 11/26/94 | 3 | FSMQ | 110 |
| 389 | VILLAFANE MODESTA | | 0150 | 11/26/94 | 6 | LSMQ | 110 |
| 390 | RODRIGUEZ JULIO | | 1877 | 11/26/94 | 9 | LSMQ | 110 |
| 391 | RIVERA RAFAEL | | 6012 | 11/26/94 | 11 | | 110 |
| 392 | MORALES ANGEL | R | 4561 | 11/26/94 | 12 | LSMQ | 110 |
| 393 | MALDONADO SANDRA | I | 8965 | 11/26/94 | 13 | | 110 |
| 394 | PADILLA MARYV | T | 2614 | 12/10/94 | 2 | | 110 |
| 395 | SALGADO WILSON | | 6039 | 12/24/94 | 12 | | 110 |
| 396 | CABRERA ADRIAN | | 0061 | 01/21/95 | 1 | | 110 |
| 397 | REYES MAGALY | | 5934 | 01/21/95 | 1 | | 110 |
| 398 | DE HOYOS ROBERTO | | 8443 | 04/15/95 | 4 | FSMQ | 110 |
| 399 | RIVERA ROBERT | | 3016 | 04/17/95 | 2 | | 110 |
| 400 | ISABELL JOSE | | 7649 | 05/27/95 | 1 | | 110 |
| 401 | RAMOS CARMEN | | 7718 | 06/24/95 | 1 | | 110 |
| 402 | LOPEZ ANTONIO | | 1427 | 06/24/95 | 2 | | 110 |
| 403 | LEBRON-MALAT CARMEN | | 9939 | 06/24/95 | 1 | | 110 |
| 404 | MARTINEZ PEDRO | | 1329 | 06/25/95 | 1 | | 110 |
| 405 | MUNIZ MARIA | | 3825 | 07/08/95 | 1 | | 110 |

FROM :                          FAX NO. :                    Nov. 14 2005 08:15AM P5

Exhibit-40, Page-2

CM9  CARIBBEAN CUST SVC DISTRICT        HUMAN RESOURCES INFORMATION SYSTEM
0025                                    SENIORITY ROSTER
SENIORITY LIST TO POST                                                      PAGE:        15
                                                                            REQUESTED:  10/06/05 08:01:31
REQUESTING INSTALLATION: MB42          SONIA                                PRODUCED:   10/06/05 08:01:44
BIDDING INSTALLATION:    MB42   SAN JUAN POST OFFICE

| RAFT | EMPLOYEE NAME | | CLERK EMPLOYEE ID | SENIORITY | RANK | FULL TIME/PTR REMARKS | DES/ACT |
|---|---|---|---|---|---|---|---|
| 181 | ALVAREZ | ADALIZ P | 1223 | 03/12/88 | 3 | | 110 |
| 182 | SANTOS | LUIS | 9580 | 03/12/88 | 4 | | 110 |
| 183 | BELTRAN | FLORENTINO P | 0159 | 04/01/88 | 1 | | 110 |
| 184 | NIEVES/MB | JORGE J | 6932 | 04/23/88 | 2 | | 110 |
| 185 | CEDENO | ROSA | 4190 | 04/23/88 | 7 | FSMQ | 110 |
| 186 | ROSATO | WANDA I | 2416 | 04/23/88 | 7 | | 110 |
| 187 | SANTIAGO | ENID | 1864 | 05/07/88 | 2 | LSMQ | 110 |
| 188 | RIOS | DAVIS | 3331 | 05/07/88 | 6 | LSMQ | 110 |
| 189 | COLON | ORLANDO | 3099 | 05/07/88 | 5 | | 110 |
| 190 | VARGAS | JORGE A | 1023 | 05/07/88 | 8 | | 110 |
| 191 | SANCHEZ | CARLOS | 0432 | 05/07/88 | 6 | LSMQ | 110 |
| 192 | MORALES | DANIEL | 7703 | 05/07/88 | 11 | | 110 |
| 193 | ROMERO | OSCAR | 5123 | 05/07/88 | 5 | | 110 |
| 194 | | NANCY M | 0974 | 05/21/86 | 12 | | 110 |
| 195 | BURGOS | FRANCISCO | 8677 | 06/04/86 | 10 | | 110 |
| 196 | SANCHEZ | WILFREDO | 9970 | 06/21/86 | 3 | FSMQ | 110 |
| 197 | RIOS | OSCAR | 3696 | 06/23/86 | 4 | | 110 |
| 198 | COLON | RICARDO | 2804 | 07/02/86 | 3 | | 110 |
| 199 | HERNANDEZ | JESUS A | 9570 | 07/02/85 | 4 | | 110 |
| 200 | MEDINA | JUAN E | 7618 | 07/07/85 | 8 | FSMQ | 110 |
| 201 | MORALES | ALFREDO | 1325 | 07/07/85 | 11 | FSMQ | 110 |
| 202 | DEL HOYO | ANGEL O | 1927 | 07/07/85 | 12 | FSMQ | 110 |
| 203 | MORALES | GISELA | 0961 | 07/02/98 | 3 | FSMQ | 110 |
| 204 | DIAZ | ANTONIO | 0762 | 07/30/88 | 1 | | 110 |
| 205 | GRACIA | HECTOR | 0220 | 07/10/88 | 2 | | 110 |
| 206 | CASTRO | EDWIN L | 0981 | 07/30/88 | 6 | FSMQ | 110 |
| 207 | PACHECO | JUAN | 1954 | 07/30/88 | 9 | | 110 |
| 208 | CRUZ | EFRAIN | 9735 | 07/30/88 | 7 | | 110 |
| 209 | ROBLES | MANUEL | 2164 | 07/30/88 | 14 | | 110 |
| 210 | NAVARRO | VICTOR D | 2225 | 07/30/88 | 23 | | 110 |
| 211 | AYALA | JUAN A | 0903 | 07/30/88 | 25 | | 110 |
| 212 | TORRES | MIGUEL A | 5144 | 07/30/88 | 30 | | 110 |
| 213 | RODRIGUEZ | MIGDALIA | 6911 | 07/30/88 | 36 | | 110 |
| 214 | SOTO | SANTIAGO | 8552 | 08/13/88 | 37 | FSMQ | 110 |
| 215 | PENA | CARLOS | 8026 | 08/13/88 | 4 | LSMQ | 110 |
| 216 | RIVERA | ALIDA A | 0187 | 08/13/88 | 5 | FSMQ | 110 |
| 217 | MARTINEZ | VICTOR M | 0480 | 08/13/88 | 7 | FSMQ | 110 |
| 218 | FELIX | SANTOS | 2625 | 08/27/88 | 1 | | 110 |
| 219 | LYNNE | JUAN | 7524 | 08/27/88 | 3 | | 110 |
| 220 | RIVERA | MILDRED H | 8155 | 08/27/88 | 2 | LSMQ | 110 |
| 221 | MATEO | ANGEL | 4141 | 09/24/89 | 5 | | 110 |
| 222 | RODRIGUEZ | MARIA M | 7033 | 09/24/68 | 3 | LSMQ | 110 |
| 223 | PADILLA | TOMAS H | 9283 | 09/24/88 | 6 | LSMQ | 110 |
| 224 | REYES | MEREDITH | 9802 | 09/24/88 | 6 | LSMQ | 110 |
| 225 | DIAZ | FRANCISCO | 9573 | 10/08/88 | 3 | FSMQ | 110 |