1     IN THE UNITED STATES DISTRICT COURT

2        FOR THE DISTRICT OF PUERTO RICO

3

4  *    *    *    *    *    *    *

5  ANGEL D. MORALES-VALLELLANES,  *

6  Plaintiff,                     *

7  vs                             *    CIVIL #97-2459(GAG)

8  JOHN D. POTTER, et als,        *

9  Defendants                     *

10 *    *    *    *    *    *    *

11

12

13

14

15

16

17 THE DEPOSITION OF:

18              GUILLERMO HOYOS

19 was taken on the 24th of October, 2006 at the offices of

20 the UNITED STATES ATTORNEY, Suite 1201 Torre Chardón

21 Building, 350 Carlos Chardón Street, San Juan, Puerto

22 Rico, commencing at 10:00 A.M.

23

24

25

2

```
 1   APPEARANCES:

 2   For Plaintiff:

 3   MIRANDA LAW OFFICES

 4        Calle Mayaguez #22

 5        Hato Rey, P.R.

 6   BY:  MIGUEL MIRANDA-GUTIERREZ, ESQ.

 7

 8   For Defendants:

 9   US ATTORNEY'S OFFICE

10        Suite 1201 Torre Chardón Bldg.

11        350 Carlos Chardón St.

12        San Juan, P.R.

13   BY:  FIDEL SEVILLANO, ESQ.

14        Assistant U S Attorney

15

16

17

18

19

20

21   ALSO PRESENT:

22   LAURA STUBBS - Court Reporter

23   AUSA REBECCA VARGAS - Notary Public

24   ANGEL D. MORALES - Plaintiff

25
```

3

PROCEEDINGS

1

2          MS. VARGAS: Do you solemnly swear to make

3   a faithful transcript of everything that is said here in

4   this deposition?

5          COURT REPORTER: Yes, I do.

6          MS. VARGAS: Doctor Guillermo Hoyos, do yo

7   solemnly swear to tell the truth, the whole truth and

8   nothing but the truth of everything that is asked here

9   in this deposition?

10          DEPONENT: I do.

11          MS. VARGAS: Okay.  The notary asks that

12   the notary is excused.

13          MR. SEVILLANO: Thank you very much,

14   Rebecca.

15             (The notary exits the room.)

16          MR. SEVILLANO: Okay, let's go straight

17   into the deposition.

18   Whereupon,

19                  GUILLERMO HOYOS

20   after first having been duly sworn by the notary public,

21   was examined, and testified as follows:

22   DIRECT EXAMINATION BY MR. SEVILLANO:

23   Q    Doctor Hoyos, you've been in depositions before?

24   A    Yes.

25   Q    You're a seasoned psychiatrist, I've known you for

4

1   many years in other litigation, so there no need to

2   advise you that this is a question and answer session.

3   We expect the honest answers to the best of your

4   ability.  If you don't understand the question, by all

5   means let me know and I'll rephrase it so that you can

6   understand the question.  The purpose of this deposition

7   is not to trick you by any means.  We're just interested

8   in straight answers and I hope I can pose to you

9   straight questions.  Is that understood, sir?

10  A    Yes, sir.

11  Q    Okay.  You're under oath and present is Brother

12  Counsel Miguel Miranda and plaintiff, Angel Morales

13  Vallellanes.

14            MR. SEVILLANO:  Stipulations, we will

15  request that this deposition be expedited; I'll try to

16  make it as short as possible due to the constraint of

17  time.  So let's stipulate fifteen days upon receipt of

18  the deposition to make the ...

19            MR. MIRANDA: We don't have any problem

20  with that.

21            MR. SEVILLANO: ... the changes allowed by

22  the Federal Rules.  By changes we mean a misspelling of

23  technical words and the like; you cannot alter or amend

24  what you said.  What you say today is history, it's

25  said, and in due course in court you will have your

5

1  opportunity to clarify what needs to be clarified, but

2  you are allowed to make, again, changes in technical

3  words, misspelling of words and the like.

4                      MR. MIRANDA: Does Brother Counsel request

5  from Doctor Hoyos that it should be signed or only if he

6  has any ...

7                      MR. SEVILLANO: Yes, yes, if you have any

8  corrections, there's an errata sheet at the end of the

9  deposition.  You just put Line 9, whatever, it says

10  Guillermo with a J, Y, it should be Guillermo with a G.

11  And then you return it to Brother Counsel and then he

12  returns it to me.  Those changes are definitely allowed.

13  And all exceptions, except as to form and privilege, are

14  not deemed waived and they shall be raised in trial in

15  due course.  Any preliminary matter, Brother Counsel?

16                      MR. MIRANDA: No.

17                      MR. SEVILLANO: Okay.  Let's go back to

18  the deposition.

19  BY MR. SEVILLANO:

20  Q     Your name for the record, sir?

21  A     Guillermo José Hoyos Precssas.

22  Q     You're a psychiatrist; that's correct?

23  A     Yes, sir.

24  Q     And I see from your report, dated June 29th, ' 06,

25  right?

6

1  A     Yes, sir.

2  Q     June 29, '06, that you're a Diplomat from American

3  College of Forensic Examiners; is that correct?

4  A     Yes, sir.

5  Q     And from your curriculum vitae, I also see that

6  you're a member of the American College of Forensic

7  Examiners; is that correct?

8  A     That's right.

9  Q     And you're also a member of the American College of

10  Forensics Examiners; is that correct?

11  A     Yes, sir.

12  Q     And also a member of the American Academy of

13  Psychiatry and the Law?

14  A     Yes, sir.

15  Q     And also a member of the American Psychiatric

16  Association?

17  A     Yes, sir.

18  Q     Okay.  Now, did you bring to the deposition today

19  your medical record from June until the present?

20  A     Yes, it's here.

21              MR. MIRANDA: Is that a copy for Brother

22  Counsel?

23              DEPONENT: No, that's ...

24              MR. SEVILLANO: We have to make a copy of

25  it.

7

1  BY MR. SEVILLANO:

2  Q    So besides your report, this is the only addendum

3  to your report; is that correct?

4  A    That's it.

5  Q    Okay, so we'll make a copy of it. We'll in due

6  course ask you questions about it.

7       Okay.  Sir, since when have you been treating Mr.

8  Morales Vallellanes?

9  A    Well, I initially saw Mr. Morales Vallellanes on

10  February 5, 1997.  It was not for treatment at that

11  time.  He came to see me because he had a case and he

12  wanted to submit a report to Worker's Compensation

13  Program, so I interviewed him during that time and made

14  this report here, which was sent to Office of Worker's

15  Compensation Program, Employment Standards

16  Administration.

17  Q    Okay.  So according to what you have given me, you

18  evaluated Mr. Morales on February 5th, 11th, 19th, 21st and

19  27th of 1997; is that correct?

20  A    That is so.

21            MR. MIRANDA: What month?

22            DEPONENT: February.

23            MR. SEVILLANO: February 1997.

24  BY MR. SEVILLANO:

25  Q    And it was for the purposes of submitting an OWCP

1  claim for Mr. Morales Vallellanes; is that correct?

2  A     That is true.

3  Q     In other words, he requested from you that you

4  submit your psychiatric evaluation in support of his

5  OWCP claim; is that correct?

6  A     He requested from me to examine him and then

7  determine whatever I had to determine then and then send

8  the report.

9  Q     Okay.  You did examine him at that time; right, on

10 February 5th?

11 A     Yes.

12 Q     And did you also examine him on February 11th?

13 A     Yes.

14 Q     And the 19th and the 21st and the 27th?

15 A     Yes, sir.

16 Q     Okay.  Now, after you examined him, what was your

17 diagnosis?

18 A     At the time, was what is called an adjustment

19 disorder, mixed, which means anxiety and depression, and

20 carries the code of 309.28, severe, with features of a

21 post traumatic stress disorder.

22 Q     Now, after you diagnosed him, did you treat him?

23 A     After I diagnosed him, then he asked me that he

24 would like to continue being seen by me and then I began

25 treatment with him.

9

1  Q     So you began treatment of Mr. Morales Vallellanes

2  in 1997; is that correct?

3  A     That is true.

4  Q     And have you been treating him for the past ...,

5  since then?

6  A     Since then.

7  Q     You've been his physician, his psychiatrist, if you

8  will, from 1997 to present; is that correct?

9  A     To the present, yes.

10  Q     And in his treatment, have you had a chance to

11  treat him with medications?

12  A     Yes, sir.

13  Q     What type of medications have you given Mr. Morales

14  Vallellanes?

15  A     I prescribed him anti depressants and tranquilizers

16  and hypnotic ..., medication has changed during the

17  time; depends because sometimes I have used some

18  medications which could have the potential to be habit

19  forming, so I changed and I give him something else, but

20  more or less have been anti depressants and

21  tranquilizers off and on, and hypnotics at times.

22  Q     Okay.  Now, you mentioned adjustment disorder when

23  you examined him on February 5th and the 11th.  In

24  February of 1997 you examined him one, two, three, four,

25  five times; right?

10

1    A    That is true.

2    Q    And then you came to the conclusion that he had,

3    among other things, adjustment disorder; tell me about

4    that?

5    A    You want me to tell you about adjustment disorder?

6    Q    Well, as applied to him. what did you find in him

7    that prompted you to diagnose adjustment disorder?

8    A    Okay.  The definition of adjustment disorder is a

9    reaction to a stressor on the environment which can be

10   of different kinds, in the work can be found, etcetera,

11   and the way the person reacts to that stressor with

12   anxiety and/or depression and the person's symptoms

13   persist for over a month and sometimes becomes chronic,

14   like in his case, and as far as the history he brought

15   and the findings that I make, that he was quite anxious

16   because of the different events occurring at his work

17   site and the way he was dealing with this, he was trying

18   to cope, and of course, these events these events were

19   producing stress at a cognitive and psychological level

20   and at the same time he was trying to cope with that,

21   trying to do whatever he could do best.  These brought

22   on, you know, the symptoms that signal, you know,

23   towards the diagnosis that I made.  He was depressed,

24   anxious, insomniac.  He had sought help, psychological

25   help, before me, and later, psychiatric help from me, as

11

1 stated.

2 Q    Okay.   Then, following your six times you saw him

3 in February 1997, when did you see him again?   After

4 February of 1997, did you see him again?

5 A    Yes.

6 Q    When did you see him again?

7 A    I don't have that here because you told me to bring

8 only those, but I saw him ..., February 1997, probably I

9 must have seen him a month later.   His visits were on a

10 monthly basis.

11 Q    So would it be true to say that since 1997, you've

12 been seeing Mr. Morales Vallellanes more or less on a

13 monthly basis?

14 A    Monthly or bi-monthly, or two months.

15 Q    Up to present?

16 A    Up to present.

17 Q    Now, let's go back to February 1997.   You tell us

18 that he came to you to seek your psychiatric advice and

19 treatment in support of an Office of Workmen's

20 Compensation claim; is that correct?

21 A    That is true.

22 Q    Now, you mention also in your report, dated June

23 29, 2006, that also you were consulted as a

24 psychiatrist, then as a treating physician, for a claim

25 that he had under OSHA; is that also correct?

12

1    A    Yes.

2    Q    And also he had an EEO complaint, so he came to you

3    in support of that claim, he contacted you; is that

4    correct?

5    A    Yes, he contacted me and told me that he had this

6    situation, which obviously were related to his work

7    environment, and that OSHA, you know, was requesting

8    ..., I mean, OWCP was requesting, you know, a report on

9    that.

10   Q    But the fact is your intervention as Mr. Morales'

11   treating physician came for the Office of Workmen's

12   Compensation; is that correct?

13   A    Yes, initially.

14   Q    Initially?

15   A    Uh-huh.

16   Q    Okay.  And how did that change in the future?

17   A    Well, because later I continued to give him

18   treatment.  I mean, the first thing was the report made.

19   Then the request he made from me for me to give him

20   treatment, and then I continued on that and then, of

21   course, in that same report, things were said about the

22   situation that he was going through.

23   Q    Okay.  Did there come a time that you had to submit

24   additional psychiatric reports to OWCP?

25   A    Oh yes.

13

1  Q     On how many occasions, that you can recall at this

2  time?

3  A     About six or seven occasions.

4  Q     In other words, you submitted six or seven, more or

5  less, based on your recollection at this time, six or

6  seven what did you submit to OWCP?

7  A     Well, OWCP would request, at different times, you

8  know, that I submit reports based on the questions, a

9  specific questionnaire that they had.  They sent me

10 those questionnaires and they said that according to

11 whatever they were asking, how was he doing, what was

12 his progress, etcetera, initially what was the cause of

13 all this, etcetera, and that the treatment being given,

14 the response to treatment, the availability or non

15 availability for work, so all of those things or

16 questions were included and I had to fill that

17 according, you know, to what I was detecting at the time

18 and send it over and that occurred for over about five

19 or six or seven times.

20 Q     Okay.  So you continued to treat Mr. Morales, and

21 as a result of that treatment, you submitted reports to

22 OWCP advising OWCP on the course of action of your

23 treatment and you answered some questions from OWCP

24 regarding the course of Mr. Morales' treatment with

25 yourself; is that correct?

14

1   A      That is so.

2   Q      When was the, if you can recall, the last report

3   that you submitted to OWCP?

4   A      I think it was in two thousand ..., this year.

5   Q      Okay.  Is that June 29th, 2006 report that you

6   submitted to us, is that the same one that you submitted

7   to OWCP?

8   A      No, because that is just a progress, a clinical

9   progress, but the report is not there.

10  Q      Okay.  I have a report, a comprehensive psychiatric

11  report, that Brother Counsel submitted, dated June 29th,

12  2006?

13  A      Okay, but that was the report written for the law

14  case.

15  Q      For the pardon?

16  A      For the case.

17  Q      For this case?

18  A      Yes.

19  Q      This report was ...

20  A      I was asked, you know, that the judge was

21  requesting that I submit a report which covered, you

22  know, all the findings, etcetera, to the ...

23  Q      And you submitted this report?

24  A      Yes.

25  Q      The June 29th, 2006 report?

15

1   A     That's right.

2   Q     Now, my question is, did you submit this report to

3   OWCP also?

4   A     No, not to OWCP.

5   Q     So OWCP doesn't have this?

6   A     I don't think so.

7   Q     Okay.  Now, when was the last report to OWCP,

8   submitted to OWCP?

9   A     It was during this same year, 2006.  We are now in

10  October; that might have been by April or something like

11  that.  That's available, if you want it.

12  Q     Do you have it here?

13  A     No, I don't have it here.

14  Q     Okay.  So, in summation, the report that you

15  submitted to OWCP, what does it say essentially as to

16  Mr. Morales Vallellanes?

17  A     Well, it talks about his ongoing condition.  What

18  they have been more interested on is on the development

19  of his condition, the progress of that condition, the

20  treatment of that condition, and at times, you know,

21  they have asked his availability for work, etcetera.

22  Q     From a psychiatric point of view; right?

23  A     From a psychiatric and emotional point of view.

24  Q     And what has been your report?

25  A     Well, the report, based on the clinical findings,

1    which also includes, because they have asked for that

2    and it's usually in my procedure, you know, at certain

3    times, you know, to test the individual to see, you

4    know, if what they are telling me is what I see, or what

5    is detected, and I use the scales, and those scales are,

6    for example, the Hamilton Scale for Depression, the

7    Hamilton Scale for Anxiety, and I have used those scales

8    and the scales and my own clinical findings have been

9    that all throughout, the main thing has been, or the

10   common denominator that the ongoing process has kept him

11   on a state of turmoil on and off, that he has been

12   unable to work, at least going back to work in the same

13   environment or area that he was working, that I have

14   advised that he, among other things, that he start to

15   deviate his mind, you know, from this ongoing process

16   which has taken a long time, and that includes what I

17   call R and R, recreation and relaxation, so I tell him,

18   you know, that he could enjoy music, which he likes, or

19   whatever it is in that sense, as part of the therapy, so

20   the findings have been more or less the same throughout

21   the years and the clinical treatment and I have informed

22   that to them.  Also I've given evidence of the scales

23   applied which support those findings.

24   Q    So you have conducted some studies, like the

25   Hamilton Scales of Depression and what you have told us?

17

1   A    Yes.

2   Q    Empirical studies, right?  Empirical studies to

3   assess ...

4   A    Here they are.  As a matter of fact, let me see.

5   Ah, this was about one of the first reports sent to

6   OWCP.

7                MR. MIRANDA: Let me see that.

8   BY MR. SEVILLANO:

9   Q    And as you said, you have conducted tests to

10   evaluate his condition and advise you on treatment of

11   Mr. Morales; is that correct?

12   A    Yes, at intervals.

13   Q    At intervals?

14   A    Not all the time, but at intervals.

15   Q    At intervals, during the years?

16   A    Yes.

17   Q    And those reports, those tests, if you will, that

18   you have conducted during the years, have formed the

19   basis, part of the basis of your report to OWCP on Mr.

20   Morales' condition?

21   A    In terms of his emotional condition and development

22   and progress, yes.

23   Q    Okay.  Now, I ask you, you know that Mr. Morales

24   ceased to work in the Postal Service, not ceased, but

25   went on OWCP status since 1997; you're aware of that,

1    right?

2    A    Yes, sir.

3    Q    And he hasn't gone back to the Postal Service since

4    1997; he has been out of the Postal Service, if you

5    will, for the past ten years; right?

6    A    Yes.

7    Q    Nevertheless, you still opine that his mental

8    condition is related to his work condition.  Now, I ask

9    you to explain to the record how could that be when he

10   has been away from his work since 1997, so his stressors

11   have not been there, or what are the stressors that you

12   rely on to support your opinion that he's still on a

13   condition, the same condition, practically, as in 1997?

14   A    Okay.  Well, his condition. I don't think that it's

15   the same condition because I have stated in the report

16   that he has improved with medications.  It's here.  But

17   I said that in the beginning, he had those stressors.

18   Okay.  And he has been under treatment, and as I said,

19   he has improved to a certain extent, because he's not

20   under the same stressor as in the Post Office, but the

21   point is then that the ongoing legal process and all of

22   this throughout the years is a stressor that is there,

23   it has not passed away, it's there.  So I would say that

24   although his condition might have improved, and I said

25   that, because at the beginning, he had an adjustment

1  disorder, progressed to a major depression, because of

2  the findings and the symptoms he was, I would say, quite

3  ill in that sense.  Later he improved with treatment.

4  Now, the diagnosis that I make now is a much lesser,

5  similar to what I saw at the beginning, which later I

6  said changed to a major development disorder, what I say

7  here in Page Number 17.

8  Q    You're referring to the June 29th?

9  A    The June 29 report.

10  Q    Page 17, okay.

11  A    Page 17, Diagnosis.

12  Q    Okay, go on?

13  A    Okay.  Page 17.  The diagnosis that now I specify

14  is an adjustment disorder mixed, anxiety and depression

15  chronic present, at the present time, and it's moderate,

16  you know, is not as severe as it was before, and

17  obviously, because he has been under treatment, there

18  has been some improvement, but still, you know, it's

19  there.

20  Q    Okay, let me ask you a question, doctor.  So let's

21  assume, hypothetically, that Mr. Morales does not have

22  this case, that he doesn't have ..., he is not carrying

23  this case.  You're saying that if this case would not

24  exist, he would be 100% okay?

25  A    Well, you know, he's carrying not only the case,

20

1    but he's carrying the burden of all the previous

2    stressors over there and the fact that nothing was done

3    wbout that, up to the present date, as he has told me

4    and it has come out, and of course, if he didn't have

5    anything, he says that himself at the end.  Let me see.

6    Q    If it weren't for this case, he would be ..., he

7    said something, "were it not for this problem and case,

8    I would be a normal happy functioning guy"?

9    A    Okay.

10   Q    That's what he said?

11   A    Yes.  That's on Page?

12   Q    Page 16, at the bottom.

13   A    16, yes.

14   Q    So you agree with him?  "Were it not for this

15   problem and case I would be a normal happy functioning

16   guy"?

17   A    Okay.  Remember, you know, that ...

18   Q    First of all, do you agree with him?

19   A    Well, let me explain.

20   Q    Well, do you agree with him, yes or no, and then

21   explain?

22   A    I would say, you know, that of course, it's here,

23   because he has this case, which he didn't have before,

24   and he has been going through all of these stressors

25   throughout time, and those stressors have got an impact

1   on that.  As a matter of fact, you know, that I am

2   quoting here this study, which is included in quotes in

3   this report, and one of the things that it says here,

4   for example, in this study, okay ...

5   Q    Page?

6   A    Page 20.  It says here, second paragraph, it says

7   (Reading) "Mr. Morales has been the object of violence

8   at work, such as the acts described before, which is

9   part of the overall picture that have catalyzed the

10  development of his emotional condition, being trauma

11  related incidents".

12  Q    Excuse me.  Those you're referring to the incidents

13  that he told you happened in 1997; is that correct?

14  A    The incidents that he told me, but that also, as I

15  mentioned here, sources of information which includes

16  the sworn statements, you know, from all these people.

17  Q    Okay.  But all that scenario, isn't it a fact that

18  it was from 1997?

19  A    Yes, from 1997.

20  Q    Right.  But my concern is, my question is, you're

21  saying that this case has become a stressor for him?

22  A    It has become a stressor.

23  Q    It has become a stressor.  And he says that were it

24  not for this case, in other words, were it not for this

25  stressor, he would be a happy normal functioning guy;

1  that's what he said?

2  A    That's what he said.

3  Q    Okay.  Now, if we can put two and two together,

4  wouldn't it be a conclusion to say that were it not for

5  this case, he would be A-Okay?

6  A    Well, were it not for this case, he wouldn't be

7  here.

8  Q    No, but my question is that you told us that you

9  consider this case a stressor for him.  There were

10  stressors in 1997; right?

11  A    Yes.

12  Q    Those stressors are history.  In 1997 those

13  stressors ceased to exist.  However, you're telling us

14  that those stressors continued in his mind and were

15  exacerbated possibly by this case, which as we speak, he

16  still has a stressor based on this case; that is what

17  you have told us, right?  That's the way I understood

18  you.

19  A    It's not that ..., because you know, we're saying

20  here that the case is the stressor, like it were the

21  only stressor, but really it's part of the stressors

22  because what got him into the case was the previous

23  stressors.

24  Q    What percentage would you say is a residual

25  stressor, to correlate the term, of the 1997 scenario

23

1  versus this case stressor; what percentage, if one could

2  say it that way, would you attribute, what percentage

3  would you attribute to the residual of the 1997

4  stressors that you have mentioned and the stressor

5  caused by this case?

6  A    Okay.  It's that the ..., you know, that's a kind

7  of difficult thing to do, like assign, you know, a

8  percentage to those stressors before and then just see

9  this case from a unique point of view, you know, that

10 this is a stressor.  Of course it is a stressor, you

11 know, but he's immersed, you know, in all the situations

12 having to do with the case, the depositions, you know,

13 etcetera, etcetera, coming here, whatever legal things,

14 you know, I'm not going to get into that, but that he

15 knows and counsel here knows, and that's one thing.  Any

16 case would cause stressors, but what got him to the case

17 is the previous situations.

18 Q    No, I understand that, doctor, I'm very aware of

19 that, but my question is if from your standpoint, you

20 have told us that he has improved throughout the years;

21 is that correct?

22 A    He has improved somehow with treatment.

23 Q    With treatment?

24 A    Uh-huh.

25 Q    Your treatment?

24

1  A    Yes.

2  Q    Now, you have treated him, so you know how he has

3  been throughout the years and you have told us that he

4  has definitely improved, that the comndition he has now

5  is not as severe, if you will, that he had when he had

6  it back in 1997; is that correct?

7  A    Well, he has been under treatment.

8  Q    He has been under treatment?

9  A    Yes.

10  Q    And the treatment has worked; right?

11  A    Has worked.

12  Q    Why?  Because he has improved.  Now, my concern is,

13  he has improved because of your treatment and your

14  advice, granted, but isn't it also a fact that he has

15  improved because he has left behind the February 1997

16  stressors, just by the passage of time?

17  A    Well, he has not been, you know, in the same stress

18  laden area.

19  Q    He has been outside the Postal Service since 1997.

20  Would you say, as a psychiatrist, that that has

21  benefitted him, from a psychiatric point of view,

22  coupled with your treatment?

23  A    Okay.  The only thing it has benefitted him, maybe,

24  in a way that you say, but financially it has not

25  benefitted him.

1 Q    But that's another problem, but from a psychiatric

2 point of view ...

3 A    But that has to add ...

4 Q    But your intervention here is as a treating

5 psychiatrist; is that correct?

6 A    Yes, but I have to consider everything now because

7 he brings up the financial situation.

8 Q    Okay.  The financial situation, do you know that

9 he's receiving two thirds of his pay from OWCP, tax

10 free; do you know that?

11 A    Yes, yes, he's receiving part of the pay.

12 Q    So, theoretically, there could be an argument that

13 he's receiving more or less the same pay that he

14 received when he was working, more or less?  Without

15 entering into much detail, he's not financially in the

16 woods; right?

17 A    Uh-huh.

18 Q    He's earning money from OWCP; is that correct?

19 A    Okay.  But would you sort of rephrase the question?

20 Because you know, you want me to assign percentages.

21 Q    Well, if you can.  I mean, what I'm trying to say

22 is that the passage of time, wouldn't you agree with me,

23 doctor, that the passage of time in this case, coupled

24 with your treatment, has caused the improvement of Mr.

25 Morales Vallellanes?  Wouldn't you agree with that?

1  A    Well, obviously, you know, we are not in the same

2  position as he was when he came to see me.

3  Q    Of course; why not?  Why would you say he's not now

4  in the same position that he was in February of 1997

5  A    Well, because as we said, he's not under the same

6  stressors right there, you know, but he has been

7  experiencing the aftermath of that.

8  Q    Which is this case?

9  A    The case, which is prompted by the aftermath of

10  that situation.

11  Q    So what you're saying is that he has substituted

12  stressors, now this case has been substituted for the

13  past stressors; is that what you're saying?

14  A    Well, it's that the case per se, since the

15  beginning, which is related to this events, you know,

16  has been ..., is one of the sources of stressors.

17  Q    You consider the case a stressor in itself?

18  A    And remember, you know, that this has been in his

19  mind, too.

20  Q    Okay.  But my question is, you have been treating

21  him for the past ten years?

22  A    Yes.

23  Q    In his mind, would you say that this case is a

24  stressor for him?

25  A    Well, I made a diagnosis, you know, of features,

1  not completely post traumatic stress disorder, you know,

2  because if I can quote, for example, what the book says

3  on that ...

4  Q    But before we get into the book, because that's

5  your corner, that's your corner.  What I want to know,

6  as a lay person, would you consider a stressor for Mr.

7  Morales Vallellanes this case?

8  A    This case is a stressor.

9  Q    For him?

10  A    For him.

11  Q    Okay.  That's all I wanted to know.  You agree with

12  that, that this case is a stressor for him?

13  A    Is one of the stressors.

14  Q    What are the other ones?

15  A    All the past things that happened that brought him

16  up to this case.

17  Q    The February 1997 scenario?  Let's call it

18  collectively the February 1997 scenario?

19  A    All that collectively brings over to this case,

20  which also is a stressor.

21  Q    And that equates to his present condition?  His

22  present mental condition is conditioned to the past and

23  present stressors, being the present stressor the case;

24  is that correct?

25  A    It's related.

28

1  Q    It's related.  Any other scenario that relates to

2  his present mental condition, besides the February 1997

3  scenario carried over to this case?

4  A    No, not that I know.

5  Q    Okay.  We know that he's single, right?

6  A    Yes.

7  Q    We know that he lives with his parents; right?

8  A    That I know, he lives alone.

9  Q    He lives alone?  Okay.  Do you know if his house is

10 owned by him or rented by him?

11 A    It's owned.

12 Q    Owned by him.  Do you know if he has friends?

13 A    I think he has some friends.  I don't know, but

14 I...

15 Q    His social activities, how would you describe his

16 social activities, is it normal, abnormal, how would you

17 describe his social interaction, if you will?

18 A    Well, remember that I thought, you know, that he

19 should go out and socialize and not be thinking about

20 the case all the time because if you see my progress

21 notes, the follow up, there is a preoccupation, you

22 know, with the case and all these things all the time,

23 so one of the things that I told him "listen, go out,

24 enjoy yourself, you know, relax, relaxation, recreation,

25 whatever you can", so in that sense, I suppose he would

29

1  socialize.

2  Q    Do you believe that he's being obsessive, that he

3  has an obsessive behavior with this case?

4  A    Well, not necessarily with this case, you know, he

5  has some obsessive features, you know, in his

6  personality, but not necessarily with the case.

7  Q    With what, for example?

8  A    Okay.  He has a concern for the case because, you

9  know, it's his case, and he's dealing with that.  But

10 for example, he's quite methodical; for example, he

11 comes to all the appointments on time, you know, he's

12 there.  He follows through on his treatment. In that

13 sense he's a good patient.  He likes things orderly, you

14 know, in an orderly fashion, clean, etcetera.  That was

15 one of the problems, maybe, at the post office.

16 Q    That he wanted everything the way he looks at it?

17 A    No.

18 Q    No?

19 A    He said that there were problems, you know, with

20 the dust accumulation and things like that and there was

21 an inspection that reinforced what he was saying.

22 Q    So he would be obsessive, a compulsive personality,

23 would you say that he has that?

24 A    He has obsessive compulsive personality traits, but

25 that doesn't mean that ...

30

1   Q       When you say "traits" ...

2   A       That doesn't mean ..., features, features.

3   Q       Features?

4   A       Features.

5   Q       And one of the obsessive personality traits, or

6   features, could be this case?

7   A       No, not necessarily.

8   Q       No?

9   A       That's not ...

10  Q       You rule out that this case is one of his obsessive

11  compulsive traits, as you say?

12  A       No, no, I think that this case is an incidental

13  thing in his life and it came out, you know, and well,

14  he's working with it.

15  Q       Then if you say that, why do you say that this case

16  is a stressor for him?

17  A       Well, because this case would be a stressor, any

18  case, any legal case would be a stressor for any person

19  that has been on such a case for so many years.

20  Q       Do you know that he also has a condition of

21  epicondylitis?

22  A       Yes, sir.

23  Q       And sprain of his right superior extremity and

24  shoulder?

25  A       Yes.

1  Q     That he's also covered by OWCP for that, for his

2  physical ailment; you know that, right?

3  A     Yes.

4  Q     Wouldn't that also be a stressor for him?

5  A     Not necessarily because he has dealt with that and

6  he's not doing any effort, you know, that is going to

7  aggravate that condition.

8  Q     So that's not a stressor, you rule out that this

9  physical condition could be a stressor for him?

10 A     I would say that at the time that he was working,

11 and he was doing the kind of work that he had to do,

12 especially with a tabulator, whatever it is, that he had

13 to use the fingers, one of the things, besides the

14 psychiatric, was that he should be on a reasonable

15 accommodation, and he was under reasonable accomodation

16 until the situation, you know, began with the case at

17 OSHA, etcetera, and then, you know, things changed. At

18 that time it was a concern for him, but not later on.

19 Q     Not later.  So at present, epicondylitis and sprain

20 of the right superior extremity is not a factor in your

21 mental condition?

22 A     Because, you know, I have epicondylitis and what I

23 do, you know, I inject myself and that's it.

24 Q     Okay.  So he left that behind?

25 A     I think so.  He received treatment for that,

32

1  anyway, but it's something that he has learned to live

2  with.

3  Q    But he has not learned without the condition

4  outside the Postal service; he still remembers the

5  February 1997 scenario?

6  A    Well, you know, if you have gone through this when,

7  for example, like pouring, you know, like sugar in the

8  tank and going through the highway with his family, you

9  know, and even went to have an accident, something that

10 you remember; for example, he tells me about when he

11 goes over to the pump, he remembers, you know, what

12 happened.

13 Q    He has a flashback?

14 A    Yes, a flashback, you know, which is a feature of

15 PTSD.

16 Q    Wouldn't you say that that flashback is conditioned

17 by his obsessive compulsive behavior?

18 A    No.

19 Q    No?

20 A    No.

21 Q    Okay.  So he has that flashback that occurred ten

22 years ago ...

23 A    Other people that have PTSD, complete PTSD, or

24 features of PTSD, and have flashbacks and has nothing to

25 do, you know, with personality.

1  Q    Okay.  So what you're telling us is that every time

2  he goes to the pump, he remembers what happened ten

3  years before and that ...

4              MR. MIRANDA: Every time he goes and does?

5  Excuse me?

6              MR. SEVILLANO: That every time he goes to

7  the pump, the gasoline pump?

8              DEPONENT: Every time or sometimes.

9  BY MR. SEVILLANO:

10 Q    Or sometimes, that when he goes to the pump, he

11 remembers, he has a flashback to the February 1997 pump

12 scenario, what he tells you happened at that time, and

13 that definitely destroys his mental condition?

14 A    Not necessarily that destroys, you know.

15 Q    So how would you characterize it?

16 A    well, you know, it's part of the overall picture,

17 you know, that comes in about the situation, that he

18 remembers, you know, not only the fact that they put

19 sugar in the tank, but all of the things, you know, that

20 surrounded that scenario then.

21 Q    Okay.  So he cannot function normally?

22 A    Well, he functions, I don't say that he ...

23 Q    He functions normally?

24 A    I don't say that.  He functions normally "within

25 certain limits".

34

1   Q     What are the limits?

2   A     Well, he cannot be under stress situations like

3   that.

4   Q     What type of stress situations that he cannot be?

5   A     Well, for example, OWCP sent me a letter once, you

6   know, and asked me if he could work and I said "well, he

7   could, maybe he could if he were not, you know, under

8   the circumstance that he was".  He was being constantly

9   watched, he was being harassed, he was being

10  intimidated.

11  Q     Do you know whether he has petitioned to go back to

12  the Postal Service to another place to work?  Has he

13  told you at any time that he wants to go back to the

14  Postal Service to work, not under the same conditions,

15  but under different conditions?

16  A     He told me no, that he would not like to go to the

17  Postal Service, because that's one thing that ...,

18  question made to me from OWCP and I intervened and asked

19  him and he said "I don't want to go back to the Postal

20  Service".

21  Q     To any job there?

22  A     To any job there.

23                    (Off the record.)

24  BY MR. SEVILLANO:

25  Q     Okay, doctor.  During this year, 2006, on how many

35

1  occasions have you seen Mr. Morales?

2  A    Well, I have seen him since the beginning of the

3  year.

4  Q    On a monthly basis, you have told us that on a

5  monthly, bi-monthly basis, you have been seeing him and

6  treating him for the past ..., since 1997; is that

7  correct?

8  A    Yes.

9  Q    Seeing him and treating him?

10 A    Yes.

11 Q    Okay.  You brought to the deposition the visit, the

12 first one was on September 27; is that correct?

13 A    Well, there were others before that, but I was told

14 to bring ...

15 Q    Yes.  Let's start from ...

16 A    July 24.

17 Q    Let's start from July 24th.

18 A    August.

19 Q    August, and then on September.  On July 24th, you

20 saw him, again, as you have been seeing him for the past

21 years, on a monthly and/or bi-monthly basis.  What was

22 his complaint on July 24th?

23 A    he told me that he continued with insomnia, he was

24 tense, that he was not sleeping, that he would wake up

25 and ..., that when he woke up, he would start thinking

1   about the case.

2   Q    And you found that he was anxious; right?

3   A    Anxious and restless.

4   Q    Restless?

5   A    Logical and coherent speech, verbal rate, I mean,

6   that he was talking a lot, there were no other

7   psychological, psychopathological findings.  I

8   prescribed him Prozac 20 milligrams daily, Alprezolam,

9   A-l-p-r-e-z-o-l-a-m, which is Xanax, generic, 0.5

10  milligrams qad, I mean daily, whenever needed, and

11  Estazolam, E-s-t-a-z-o-l-a-m, 2 milligrams at bedtime,

12  if needed.  The patient was stable, I say "factors

13  related to the case have him anxious".

14  Q    And then you told him next visit one month; right?

15  A    That's right.

16  Q    And it's signed by you?

17  A    Yes.

18  Q    Okay.  Let's go the next one?  And that will be

19  August 30th?

20  A    Uh-huh.

21  Q    Okay.  What are the symptoms?

22  A    Okay.  He said that he felt so so, that he was

23  waiting for the trial and that all this, referring to

24  the case and the depositions, have him with anxiety and

25  insomnia, and that he was eager that all of this pass.

1  I found him to be anxious, somewhat restless, speech was

2  logical and coherent.  There were no other

3  psychopathological findings.  He was prescribed Prozac,

4  P-r-o-z-a-c, 20 milligrams daily, Alprezolam 0.5

5  milligrams daily whenever needed, and Estazolam, 2

6  milligrams at bedtime whenever needed.  Return visit one

7  month and my signature.

8  Q    And that month, the next visit was on ...

9  A    September.

10  Q    ... September 27th of this year; is that correct?

11  A    Yes.

12  Q    Okay.  The symptoms?

13  A    He informs that he's pretty anxious due to the

14  legal process and also to the fact that he was summoned

15  to see a psychiatrist and he said that although the time

16  had already passed to se the psychiatrist, but that he

17  had to go, that he looked anxious and restless and made

18  logical and coherent verbal rate and that there was no

19  other psychopathology and he was prescribed again the

20  same medications, Prozac 20 milligrams daily, Alprezolam

21  0.5 milligrams whenever needed and this time I gave him

22  Ambien 10 milligrams at bedtime whenever needed.  At the

23  bottom it says "he talks all the time about the same

24  thing", about the case, how he feels, etcetera.  He was

25  given appointment in one month and my signature.

38

1  Q    Okay.  So based on this, the next visit would be

2  more or less in October; right?

3  A    October, yes.

4  Q    And you plan possibly to see him on a monthly

5  basis, and now that the case is approaching, obviously

6  he will maybe ask to be treated by you, not maybe on a

7  monthly basis, but more frequent?

8  A    Well, that depends.

9  Q    But no less than once a month?

10 A    Yes.

11 Q    Do you foresee that within the foreseeable future?

12 A    Well, maybe yes and maybe no, because maybe if the

13 case is just there, you know, he may over react and then

14 be eager to get into the thing and get it over with and

15 maybe it will ...

16 Q    But upon finishing ..., concluding the September

17 27th, you said that you're going to at least see him one

18 more time, which would be October of this year?

19 A    Yes.

20 Q    Now, we would like, if it's possible, for future

21 visits, that you can forward it to us?

22 A    I will look into the record to see if he has an

23 October visit.

24 Q    If that visit materializes, what I want is that if

25 he visits you in October, I want to have a copy.

39

1   A    Send it over?

2   Q    Send it over to us.

3   A    Yes, I will send it over.

4   Q    Send it over to Brother Counsel and then he sends

5 it to me.

6   A    Sure.

7   Q    If he goes to you in November, likewise.  If he

8 goes to you in December, likewise, if he goes ten times

9 in December, I would like to have that also.  Any

10 problem with that?

11   A    No, no problem with me.

12           MR. SEVILLANO: No problem with that?

13           MR. MIRANDA: I'd have to see.

14 BY MR. SEVILLANO:

15   Q    The thing is that you foresee that you're going to

16 continue seeing him and treating him on a monthly basis?

17   A    Yes, sir.

18   Q    As you have done in the past since 1997; right?

19   A    Yes, sir.

20   Q    By the way, what does, at the bottom, what does

21 ABFE stand for?

22   A    Where?

23   Q    Where it says Guillermo Hoyos Precssas, MD?

24   A    Ah, American Board of Forensic Examiners.

25   Q    Okay.  Now, have you advised Mr. Morales at any

1  time during the course of these years, the past ten

2  years, to return to work on another type of work, not

3  related to the Postal service?

4  A    I think that at some time, including he was telling

5  me something about selling some pencils, or something

6  like that, so at some time, you know, he told me that.

7  Q    Do you think he would be well served ...

8  A    Because, you know, like he could work without being

9  in a less stress producing environment, that he could go

10  over and work.

11  Q    Do you believe that work for him could be

12  beneficial for him?

13  A    Well, you know, work is always beneficial as long

14  as you feel positive and that you like what you're doing

15  and you don't have enough severe stress upon you, which

16  would sort of hinder what you're doing.

17  Q    Has he shared with you that he would like to work

18  in other matters not related to the Postal Service?

19  A    I think that at some time.  I don't remember right

20  now, but I think that at some time.

21  Q    What has he told you?

22  A    As I told you, he was, at one time, he was selling

23  pencils or wanted to sell some pencils or something like

24  that, office supplies.

25  Q    Besides that, has he shown interest in working in

1  other matters not related to the Postal Service?

2  A    Well, I think that he has an interest, you know, in

3  music, which was his major in college.

4  Q    Has he followed up on that interest?

5  A    I don't know if he has played some.  I don't know.

6  Q    Has he shared with you any interest in carrying out

7  some job in the music industry, going out and playing

8  with somebody or whatever, be productive in the music

9  sector, has he shared with you those thoughts?

10 A    Well, you know, he may have talked about that.  The

11 thing is that he has been, you know, so focused on all

12 of this all the time that ...

13 Q    On the case?

14 A    The case is that says that he wants to take this

15 over with so he can, you know, then focus his mind on

16 something else.

17 Q    So he's waiting for the case to be over in order to

18 re-group his life and continue living?

19 A    More or less.

20 Q    Is that correct?

21 A    More or less.

22 Q    So this case, for him, is like the key to his

23 future, is that right?  In the sense that he has to

24 finish with this case in order for him to pursue other

25 things?

42

1   A    Well, not necessarily that it's the key to his

2   future, you know; that he wants to get this over with,

3   you know, so he can dedicate his mind to other things.

4   Q    So he won't advance in any direction until he

5   finishes this case?

6   A    Well, I don't know that right now.

7   Q    But the fact is that he hasn't shown any interest

8   in any other activity of working at the present time?

9   A    Well, like I said, you know, he has done some

10  things.

11  Q    Like pencils, selling pencils?

12  A    And also some things related to the music.

13  Q    What has he told you about music?  He has a major

14  in music; right?

15  A    Yes.  I don't know if he's not, something like

16  that, you know, if he played with some group or

17  something like that.

18  Q    The fact is that he hasn't shown too much interest

19  in pursuing any other activity; is that correct?

20  A    Well, as I told you before, he has shown some

21  interest at times, you know, but he's still very much

22  focused on this.

23  Q    On the case.  On the case, you mean?

24  A    Yes, in one of these events, the case.

25  Q    Okay.  I'm going to show you something, but before

43

1  we do, now, remember I asked you all those, that you are

2  a member of the American College of Psychiatry and the

3  Law; remember I asked you that at the beginning?

4  A    Yes.

5  Q    Now, I take it that there's some code of ethics for

6  those institutions; is that correct?

7  A    Yes.

8  Q    Psychiatrists are bound by a code of ethics; is

9  that correct?

10 A    There are rules.

11 Q    Code of ethics, I mean, like the American Academy

12 of Psychiatry and the Law has a code of ethics, some

13 rules?

14 A    Uh-huh.

15 Q    Okay.  I'm going to show you a two page article, if

16 you will, from the American Journal of Psychiatry.  It

17 should be a relatively quick reading.  I would like you

18 to examine it; maybe you have seen this before?

19 A    Uh-huh, yes, I have seen this.

20 Q    You want to read it?  Because I'm going to ask you

21 some questions about it.  Maybe you should read it.

22 Take your time.

23               MR. MIRANDA:  When you finish, I want to

24 read it.

25 BY MR. SEVILLANO:

44

1  Q    Okay, doctor.  Now, Mr. Morales has been a patient

2  of yours for the past ten years; is that correct?

3  A    Yes.

4  Q    In the article I have given you, which you read and

5  that you're aware of it, talks about the incompatibility

6  of wearing two hats, of being a clinical physician and a

7  forensic physician; is that correct?

8  A    It talks about the conflicts that you may have in a

9  psychotherapeutic relationship of not doing harm to the

10 patient, etcetera.

11 Q    Okay.  Now, would you agree with this ir do you

12 disagree with this; (Reading) "A treating psychiatrist",

13 such as you with Mr. Morales, "should generally avoid

14 agreeing to be an expert witness or to perform an

15 evaluation of his patient for legal purposes because a

16 forensic evaluation usually requires that other people

17 be interviewed and testimony may adversely affect the

18 therapeutic relationship"; would you agree with that?

19 A    For example, other person being ...

20 Q    No, my question is do you agree with that?

21 A    Well ...

22 Q    You want me to read it again?

23 A    Yes.  I heard you, I heard you.

24 Q    Okay.  I'm just quoting; do you agree with that?

25 A    The only thing is that ...

1  Q     Please, sir, first of all, do you agree with that?

2  A     Not necessarily.

3  Q     You don't agree with it?

4  A     Not necessarily because it depends.

5  Q     With what part you don't agree?

6  A     Okay.  It depends, okay, they're talking there

7  about the fact that there is a treating psychiatrist, a

8  therapeutic relationship, what I told you from the very

9  beginning that when he came to me, he didn't come to me

10 as me being a treating psychiatrist for him; it was

11 working on a document evaluating him for one purpose.

12 Q     That was in 1997?

13 A     In 1997, okay.

14 Q     And then what happened after 1997, you treated him

15 and you're treating him now?

16 A     Okay.  I treated him.

17 Q     And you are treating him now?

18 A     Okay, I treated him, but however ...

19 Q     And you see him on a monthly basis; isn't that a

20 fact?

21 A     Well, but let me tell you something.  I believe

22 that also there are some ..., for example, Social

23 Security states that ...

24 Q     Sir, no ...

25 A     Excuse me.

46

1   Q    What I would like is that ..., do you ..., I'm just

2   reading from the code of ethics from the American

3   Psychiatry ...

4   A    Well, those are guidelines.

5   Q    Those are guidelines.  For you, you don't agree

6   with that?

7   A    Those are guidelines.

8   Q    Do you agree with this or not?  It's a basic simple

9   question.

10   A    I have my reservations.

11   Q    You have your ..., you don't agree with this?

12   A    I have my reservations.

13   Q    You don't agree with this then?

14   A    Partly I agree.

15   Q    You think that a treating physician could also

16   serve as an expert witness; is that what you're telling

17   us?

18   A    No, you're talking about an expert witness and what

19   I'm doing here is giving an opinion.  I am not here as

20   an expert witness.  I could be here as an intermediate

21   witness which is one ...

22   Q    You're here as a treating physician; is that

23   correct?

24   A    I'm here as an intermediate witness, not expert

25   witness.

1  Q    What's that, what's an intermediate witness; could

2  you explain that?

3  A    Intermediate is one who knows about the case and

4  can give an opinion.

5  Q    That's an expert witness, in my ...

6  A    Not necessarily.

7  Q    Not necessarily?

8  A    Not necessarily and let me tell you something, the

9  physician that treats can give an opinion about the

10 person he's treating ...

11 Q    Okay, so ...

12 A    ... and he's in a better position, excuse me ...

13 Q    No.

14 A    He's in a better ..., excuse me, he's in a better

15 position to give an opinion and be ethical because he

16 has been seeing this person for so many years versus one

17 that comes in and just sees him for two hours.

18 Q    Okay.

19 A    Excuse me, and then he writes a report, maybe not

20 considering all the facts about the case.

21 Q    Okay.  Now, you don't think there's any conflict

22 that you have submitted, filled out reports to OWCP, on

23 behalf of Mr. Morales, throughout the years, based on

24 your treatment of Mr. Morales Vallellanes, and that you

25 can also opine as an expert witness pursuant to the law

48

1   on this case; you don't see any incompatibility as to

2   that?

3                    MR. MIRANDA: Objection; that has been

4   asked and answered.

5                    MR. SEVILLANO: Your objection is noted.

6                    MR. MIRANDA: It has been asked and

7   answered.  Your objection is stated.

8   BY MR. SEVILLANO:

9   Q    Okay, answer the question.  You don't see any

10  incompatibility between you being a treating physician

11  and opining in this case; you don't see any

12  incompatibility?

13  A    I can give an opinion on the case.

14  Q    What I'm saying is, you don't see any

15  incompatibility; yes or no?

16  A    What I'm telling you from the beginning is that,

17  you know, I am not here necessarily in the position of

18  an expert witness.  I said that I am a treating

19  physician who can give an opinion and that is the ...

20  Q    That is what you call an intermediate opinion?

21  A    As a matter if fact ...

22  Q    That is what you call an intermediate opinion;

23  right?

24  A    As a matter of fact, in Puerto Rico law, that is

25  considered, you know, intermediate.

1  Q    That's what you're saying?

2  A    You have a fact witness, you have an intermediate

3  witness, and you have an expert witness.

4  Q    Where would you fit in, an intermediate?

5  A    An intermediate.

6  Q    Intermediate, okay.

7  A    Because what I'm doing is giving an opinion because

8  I know the case.

9  Q    So, I don't see ..., would you, in these records,

10 tell me if there is anything in the Code of Ethics of

11 Psychiatry that is called an intermediate witness?  If

12 you can come with something, I'd sure appreciate it.

13 A    Well, I told you, you know, that for Puerto Rico, I

14 have something written down.

15 Q    I'm speaking of the American Association of

16 Psychiatry and the Law, of which you are a member?

17 A    No, not over there.  Not over there.

18 Q    Not over there; right?

19 A    And let me tell you something, from the beginning,

20 one thing that I brought you was that.  I am aware of

21 that and I brought that with the patient.

22 Q    Now, wouldn't you agree, sir, that those codes of

23 ethics in the American Association of Psychiatry and the

24 Law, which you are a member of, the reason behind those

25 ethics regulations as to avoiding you having a clinical

1   input and a forensic input, of wearing these two hats of

2   these conflicting views, is that the testimony, or the

3   opinion could be biased or unreliable, the Code of

4   Ethics?  The code of ethics?

5   A     No.

6                MR. MIRANDA: Objection, objection, that's

7   an opinion of Brother Counsel.

8                MR. SEVILLANO: Okay, well taken.

9   BY MR. SEVILLANO:

10  Q     You answer?

11  A     No.

12  Q     No?  Then you don't find any ...

13  A     Excuse me, not biased because we're here, you know,

14  seeking the truth.

15  Q     You're not biased by treating him?

16  A     Excuse me.  We're here seeking the truth, you know,

17  have considered the evidence on the case, all the

18  evidence, which has to be presented, you know.  If you

19  want to give a really truthful opinion on a case, I am

20  not taking sides here, really, I'm not taking sides,

21  because the evidence and facts speak for themselves and

22  there is plenty of evidence in this case.  So in that

23  sense, I am not biased and I am not harming the patient

24  either.

25  Q     So you're here as what you call, what you

51

1    characterize as an intermediate physician.  You're not

2    an expert witness, you're not a treating physician, but

3    you call yourself an intermediate?

4    A    I'm here, you know, as a physician who initially

5    performed an evaluation of this person for the OWCP who

6    later, you know, asked me to treat him.  I started

7    treatment and then, you know, as things went on, I

8    gathered enough information to know about the case; let

9    me tell you that initially, when he asked me, you know,

10   to serve, I told him that maybe, you know, he should get

11   someone else because I knew that this was coming on.

12   Q    So you anticipated this?

13   A    I knew it was coming on, okay, but the fact is, you

14   know, that here ...

15   Q    Did you anticipate that this would come up; yes or

16   no?

17   A    Yes, I did, but anyway ..., but, you know, I told

18   him, you know, that in this case, I am telling you that

19   I am giving an opinion because I know of the case.  Now,

20   you can do with that opinion whatever you want, or think

21   about it, but anyway, I have considered all the facts

22   and if you are bringing, you know, your expert, whatever

23   it is, he has to consider the whole evidence and I don't

24   take sides because he's here because if he didn't have

25   a...

52

1  Q     But my concern is ...

2  A     If I don't think, if I don't think that what I

3  considered would be truthful, I would not make any

4  report.

5  Q     The thing is that then the codes of ethics are ...,

6  they speak of wearing two hats, they speak of

7  psychiatrists trying to avoid this, so what's the use of

8  all this?  What's the use of all this?

9  A     Let me tell you something, okay, okay.  But that's

10 not a law, you know.  I think that that's something that

11 needs to be discussed a little bit further on, but

12 that's not a definite law that says that you cannot do

13 this like that.

14 Q     Wouldn't you agree that there is some basis for

15 this?

16 A     It depends, you know, because maybe you are using

17 that to your advantage.

18 Q     No, no.

19 A     Oh yes.

20 Q     Look, wouldn't you agree that there's a basis for

21 this?

22 A     No.

23 Q     There's no basis for this?

24 A     What I'm saying here, you know, is that I'm being

25 sort of a ..., you know, you're putting stuff, you know,

53

1  in my mouth.

2  Q    No, no, no.  I don't have any quarrels if you ...,

3  I don't have any quarrels in you being a treating

4  physician.  I don't have any quarrels about that.  And I

5  respect, I respect your treating of Mr. Morales

6  Vallellanes and your deposition is well taken.  My only

7  concern here is that it's not me, sir, it's the articles

8  that say ...

9  A    Okay, but those are articles, those are not ...,

10 that has no ...

11 Q    You don't agree with the articles?  You don't agree

12 with them?

13 A    I don't necessarily agree with everything there;

14 okay?

15 Q    You don't agree with that.  Okay.  You don't

16 consider yourself nor a treating physician nor an

17 expert.  You consider yourself an intermediate, what you

18 call an intermediate witness?

19 A    Correct.  I am a witness, you know, and I'm giving

20 an opinion on the case.

21 Q    That's an expert witness.

22 A    And again, I wonder, you know, who is in a better

23 position to give an opinion, one, you know, that comes

24 in and performs, you know, a report for two hours on

25 this kind of patient, or one who has been seeing this

54

1   person for a long time.

2   Q    So there's no argument ...

3   A    Who is more ethical?  I wonder.  I wonder if that

4   person ...

5   Q    All these articles are not well taken.  That's what

6   you're saying?  You're saying that these articles ...

7   A    Those are articles, you know, and they are

8   considered.  I don't say that it's not well taken.  They

9   have a point.

10  Q    What point do they have?  Clarify for me because

11  I'm confused here.  What's the point of these articles?

12  You tell us.

13  A    But let me talk.

14  Q    You tell us, yes?

15  A    Well, but you're going to keep talking, you know, I

16  cannot ...

17  Q    My question is, what's the point of these articles?

18  A    Let me answer.  Okay.  The point is, you know, to

19  avoid conflicting situations.

20  Q    To avoid conflicting situations; what

21  conflicting...

22  A    What could be considered conflicting situations.

23  Q    Conflicting situations; what do you mean by that?

24  A    Well, for example, they are going there stating the

25  fact that, for example, if you're doing psychotherapy

1  with the patient, etcetera, and maybe you can harm the

2  person because you're going to take information that,

3  you know, is material, you know, and  this can come

4  around on the case, etcetera, and it might harm the

5  patient.

6  Q    Do you think that's reasonable or not reasonable,

7  from a psychiatric point of view?

8  A    Okay, but the point is that the material, excuse

9  me, the material, you know, that has come in from all

10  the interviews are related to this case.

11  Q    My question is very simple, doctor.  Do you believe

12  that those articles are written just to write it?

13  A    Counselor, they have a point.

14  Q    What's the point then?

15  A    Well, to avoid conflicting situations.

16  Q    Conflicting situations between what and what?

17              MR. MIRANDA: Asked and answered.  He has

18  answered that before.

19              MR. SEVILLANO: Okay, that's your

20  objection.

21  BY MR. SEVILLANO:

22  Q    Answer the question.  Conflict between what and

23  what?

24  A    Between what they call, you know, being a therapist

25  and being a witness.

1  Q    Right.  Do you think that's reasonable, is a

2  reasonable concern?

3  A    It's a concern, but you know, the thing is that I

4  told you, that usually applies when you start from the

5  beginning as a sole and unique therapist.  I didn't

6  begin in this case as a sole and unique therapist.

7  Q    In 1997 you began as a basis for the OWCP; right?

8  A    In 1997 I began as an evaluator and consultant for

9  that purpose.

10 Q    And you told us in your deposition, and correct me

11 if I'm wrong ...

12 A    And later, you know ...

13 Q    Later, in 1997, 1998, you started to treat Mr.

14 Morales up to the present?

15 A    Well, you know, okay, let me tell you something,

16 Counselor.  Then we can go back and we could extrapolate

17 all of this to that point, okay?  Just to the mid

18 evaluation.

19 Q    Sir, you told us ...

20 A    And in that time ...

21 Q    You told us in this deposition that you began as an

22 evaluator and then shortly thereafter you began treating

23 this gentleman here till present.

24 A    I began treating him, but I tell you, because

25 you're telling me too, you were telling me before, you

57

1  know, that all of this, you kept telling me frequently

2  during this deposition that all of this pertains to the

3  1997 evaluation situation.  Well, let's go back to that

4  situation then and let's say that my opinion is based on

5  that situation, 1997.

6              MR. SEVILLANO: I think I'm about through.

7  Okay, we're through.

8              (Exhibit 1 marked.)

9              (The deposition concluded at 12:05 P.M.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

58

1                           ERRATA SHEET

2           I, GUILLERMO HOYOS PRECSSAS, the undersigned,

3           DO HEREBY CERTIFY that I have read the

4    foregoing deposition taken on the 24th of October, 2006,

5    and that to the best of my knowledge, said deposition is

6    true, correct and accurate, with the exception of the

7    following corrections and reasons listed below:

8    PAGE      LINE      READS              SHOULD READ

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24              _____

25                   GUILLERMO HOYOS PRECSSAS

59

REPORTER CERTIFICATE

1

2

3          I, LAURA STUBBS, Court Reporter,

4          DO HEREBY CERTIFY that the foregoing

5 transcript is a full, true and correct record of the

6 testimony that was electronically recorded by me and

7 thereafter reduced to typewritten form.

8          I FURTHER CERTIFY that I am in no way

9 interested in the outcome of the case mentioned in said

10 caption.

11

12

13

14

15                    LAURA STUBBS

16                    Court Reporter

17

18

19

20

21

22

23

24

25

60

1                       NOTARY'S CERTIFICATE

2

3                I, REBECCA VARGAS, ESQ., Notary Public,

4    duly certified in and for the Commonwealth of Puerto

5    Rico,

6                DO HEREBY CERTIFY that the foregoing

7    record was taken on the date and hour aforementioned;

8                That the court reporter and the deponent

9    were duly sworn by me before the commencement of the

10   taking of the testimony.

11               IN WITNESS WHEREOF, I sign these presents

12   and affix my notarial seal in San Juan, Puerto Rico this

13   _____ day of _____, 2006.

14

15

16

17                              _____

18                              REBECCA VARGAS, ESQ.

19                              Notary Public

20

21

22

23

24

25