# IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| **ANGEL DAVID MORALES VALLELLANES,** **Plaintiff,** <br><br> **v.** <br><br> **JOHN POTTER, UNITED STATES POSTMASTER GENERAL, ET ALS.,** **Defendants.** | **CIVIL NO. 97-2459 (GAG)(CVR)** <br><br> **DAMAGES BASED ON RETALIATION AND DISCRIMINATION; PROHIBITED PERSONNEL PRACTICES; UNFAIR LABOR PRACTICES; BREACH OF COLLECTIVE BARGAINING AGREEMENT** |

### MOTION IN COMPLIANCE WITH ORDER

**TO THE HONORABLE COURT:**

**COMES NOW**, Plaintiff, Angel David Morales-Vallellanes, through the undersigned attorneys, very respectfully inform this Honorable Court:

1.      Last December 21, 2007 the jury entered a verdict for $500,000.00 reduced to $300,000.00

subject to the limitations on "compensatory damages" under 42 USC § 1981(a).

2.      Said verdict stated that plaintiff has proven that he was intentionally discriminated against

by defendant on the basis of sex or gender, and also that he was subjected by defendant to intentional

discriminatory retaliation.

3.      This Honorable Court ordered the parties to file a memorandum of law in relation to Back

and Front Pay.  Said order requested plaintiff to file first and defendants to file a    response.

### **Burden of Proof is on the employer**

In accordance to the law and courts decisions once a plaintiff is favored in a trial of

discrimination under Title VII there is a strong presumption in favor of back pay.  Therefore, the

burden of proof in order to oppose back pay falls on defendant.  In Cantrell v. Knoxville Community

1

Development Corp., 60 F.3d 1177, 1180 (6th Cir. 1995) the Sixth Circuit noted that the burden of showing that back pay is not warranted or that should it be limited is generally placed on the employer.  Also in Hennesey v. Penril Datacomm Networks, Inc., 69 F3.d 1344, 1351 (7th Cir. 1995) the Seventh Circuit held:  "In short, the 1991 Act provides that to avoid back pay and reinstatement, the employer, not the employee, must demonstrate that the employment decision would have occurred absent the impermissible motivating factor.  In City of Omaha v. Doane, 522 U.S. 1048, 118 S.Ct. 693, 139 L. Ed. 2d 638 (1998) the Supreme Court held that:  "A person who has been discriminated against is entitled to the most complete relief possible, and there is a strong presumption that persons who have been discriminated against are entitled to the most complete relief possible, and there is a strong presumption that persons who have been discriminated against are entitled to back pay."

## I.  The Statutory Framework of Back Pay

When there has been a violation of the Act [42 USC 2000e-5(g)(1)] Title VII provides for back pay.  The First Circuit defined the back pay and front pay in *Scarfo vs. Cabletron Sys*., 54 F.3[rd] 931, 953 (1st Cir. 1995) as follows:

> *"The term back pay refers to lost wages commencing on the date two years before the plaintiff's filing with the EEOC to the date of judgment. Front pay refers to damages for wages from the date of judgment to some specified date in the future."*

In a case from the Seventh Circuit there has been stated that once a finding of unlawful employment discrimination, there is a strong presumption to an award of back pay.  See *EEOC vs. Ilona of Hungary, Inc*., 108 F.3d 1569, 1579 (7th Cir. 1997).  Also the Fifth Circuit has said that a

back pay award should include employee compensation and other benefits of employment.  In Pettway vs. American Cast Iron Pipe Co., 494 F.2d 211, 263 (5th Cir. 1997) the Court stated: "the ingredients of back pay should include more than 'straight salary'.  Interest, overtime, shift differential, and fringe benefits such as vacation and sick pay are among the which should be included in back pay.  Adjustment to the pension plan …should also be considered…"

In Corti vs. Storage Technologies Corporation, 304 F. 3d 336 (4th Cir. 2002) it was held that it is important to remember that an award of back pay is not subjected to the statutory caps on compensatory damages and can be rather large.

**a) Subsequent Promotion Award Of Back Pay**

In terms of a subsequent promotion in an award of back pay, there must be more than mere speculation that the employee would have been promoted.  While an award of back pay should consider interim increases of pay and promotions that would likely have occurred absent the discriminatory conduct, subsequent promotions may not be awarded without some degree of certainty.  In Winsbush vs. State of Iowa By Glenwood State Hospital, 66 F.3d 1471, 1486 (8th Cir. 1995), the Eight Circuit reversed an award of back pay that included a promotion where the employee never sought promotion and testified that at the time she was not interested in the promotion.

In circumstances where the victim would have received subsequent promotions, but such promotions are an impractical remedy, an appropriate remedy may include an award of front pay to offset the loss of pay from the lost promotions. For example, in *Miles v. Indiana*, 387 F.3d 591, 599 (7th Cir. 2004), the court ultimately found neither promotion nor front pay to be appropriate under the circumstances presented, but nonetheless observed:

To make the plaintiff whole, promotion to the position the plaintiff would have held absent the discrimination is often the preferred remedy, and courts should award a promotion when doing so is feasible. *See* [*Bruso v. United Airlines, Inc.,* 239 F.3d 848 (7th Cir. 2001)], at 861; *see also Richerson v. Jones*, 551 F.2d 918, 923 (3d Cir. 1977) (holding that the district court could have awarded a retroactive promotion if it had found that the plaintiff would have been promoted but for the unlawful discrimination). As an alternative, the district court has discretion to award front pay in order to make the plaintiff whole. *See Bruso*, 239 F.3d at 862. An award of front pay seeks to place the plaintiff in the same position he would have occupied had he actually been promoted. *Id.*

### b)  Back Pay Limited To Two (2) Years Prior To Administrative Complaint

Title VII provides that an award of back pay is limited to two years prior to filing the administrative complaint of discrimination. 42 USC 2000e–5(g); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418 n.3, 95 S. Ct. 2362, 2372, 45 L. Ed. 2d 280 (1975); *Goodwin v. General Motors Corp.*, 275 F.3d 1005 (10th Cir. 2002); *Winbush v. State of Iowa by Glenwood State Hosp.*, 66 F.3d 1471, 1477 n.8 (8th Cir. 1995); *Bereda v. Pickering Creek Indus. Park, Inc.*, 865 F.2d 49, 54 (3d Cir. 1989); *Kornegay v. Burlington Indus., Inc.*, 803 F.2d 787, 788 (4th Cir. 1986); *Laffey v. Northwest Airlines, Inc.*, 740 F.2d 1071, 1094 (D.C. Cir. 1984); 29 CFR 1614.501(b)(3) ("Back pay under this paragraph (b) for complaints under title VII or the Rehabilitation Act may not extend from a date earlier than two years prior to the date on which the complaint was initially filed by the applicant").

### c)  Overtime

An award of back pay must include overtime. *United States v. City of Warren*, 138 F.3d 1083, 1097 (6th Cir. 1998). In determining the amount of overtime, it is appropriate to compare the

overtime earned by other persons who held the position denied. In *Warren*, the Sixth Circuit found that the plaintiff, who was unlawfully denied employment because of a preapplication residency requirement and other recruitment practices that violated Title VII, should have been awarded overtime because the people hired as police officers at the time plaintiff would have been hired earned between $12,000 and $35,000 in overtime.

**d)  Interest on Back Pay**

Prejudgment interest may be awarded in appropriate circumstances to ensure that the victim receives the full value of an award of damages.  In fact, in <u>Clarke v. Frank</u>, 960 F.2d 1146, 1153-54 (2d. Cir. 1992), the Second Circuit has suggested it would be an abuse of discretion for a court no to award interest on back pay, noting:

"Prejudgment interest discourages an employer from attempting to "enjoy an interest-free loan for as long as [it can] delay paying out back wages." <u>Donovan v, Sovereing Security, Ltd.</u>, 726 F.2d 55, 58 (2d Cir. 1984).  Thus, we have held that "it is ordinarily an abuse of discretion no to include pre-judgment interest in a back pay award…"  Id.

**In U.S. v. City of Warren, 138 F.3d 1083, 1096(6th Cir. 1998), the court noted:**

**"Victims of discrimination should not be penalized for delays in the judicial process, and discriminating employers should not benefit for such delays.  The purpose of awarding prejudgment interest under Title VII, however, is to compensate victims both of the time value of the lost money as well as for the effects of inflation."**

See *Pegues v. Mississippi State Employment Serv*., 899 F.2d 1449, 1453 (5th Cir. 1990) ("Interest is compensation for the use of funds; it is not awarded as a penalty against a defendant. We have stated in this Circuit that under Title VII interest is an item that 'should be included in back

pay' to make a victim whole.") The Second Circuit has held that, to the extent "that the damages awarded to the plaintiff represent compensation for lost wages, 'it is ordinarily an abuse of discretion not to include pre–judgment interest.'" *Gierlinger v. Gleason*, 160 F.3d 858, 873–74 (2d Cir. 1998) (quoting *Saulpaugh v. Monroe Community Hospital*, 4 F.3d 134, 145 (2d Cir. 1993)).

The Back Pay Act provides, in pertinent part, that "an employee of any agency who…is found by appropriate authority under applicable law, rule, regulation, or collective bargaining agreement, to have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction of all or part of the pay, allowances or differentials of the employee…" is entitled to back pay. 5 USC 5596(b)(1). The Back Pay Act did not originally provide for the payment of interest, but this changed when Congress amended the Back Pay Act in 1987 to provide that any amount payable under the Back Pay Act would be paid with interest. Pub. L. No. 100–202, 623, 101 Stat. 1329, 1329–428 to –429 (1987), (codified at 5 USC 5596(b)(2) (1988).

In accordance to the legislative intention in 1987 Congress amended the Back Pay Act to allow for interest on back pay awards when Federal employees are found to "have been affected by an unjustified or unwarranted personnel action which has resulted in the withdrawal or reduction" of compensation 5 USC 5596 (b)(1).

An excellent discussion of prejudgment interests, the purposes of backpay and development of the law can be found in *Richardson v. Tricom Pictures & Productions, Inc.*, 334 F. Supp.2d 1303, 1315-16 (S.D. Fla. 2004).

In *Smith v. American Serv. Co. of Atlanta, Inc.*, 796 F.2d 1430, 1432-33 (11th Cir. 1986), the Eleventh Circuit held that, in analyzing the issue of whether prejudgment interest on back pay awards should be awarded to prevailing Title VII claimants, the district court should look to the

practice under the National Labor Relations Act ("NLRA") with respect to prejudgment interest on back pay awards. *See also Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549 (11th Cir. 1983) (*en banc*) (*per curiam*). In *E.E.O.C. v. Joe's Stone Crab*, 15 F. Supp.2d 1364, 1379 (S.D. Fla. 1998), the court elaborated on the issue of awarding prejudgment interest on back pay awards, stating:

"Title VII authorizes prejudgment interest as part of the backpay remedy…. The backpay award authorized by [Title VII] is a manifestation of Congress' intent to make persons whole for injuries suffered through past discrimination. Prejudgment interest, of course, is an element of complete compensation." *Loeffler v. Frank*, 486 U.S. 549, 558-59, 108 S. Ct.1965, 1970-71, 100 L. Ed.2d 549 (1988); *see also EEOC v. Guardian Pools, Inc.*, 828 F.2d 1507 (11th Cir. 1987); *Scarfo v. Cabletron Sys., Inc.*, 54 F.3d 931 (1st Cir. 1995). *An award of prejudgment interest adjusts the back pay award for inflation and reflects the present day value of income that should have been paid to the claimant in the past.* To determine the appropriate interest rate, courts have traditionally turned to [the] National Labor Relations Act (NLRA) for guidance. *See, e.g., Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549 (11th Cir. 1983) (*en banc*) (*per curiam*). Under the NLRA there has been a consistent practice of awarding prejudgment interest on back pay awards. Furthermore, in 1977, the National Labor Relations Board adopted the Internal Revenue Service's (IRS) prime rates and rejected the traditional flat six percent interest rate. The Eleventh Circuit has held that the IRS prime rates are to be used to calculate the amount of prejudgment interest on back pay awards in Title VII cases. *See Guardian Pools, Inc.*, 828 F.2d at 1512. Accordingly, in the exercise of its discretion, the court concludes that each of the claimants is entitled to prejudgment interest on their back pay award….

7

*See also* <u>U.S. v. City of Warren, Mich.</u>, 138 F.3d 1083, 1096(6th Cir. 1998) (purpose of awarding prejudgment interest under Title VII is to compensate victims both for time value of lost money as well as for effects of inflation); <u>Thurman v. Yellow Freight Sys., Inc.</u>, 90 F.3d 1160, 1170 (6th Cir. 1996) (award of prejudgment interest is element of complete compensation in Title VII back pay award; prejudgment interest helps to make victims of discrimination whole and compensates them for true cost of money damages they incurred); <u>Saulpaugh v. Monroe Cmty. Hosp.</u>, 4 F.3d 134, 145 (2d Cir. 1993) (Title VII authorizes district court to grant prejudgment interest on back pay award; its purpose is to prevent employer from attempting to enjoy interest-free loan for as long as it can delay paying out back wages); *Robinson v. Instructional Sys., Inc.*, 80 F. Supp.2d 203, 207 (S.D.N.Y. 2000) (employee was entitled to prejudgment interest on back pay award in Title VII retaliation action against employer; interest would help ensure that employee was made whole, that employer would not profit from any delay in paying wages, and that remedial purposes of Title VII would be served); *Price v. Interstate Warehousing, Inc.*, 49 F. Supp.2d 1081, 1082 (N.D. Ill. 1999) (prejudgment interest on back pay is awarded to compensate employee for the loss of use of money); *Davis v. Rutgers Casualty Ins.* Co., 964 F. Supp. 560, 575 (D.N.J. 1997) ("Prejudgment interest in a Title VII case is an equitable remedy meant to compensate for the plaintiff's loss of the value of money over time, and to avoid a windfall to defendant in paying past wages in current dollars while having enjoyed the use of the capital over the years."); <u>Ford v. Rigidply Rafters, Inc.</u>, 984 F. Supp. 386, 391 (D. Md. 1997) ("An award of [prejudgment] interest [on back pay] ensures that inflation does not consume the value of a back pay award, and ensures that a discriminating employer does not reap an unfair benefit from 'the inherent delays of litigation'") (citation omitted); <u>Iannone v. Frederic R. Harris, Inc.</u>, 941 F. Supp. 403, 413 (S.D.N.Y.

1996) (prejudgment interest on back pay award is element of complete compensation for Title VII plaintiff; "it is generally an abuse of discretion not to award interest, since that would reward the employer who has violated Title VII by effectively providing it with an interest-free loan"); *Ward v. Tipton County Sheriff Dep't*, 937 F. Supp. 791, 800 (S.D. Ind. 1996) (without prejudgment interest, plaintiff is not fully compensated for both loss of income and loss of the use of that income because prejudgment interest is element of complete compensation and normal incident of relief under Title VII).

Although the decision to award prejudgment interest on back pay is discretionary, *Gloria v. Valley Grain Products*, Inc., 72 F.3d 497, 500 (5th Cir. 1996), there is a presumption that the court should award prejudgment interest on an award of back pay to a successful Title VII plaintiff. *See Drews v. Social Dev. Com'n*, 95 F.Supp.2d 985, 991 (E.D. Wis. 1998); *Robinson v. Southeastern Pa. Transp. Auth.*, 1993 WL 126449, *2 (E.D. Pa. 1993). "This presumption is only overcome in cases 'where the award would result in "unusual inequities"'" *Robinson*, 1993 WL 126449 at 2 (quoting *Green v. USX Corp.*, 843 F.2d 1511, 1530 (3d Cir. 1988)). However, there is no "*per se* rule that requires prejudgment interest to be included in the [back pay] award." *Hadley v. VAM P T S*, 44 F.3d 372, 376 (5th Cir. 1995); *see Gloria v. Valley Grain Products, Inc.*, 72 F.3d 497, 500 (5th Cir. 1996) ("A general rule that prejudgment interest on every backpay award must be granted would obliterate the discretion of the district court. We are unable to simply ignore the recognized discretion of the district court in this area."). Prejudgment interest, if awarded, generally should be computed from the date of the adverse employment action, *see, e.g., Thomas v. Texas Dep't of Criminal Justice*, 297 F.3d 361, 372 (5th Cir. 2002), up to the date the final judgment is entered. 1317 *See, e.g., Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 757 (7th Cir. 2002).

9

### e)  Fringe Benefits

An award of back pay or front pay should include any fringe benefits and other forms of compensation or employment benefits to which the victim of discrimination would otherwise have been entitled. EEOC "Policy Statement on Remedies and Relief for Individual Cases of Unlawful Discrimination," February 5, 1985. These awards may include such benefits as health insurance, life insurance, dental insurance, awards or bonuses, annual leave or vacation pay, retirement benefits and employer paid matching contributions to a 401(k) or similar plan. For federal employees, this plan is known as the Thrift Savings Plan.

Once an employee who has prevailed on the merits establishes that fringe benefits were lost, an award is appropriate even where it is difficult to determine the value of fringe benefits. In *Metz v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, 39 F.3d 1482, 1493–94 (10th Cir. 1994), the Tenth Circuit held that an employee's own testimony, based on information obtained by the employer is sufficient evidence to support an award of fringe benefits. In reversing the trial court's finding that the evidence lacked specificity, the court of appeals noted that, while back pay awards cannot be based on speculation, uncertainty should be resolved against the employer. The court noted that once an employee presents testimony about fringe benefits, the burden is on the employer to respond in kind:

Lost fringe benefits are available under the remedial provisions of Title VII. *See* 42 USC 2000e–5(g) (providing for back pay and any equitable relief that the court deems appropriate).  *See also Fitzgerald v. Sirloin Stockade, Inc.*, 624 F.2d 945, 957 (10th Cir. 1980) (trial court has power to restore plaintiff "to the position that she would have likely enjoyed had it not been for the discrimination"); *United States v. Lee Way Motor Freight, Inc.*, 625 F.2d 918, 949 (10th Cir. 1979)

("The entire back pay concept constitutes equitable relief designed to restore and make whole the victims of discrimination."); *Long v. Ringling Bros.–Barnum & Bailey Combined Shows, Inc.*, 9 F.3d 340, 343 (4th Cir. 1993) ("Under Title VII a prevailing plaintiff is entitled to 'make whole' relief.... This may include the value of fringe benefits."); *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) ("The purpose of back pay is to completely redress the economic injury the plaintiff has suffered as a result of discrimination.... This award should therefore consist of lost salary, including anticipated raises, and fringe benefits."), *cert. denied*, 127 L. Ed. 2d 539, 114 S. Ct. 1189 (1994); *Crabtree v. Baptist Hosp. of Gadsden, Inc.*, 749 F.2d 1501, 1502 (11th Cir. 1985) ("Because the object of the back pay provisions of Title VII is to make employees whole for losses suffered on account of unlawful discrimination,..., fringe benefits should be included in backpay[.]"); *Rasimas v. Michigan Dep't of Mental Health*, 714 F.2d 614, 626 (6th Cir. 1983) (holding that fringe benefits should be awarded in Title VII cases because "backpay should completely redress the economic injury the claimant has suffered as a result of discrimination."), *cert. denied*, 466 U.S. 950, 80 L. Ed. 2d 537, 104 S. Ct. 2151 (1984); *see generally Franks v. Bowman Transp. Co.*, 424 U.S. 747, 764, 47 L. Ed. 2d 444, 96 S. Ct. 1251 (1976) (federal courts empowered to make whole the victims of discrimination).  The burden is on the plaintiff to produce evidence to support her damages claim. *Cf. Wilson v. Monarch Paper Co.*, 939 F.2d 1138, 1147 (5th Cir. 1991) (ADEA case); *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1554 (10th Cir. 1988) (noting the similarity between the Title VII and ADEA statutes) (citing *Lorillard v. Pons*, 434 U.S. 575, 55 L. Ed. 2d 40, 98 S. Ct. 866 (1978)). Although damages may not be based on speculation, "uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer." *See id*

11

Here Metz testified that she had calculated her lost fringe benefits to be $15,411.50, based on information provided to her by Merrill Lynch. Aplt. App. Vol. 2 at 357. Merrill Lynch neither objected to the evidence nor produced evidence to refute Metz' testimony. Merrill Lynch emphasizes the absence of documentary evidence supporting Metz' testimony, but advances no authority for the proposition that Metz' own testimony cannot support her claim.

We conclude the district court erred when it failed to consider Metz' damages claim for lost fringe benefits on the ground that her proof was too speculative. Metz' own testimony provided adequate evidence for consideration of the claim. Therefore, the denial of Metz' request for lost fringe benefits is reversed and that claim is remanded for further consideration. *See Harvey*, 878 F.2d at 1244. The district judge may conduct further proceedings which she deems necessary to resolve the issue. We express no opinion on the merits of the claim.

### i. Calculating the Value of Fringe Benefits

Determining the precise value of fringe benefits is difficult or perhaps even impossible and there is considerable precedent addressing the estimation of these benefits under such circumstances. In *O'Neal v. Fergusen Construction Co.*, 237 F.3d 1248, 1256–57 (10th Cir. 2001), the Tenth Circuit discussed the appropriateness of estimating the value of lost employment benefits in a case where the plaintiff was terminated from his job one day after his attorney sent a letter to his employer accusing the company of reassigning plaintiff in retaliation for his filing race discrimination and retaliation claims with the EEOC. (O'Neal actually asserted both Title VII and 42 USC 1981 in his allegations of racial discrimination and retaliation. The jury returned a favorable verdict only regarding the retaliation claims and awarded compensatory damages of $302,721.25, an amount in

excess of the Title VII statutory caps. The court concluded that O'Neal was entitled to relief under § 1981 and therefore did not reduce the award.) The court stated:

In support of his lost employment benefits claim, O'Neal offered the testimony of David Hamilton, an economist who testified that a loss in benefits amounted to between fifteen and thirty–nine percent of gross income depending on the industry. Hamilton further disclosed his calculation of O'Neal's loss in gross income that resulted from his termination.

On cross–examination, O'Neal questioned Rita Staton about the quality of benefits received by Ferguson employees. Staton testified that she did not know the monetary value of Ferguson's fringe benefit plan. She indicated, however, that Ferguson was exceedingly generous to its employees, especially in terms of the portion of family dependant health care coverage paid by Ferguson. O'Neal received such coverage through the company. Staton further testified that Ferguson had a pension plan for its employees in which O'Neal participated.

Although the evidence produced by O'Neal did not provide the jury with a exact dollar amount as to the actual loss in employment benefits, any uncertainty in determining the amount O'Neal would have earned but for his unlawful termination is resolved against Ferguson. *See* [*Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 39 F.3d 1482, 1494 (10th Cir. 1994)]. Hamilton's testimony sufficiently informed the jury on the value range for lost benefits based on O'Neal's lost gross income. The jury was entitled to credit Hamilton's testimony with the same weight it would give any other testimony. *See Moe v. Avions Marcel Dassault–BreguetAviation* 727 F.2d 917, 929–30 (10th Cir. 1984). Staton's statements provided the connection between Hamilton's testimony concerning the typical benefits and the benefits in this case.

13

Further, the district court explicitly cautioned the jury against basing its determination of damages on speculation, guess, or conjecture. The district court instructed the jury to base its damage award on evidence alone. The connection Staton's testimony provided enabled the jury to base its lost benefits determination on the evidence adduced at trial rather than on mere speculation. Accordingly, the district court properly instructed the jury to consider lost employment benefits.

In *Munoz v. Oceanside Resorts, Inc.* 223 F.3d 1340, 1348 (11th Cir. 2000), the Eleventh Circuit affirmed an award to compensate for the reduced cost of meals, health insurance benefits and vacation pay in an ADEA action. Note that once again, the employer failed to rebut plaintiff's testimony and calculations of the value of these benefits:

The Resort also complains that the jury was permitted to include in its back pay award the value of Munoz's employee "fringe benefits," such as the reduced cost of meals, health insurance coverage, and vacation pay. This circuit repeatedly has held that such benefits should be recouped in a back pay award. *See, e.g.*, *Crabtree v. Baptist Hosp. of Gadsden, Inc.*, 749 F.2d 1501, 1502 (11th Cir. 1985). Munoz submitted to the jury for use in its damages calculations an annual income estimate, supported by testimony, which included these items. The Resort maintains that Munoz inflated the value of the benefits, although it did not offer any competing figures to the jury. On appeal, this court reviews an award of pecuniary damages (such as back pay) to determine whether it exceeds "the maximum possible award that is reasonably supported by the evidence in the record." *Deakle v. John E. Graham & Sons*, 756 F.2d 821, 827 (11th Cir. 1985). Because the estimate submitted by Munoz was the only one before the jury, and because the jury's award fell within this estimate, the back pay award was not excessive.

14

### ii. Employer Matching For Pension And 401(K) Plans

It is well established that an employee who is denied the opportunity to participate in an employer matched retirement plan is entitled to compensation in an award of back pay. *Best v. Shell Oil Co.*, 4 F. Supp. 2d 770 (N.D. Ill 1998) (contributions to tax exempt trust fund and pension fund were included in back pay award under the ADA). A plaintiff

is also entitled to matching contributions that the employer would have made to an employee 401(k) savings plan. *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1111 (8th Cir. 1994).

### iii. Thrift Savings Plan (Tsp) Benefits

One area that has caused considerable confusion for litigants in the federal sector is how to deal with a missed opportunity for investing in the Thrift Savings Plan, the Government's version of a 401(k) plan, and how to calculate missed earnings on the investment. The Commission held in *Kessler v. Henderson*, 05970446 (February 26, 1999), that where an award of back pay includes the missed opportunity to contribute to the Thrift Savings Plan:

This participation shall include appropriate deductions from appellant's back pay award for inclusion in the Thrift Savings Plan, any matching contributions which the agency would have made during the relevant time period, and any other Thrift Savings Plan related benefits which appellant would have been entitled to during the relevant time period. *See also Moore v. Potter*, 0720050084 (March 6, 2007); *Morrison v. Potter*, 07A50003 (April 18, 2006) (ordering the agency to calculate contributions to appellant's TSP as part of damages award). The Commission also had the opportunity to address TSP contributions and earnings in *Malek v. Shalala*, 04990009 (August 19, 1999). The Commission reviewed the manner in which the complainant's contributions were allocated:

15

The agency calculated petitioner's lost earnings for the period between 1992 and 1997 based on the G Fund's rate of return. In this regard, 5 CFR § 1605.4(a) (3) states, in relevant part: Lost earnings will be calculated and credited to the participant's account, in accordance with 5 CFR Part 1606, using the rates of return for the G Fund, unless the participant submitted one or more interfund transfer requests during the period of separation. In the case of interfund transfer requests, the earnings will be calculated using the G Fund rates of return until the first interfund transfer was processed. The contribution that is subject to lost earnings will be posted in the investments fund(s) the participant requested and lost earnings will be calculated based on the earnings for that fund(s).

Based on this provision, the agency appropriately concluded that petitioner's contributions between 1992 and May 1996 should, for that period, be subject to the G Fund's rate of return. The agency also correctly concluded that, in light of petitioner's interfund transfer in May 1996, the 1992–1996 contributions should be subject to the rates of return of the G, F, and C funds for the period between June 1996 and his reinstatement. Although petitioner argues that the contributions for the period from June 1996 to his reinstatement should be subject to those same rates, the aforementioned regulation does not assume that, because an individual made an interfund transfer, he would have reallocated his future contributions into the accounts into which he moved his existing contributions. Therefore, the Commission finds that the lost earnings for those contributions were properly calculated using the G Fund rate of return.

In *Finlay v. Runyon*, 01942985 (April 29, 1997), the Commission concluded that, at least for purposes of calculating an award for loss of future earnings, when "the amounts attributable to CSRS and TSP cannot be deposited into appellant's retirement accounts to earn interest, the agency will also be liable for lost earnings, offset by the amount of earnings appellant would receive through

16

prudent investment of the funds." *See also Bell v. West*, 04990022 (October 22, 1999) (on missed TSP contributions "interest calculations should include a full breakdown of how the interest figures were arrived at and the interest formula used.").

In contrast, a federal employee who does not contribute to the Thrift Savings Plan stands little chance of obtaining government matching contributions in an award of damages. *Estate of Schultz v. USPS*, 2007 WL 1115209 (W.D. Pa.). In *Sands v. Runyon*, 28 F.3d 1323, 1330 (2d Cir. 1994), Sands applied to the Postal Service for employment as operator of a letter sorting machine ("LSM"), and was rejected solely because chronic knee pain rendered him medically unfit for the job, in violation of the Rehabilitation Act. The Postal Service ultimately hired Sands approximately nine months after wrongfully refusing to do so. Sands had the opportunity to contribute a specified percent of his salary to the Thrift Savings Plan. As described by the court of appeals, Sands argued that because his pay was lower than it should have been due to the Postal Service's discrimination, he lacked the financial "cushion" necessary to participate, and therefore withdrew from the Plan temporarily in order to finance this litigation.

At the damages hearing, Sands argued that the Postal Service should credit to his account retroactively the amount of matching employer contributions he would have received had he not withdrawn from the Plan. The district court rejected plaintiff's request, finding the claim too speculative inasmuch as there was "no support in the record to justify a finding that, but for the Postal Service's discrimination, [plaintiff] would have remained in the [Plan]." "In order to recover damages, a claimant must present evidence that provides the finder of fact with a reasonable basis upon which to calculate the amount of damages.… [T]he [finder of fact] is not allowed to base its award on speculation or guesswork." *Sir Speedy, Inc. v. L & P Graphics, Inc.*, 957 F.2d 1033, 1038

(2d Cir. 1992). We are not asked to consider whether such relief would be appropriate where an employee is prohibited from participating in a savings plan because of wrongful termination. *See, e.g.*, *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104 (8th Cir. 1994). Rather, Sands voluntarily withdrew from participation in the plan in order to finance this litigation. The district court did not abuse its discretion in concluding that Sands's claim is in this respect entirely too speculative. The Civil Rights Act "stresses that retroactive relief 'may' be awarded if it is 'appropriate.'" *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 719, 98 S. Ct. 1370, 1380, 55 L. Ed.2d 657 (1978) (discussing Title VII remedies). Courts are not well equipped to reconstruct history, and are in no position to surmise what the plaintiff might have chosen to do with his money if he had not suffered discrimination or if he had pursued financial opportunities other than or in addition to this lawsuit. He might have continued to put the money into the Plan, or he might have put it into stocks or lottery tickets. It is clear that an employee is not only entitled to have income sheltered by contributing to the TSP from a back pay award, but the employee is also entitled to appropriate interest and dividends that would have been earned. *Franklin v. Potter*, 04A20006 (January 28, 2003). "The amounts contributed [to TSP] shall include interest and dividends such that the resulting balance puts petitioner in the position he would have been in but for the agency's discrimination." The entitlement to lost benefits from the government's Thrift Savings Plan is limited to an appropriate computation based on wages subject to the Plan and not additional payments for other types of compensation such as overtime pay and holiday pay.

## iv. Annual And Other Leave

Another element of back pay that ought to be routinely addressed is loss of annual and other kinds of leave. Most often, the claim is that annual or sick leave would not have been taken but for

18

the effects of the unlawful discrimination. However, the court in *Lander v. Lujan*, 1991 WL 294562, 1991 U.S. Dist. LEXIS 18921, 8, (D.D.C. 1991), considered a claim for payment of "use or lose" annual leave that arguably would have been saved rather than used. SES employees are permitted to accumulate unlimited annual leave.

Other civil service employees are limited in the hours that can be carried over from one year to the next. The court declined to restore annual leave that had been used and commented that: While the Court does not doubt that the plaintiff would have accumulated some of his annual leave, the fact is that he made an election and he took leave and he received the benefits of that leave. To grant him yet additional leave would be unfair to other employees. By taking his leave, he has been "compensated" for his leave. The Court cannot rewrite history. This claim must be denied. For federal employees sick and annual leave that was necessitated by unlawful discriminatory actions should be restored for later use. Claims requesting compensation for leave taken due to emotional distress are claims for equitable relief, not compensatory damages. *McGowan–Butler v. Bentson*, 05940636 (September 9, 1994):

The Commission notes that relief under Title VII has traditionally been limited to equitable relief, and equitable relief usually includes back pay. In addition, we have held that a complainant is entitled to reimbursement for any leave that he/she was compelled to take in direct response to discrimination. *See Joyce M. Bouchell v. United States Postal Service*, EEOC Appeal No. 01932122 (June 23, 1994); *Pamela Olson v. Department of Housing and Urban Development*, EEOC Request No. 05930413 (June 16, 1994). In instances where restoration is impossible or impractical, the value of the used leave should be paid to the employee. The employee must show a causal relationship between the leave that was used and either the discriminatory act or the harm that ensued as a result.

Although the burden is on the aggrieved employee to establish both the loss (i.e. the actual use of leave) and the causal relationship with the discrimination, it may be difficult or impossible to establish the precise amount of leave used with certainty. For example, an employee who alleges that a hostile environment resulted in intolerable stress in the workplace may have used leave in large clumps that are easily identifiable or may have simply tried to continue working as best as possible with only frequent but short absences from the work place. In the former instance, identifying the leave used as a result of discriminatory conduct is fairly easy and the only real issue is showing its relation to the discriminatory conduct. In the latter instance, however, the employee may not have retained records (such as a journal or diary) that reflected why the leave was used. It also may not be possible for the employee to ascertain after the fact when leave was used because of stress or emotional harm and when leave was used for other purposes, such as dental care, teacher conferences for the kids or whatever manner one whittles away leave a day at a time. One manner used to demonstrate that leave was used because of discriminatory conduct is to compare leave usage after the unlawful conduct with the amount of leave used prior to the conduct. This may not be sufficient to prove a causal relation to the discriminatory conduct by itself, but evidence showing that at least some of the leave was because of the stress of the working environment or because of emotional harm related to the discrimination, may establish a credible claim for restoration of leave, especially if there is an increase in the use of leave from the past. Applied to a Title VII gender harassment claim, it was proper to compare the employee's historical use of sick and annual leave in determining the appropriate restoration of sick and annual leave used because of discriminatory conduct. *Mozell v. Babbitt*, 04A00002 (December 21, 2000) (OFO). *Mozell* involved a petition for enforcement from a previous Commission decision awarding equitable and compensatory damages. An EEOC

administrative judge found sex discrimination when managers sought to undermine her performance and integrity. The administrative judge ordered restoration of sick and annual leave and payment of attorney fees and costs, but denied a claim for compensatory damages finding she was not entitled to such an award because she had presented limited evidence on this issue. The Department of the Interior adopted the substantive findings of the AJ, but struck the restoration of leave and attorney fees. On appeal, the Commission reinstated the relief ordered by the AJ, but also awarded $1,000 in nonpecuniary compensatory damages. In making the award, the Commission noted that: In support of her claim, appellant offered the testimony of several co–workers who opined that the stress to which she was subjected resulted in various physical problems. The Commission finds that these lay opinions are merely speculative and are entitled to little, if any, weight. Appellant also testified, however, that as a result of the treatment she received she became much more emotional than usual. She also testified that she became more irritable as well as somewhat paranoid. The Commission finds that this testimony, which was unrebutted, is sufficient to establish a causal connection between the agency's discrimination and the appellant's emotional harm. Although appellant has not submitted any medical evidence in support of her claim, we note that such evidence is not mandatory to establish entitlement to damages [citation omitted]. …that the testimony on the question of appellant's harm was not particularly specific and offered little indication as to its severity and duration. For that reason, and based on the aforementioned precedent, we find that an award of $1,000 is sufficient to compensate appellant for her injuries. *Mozell v. Interior*, Appeal No. 01981521 (August 12, 1999) (OFO) at 4–5. On its face, the Commission's decision seems to disregard the deference that is normally afforded a determination of credibility by the trier of fact. However, it does seem that because the AJ ordered the restoration of sick and annual leave, the AJ

must have concluded that some compensable harm had befallen the complainant explaining her need to us the leave.

Subsequently, the agency asked the complainant to identify the dates the sick and annual leave were used because of the effects of the discriminatory conduct. Mozell then requested restoration of all 210 hours of leave she used in the year after the discriminatory conduct consisting of annual and sick leave, compensatory time, and credit hours. The agency instead compared her leave record to the three previous years. It determined that she routinely used leave around certain holidays and otherwise had similarities in her use of leave during these three years, therefore awarding 40.5 hours of leave, the difference between the time at issue and the average use during the previous three years. After Mozell filed a petition for enforcement, the Commission held that the agency's reconstruction of past leave usage was an acceptable method of calculating an appropriate award of restoration of leave.

This methodology works for either side of the dispute. An employee who is unable to precisely establish the dates leave was taken for reasons associated with the discrimination claim might do well to prepare demonstrative evidence illustrating changes in the amount of leave used compared to previous years. It is important to note that this type of analysis is not always a fair method of determining leave used because of the effects of discrimination. For example, suppose an employee normally uses all of her accumulated leave during the year for exotic vacations or traveling the world, but after being victimized by employment discrimination she uses the same amount of leave to seek psychiatric care or just to mope around the house suffering from depression. In such a case the amount of leave used would not be different, but a complainant might still be entitled to restoration or payment of lost leave. In such circumstances, preparing an exhibit

demonstrating how leave had been used in the past may persuade a judge, jury or the Commission that restoration of leave was appropriate. In the case of our hypothetical world traveler, a chart illustrating how leave was used in the past may help establish entitlement to have the leave restored or even corroborate evidence of actual harm. One agency counsel sought to rebut an employee's testimony that she suffered emotional distress and, as part of the effects of the distress, she had an increase in the use of leave because she often could not work. The agency attorney had prepared an oversized calendar of the leave used by the employee subsequent to the alleged unlawful conduct. Counsel also prepared a similar calendar for the year prior to the filing of the complaint. On each calendar, the dates the employee had used sick and annual leave were noted in different colors. Although there was a very modest increase in the use of leave after the complaint was filed, far more obvious from the calendar exhibits was the fact that nearly all of the employee's annual and sick leave had been taken on Mondays and Fridays, both before and after the complaint was filed. This evidence did not help the employee's credibility.

The Commission has held that restoration of annual or sick leave used as a result of discrimination is an equitable remedy rather than an element of compensatory damages. However, there must be evidence that the use of such leave was proximately caused by the discrimination and without such evidence an award of leave restoration or payment for such leave would not be warranted. *Wright v. Potter,* 01A31608 (June 16, 2004). In *Wright*, the Commission stated: Complainant, however, failed to submit any evidence, such as leave request forms and documentation showing that such leave was related to the discrimination, to substantiate his claim regarding leave without pay.

**g.  Inability To Work Due To Disability**

Generally, a Title VII plaintiff can recover back pay only for the period the plaintiff is "available and willing to accept substantially equivalent employment" elsewhere, and therefore courts exclude periods where a plaintiff is unavailable to work because of disability from the back pay award. However, where the employer's misconduct caused the disability that prevented the individual from seeking alternative work, then the inability to work does not bar an award of back pay. *Lathem v. Dept. of Children & Youth Servs.,* 172 F.3d 786, 794 (11th Cir. 1999) ("…we hold that a Title VII claimant is entitled to an award of back pay where the defendant's discriminatory conduct caused the disability); *see also Sowers v. Kemira, Inc*., 701 F. Supp. 809, 826 (S.D. Ga. 1988).

**h.  Collateral Source Rule**

The collateral source rule provides that an award of damages should not offset by sources that are reasonably unrelated to the employer.  Application of the collateral source rule is generally within the discretion of the court.  Lussier v. Runyon, 50 F.3d 1103, 1105 (1st Cir. 1995).

Under the collateral source rule, benefits received by an aggrieved individual from a source collateral to the wrongdoer cannot be used to offset an award of damages. *See McLean v. Runyon*, 222 F.3d 1150, 1155–56 (9th Cir. 2000) (*citing* 1 Dan B. Dobbs, Law of Remedies § 3.8(1) at 372–73 (2d ed. 1993)).

Circuits courts mandating that collateral sources not be used to offset damage awards include the Sixth Circuit, *Hamlin v. Charter Tp. of Flint*, 165 F.3d 426 (6th Cir. 1999); the Eight Circuit, *Arneson v. Social Security Administration*, 128 F.3d 1243 (8th Cir. 1997); and the Eleventh Circuit, *Brown v. A.J. Gerrard Mfg. Co.*, 715 F.2d 1549 (11th Cir. 1983).

### i. Worker's Compensation Benefits

Some courts have held that worker's compensation benefits may not be deducted from an award of back pay because it would negate one of the purposes of the law, i.e., to deter an employer from unlawfully discharging an employee. *Moysis v. DTG Datanet*, 278 F.3d 819 (8th Cir. 2002). We also reject Datanet's argument that the district court erred in failing to deduct worker's compensation benefits paid by an insurance company from Moysis' back pay award. In *Gaworski v. ITT Comm. Fin. Corp.*, 17 F.3d 1104, 1112 (8th Cir.), *cert. denied*, 513 U.S. 946, 130 L. Ed. 2d 310, 115 S. Ct. 355 (1994), this court stated that "'an employer can not set up in mitigation of damages in a tort action by an injured employee indemnity from a collateral source, such as insurance or compensation or benefits under a Workmen's Compensation Act, even where the defendant has contributed to the fund.'" (quoting *Chicago Great W. Ry. v. Peeler*, 140 F.2d 865, 868 (8th Cir. 1944)). We then applied the "collateral source rule" and refused to deduct unemployment benefits from a back pay award in an age discrimination action, noting the rule "gains in significance in the context of employment discrimination claims." *Id.* We explained this is so because back pay awards not only serve to make a victim whole, they also "deter future discrimination." 17 F.3d at 1113. If the unemployment benefits were deducted, this court reasoned that it would be "less costly for the employer to wrongfully terminate a protected employee." *Id.* Put another way, deduction of the benefits would constitute "a windfall to the employer who committed the illegal discrimination." *Id.* The same reasoning applies in the circumstances of this case. *See Thurman v. Yellow Freight Sys. Inc.*, 90 F.3d 1160, 1171 (6th Cir. 1996) ("Like unemployment benefits, worker's compensation benefits are a collateral source that should not be deducted from back pay."), *amended on other grounds*, 97 F.3d 833 (6th Cir. 1996).

### ii.)  FECA benefits does not preclude Title VII Remedies

The legislative histories of the Federal Employees' Compensation Act (FECA) 5 U.S.C. §§ 8101-8193 and Title VII make clear that the statutes create separate remedies against the United States for distinct types of injures.  The statutory language of FECA does not preclude a federal employee from pursuing Title VII remedies for discrimination, and we find no evidence that Congress intended to do so.  Miller's receipt of FECA compensation does not prevent the district court from proceeding to consider his Title VII claims.  Therefore, the order of the district court denying the Postmaster General's motion for summary judgment on this ground will be affirmed.  See, _Miller vs. Bolger_, 802 F.2d 660, 667 (3d Cir. 1986)

In _Nichols v. Frank_, 42 F3.d 503, the Postal Service argues that Nichols is barred from receiving additional back pay by the exclusivity provisions of FECA.  See U.S.C. § 8116.  We reject this argument.  Although FECA's exclusivity provisions prevent a court from awarding Nichols additional payments for her work-related "injury" within the meaning of the act (i.e., her post-traumatic stress disorder), the provisions do not prevent an award of additional payments for harms that fall _outside_ of FECA's definitions of "injury".  Because the district court's award compensated Nichols solely for the harm she suffered from sex discrimination-which is not an "injury" within he meaning of FECA-the exclusivity provisions are not applicable to this case.

Although receipt of Federal Employees Compensation Act (FECA) benefits precludes subsequent claim brought under statute that imposes tort liability, disparate-treatment discrimination cannot fit within FECA definition of "injury" for which subsequent recovery is precluded, since such discrimination is intentional rather than accidental, is not a disease, and is not damage to or

destruction of medical braces, artificial limbs, or other prosthetics devices.  5 U.S.C.A. §§ 8101(5), 8116(c).

The greater weight of authority, however, holds that recovery of FECA benefits does not bar a subsequent claim for discrimination.  See, e.g. Nichols v. Frank, 42 F.3d 503, 515-16 (9th Cir. 1994) (Title VIII) abrogated on other grounds by Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633(1998), and Faragher v. City of Boca Raton, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d. 662 (1998); Miller v. Bolger, 802 F.2d 660, 663-66 (3d Cir. 1986) Title VII); DeFord, 700 F.2d at 289-90 (antidiscrimination provision of the Energy Reorgarnization Act of 1974); Dubee v. Henderson, 56 F.Supp.2d 430, 432-34 (D.Vt.1999) (Rehabilitation Act and Title VII); Reidy v. Runyon, 971 F.Supp. 760, 769-71 (E.D.N.Y. 1997) (Rehabilitation Act); Karnes v. Runyon, 912 F.Supp. 280, 284-85 (S. D. Ohio 1995) (Rehabilitation Act Title VII); Callanan v. Runyon, 903 F.Supp 1285, 1296 (D.Minn. 1994) (Title VII), aff'd, 75 F.3d 1293 (8th Circuit, 1996); Taylor v. Secretary of Navy, 852 F.Supp. 343, 351-52 (E.D.Pa. 1994) (Rehabilitation Act), aff'd mem., 61 F.3d 896 (3rd Cir. 1995); Johnson v. Sullivan, 764 F.Supp. 1053, 1063 (D.Md. 1991) (Rehabilitation Act Title VII) George v. Frank, 761 F.Supp. 256, 258-59 (S.D.N.Y. 1991) (Title VII); Metz v. United States, 723 F.Supp. 1133, 1135-36 (D.Md. 1989) (anti-discrimination statutes generally); Sullivan v. United States, 428 F.Supp. 79, 81 (E.D. Wis. 1977) (anti-discrimination statutes generally); see also, Jense v. Runyon, 990 F.Supp 1320, 1329-30 (D.Utah 1998) (holding that FECA does not bar certain tort claims); Gergick v. Austin, 764 F.Supp. 580, 581-82 (W.D. Mo. 1991) (same); Underwood v. United States Postal Serv., 742 F.Supp. 968, 970-71 (M.D. Tenn.1990) (same); Newman v. Legal Servs. Corp., 628 F.Supp. 535, 543 (D.D.C. 1986) (same) disapproved on other grounds, Hall v. Ford, 856 F.2d 255(D.C.Cir. 1988)

Courts particularly emphasize that emotional injuries arising from discriminatory activities, as alleged here, are outside the scope of FECA.  Metz v. United States, 723 F.Supp. 79, 81 (E.D. Wis. 1977); DeFord, supra, Cf Treadway v. District of Columbia, 403 A.2d 732 (D.C. App. 1979) cert. denied, 444 U.S. 867, 100 S.Ct. 141, 62 L.Ed.2d 92 (1979).

## II.  The Statutory Framework of Front Pay

Front pay is a remedy often imposed when reinstatement is impractical.  Said remedy (Front Pay) is provided to an employee who would otherwise have been able to continue or return to the workplace by for the discriminatory practices of the employer.  It is most often provided in those circumstances where reinstatement is not possible, the employment conditions (such as hostility between the employees and the employer) make it infeasible for the employee to return to the workplace, or the employee is incapacitated for work for a limited time because of the effects of the unlawful employment action.

## a)  Front Pay Is Not Subject To Caps

On June 4, 2001, a unanimous Supreme Court (Justice O'Connor took no part in the decision of the case) reversed the decision of the Sixth Circuit and held that front pay was not subject to the statutory caps. The Court, in an opinion authored by Justice Thomas, relied upon language in the 1991 Civil Rights Act that clarified Congressional intent to expand the remedies for employment discrimination without limiting those remedies already available under § 706(g). The Court noted that prior to the enactment of the 1991 Act, every court of appeals that considered the matter had found that front pay was a remedy already available under § 706(g). The Court reasoned in *Pollard v. E.I. DuPont de Nemours & Co.*, 121 S. Ct. 1946, 1951–52 (2001).

When § 1981a is read as a whole, the better interpretation is that front pay is not within the

28

meaning of compensatory damages in § 1981a(b)(3), and thus front pay is excluded from the statutory cap.

As to front pay awards that are made in lieu of reinstatement, we construe § 706(g) as authorizing these awards as well. We see no logical difference between front pay awards made when there eventually is reinstatement and those made when there is not. Moreover, to distinguish between the two cases would lead to the strange result that employees could receive front pay when reinstatement eventually is available but not when reinstatement is not an option whether because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries that the discrimination has caused the plaintiff. Thus, the most egregious offenders could be subject to the least sanctions. Had Congress drawn such a line in the statute and foreclosed front pay awards in lieu of reinstatement, we certainly would honor that line. But, as written, the text of the statute does not lend itself to such a distinction, and we will not create one. The statute authorizes courts to "order such affirmative action as may be appropriate." 42 U.S.C. § 2000e 5(g)(1). We conclude that front pay awards in lieu of reinstatement fit within this statutory term. Because front pay is a remedy authorized under § 706(g), Congress did not limit the availability of such awards in § 1981a. Instead, Congress sought to expand the available remedies by permitting the recovery of compensatory and punitive damages in addition to previously available remedies, such as front pay.

In the Civil Rights Act of 1991, Congress determined that victims of employment discrimination were entitled to additional remedies. Congress expressly found that "*additional* remedies under Federal law are needed to deter unlawful harassment and intentional discrimination in the workplace," without giving any indication that it wished to curtail previously available

29

remedies. *See* Civil Rights Act of 1991, 105 Stat. 1071, § 2. Congress therefore made clear through the plain language of the statute that the remedies newly authorized under § 1981a were in addition to the relief authorized by § 706(g). Section 1981a(a)(1) provides that, in intentional discrimination cases brought under Title VII, "the complaining party may recover compensatory and punitive damages as allowed in subjection (b) of [§ 1981a], *in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964*, from the respondent." (Emphasis added.) And § 1981a(b)(2) states that "[c]ompensatory damages awarded under [§ 1981a] shall not include backpay, interest on backpay, *or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964*." (Emphasis added.) According to these statutory provisions, if front pay was a type of relief authorized under § 706(g), it is excluded from the meaning of compensatory damages under § 1981a.

**b)  Front Pay Appropriate**

Front pay may be awarded under Title VII in cases where reinstatement is unavailable.  See, Reed vs. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1177 N.7 (2d Cir. 1996); 1002 (10th Cir. 1996); Weaver vs. Casa Gallardo, 922 F. 2d 15158, 1528 (11th Cir. 1991); Shore vs. Federal Express, Inc., 777 F.2d 1155, 1159 (6th Cir. 1985).

Front pay in the Title VII context is best understood as a monetary award equal to the gain the plaintiff would have obtained if reinstated.  Tobey vs. Extel/JWP, Inc., 985 F.2d 330, 332 (7th Cir. 1993); see also Avitia vs. Metropolitan Club of Chicago, Inc. 49 F.3d 1219, 1232 (7th Cir. 1995) describing front pay as "a substitute for reinstatement"). Generally, front pay is awarded as a substitute remedy only when reinstatement is inappropriate, such as when "there is no position available or the employer-employee relationship is pervaded by hostility". McNeil vs. Economics Lab. Inc., 800 F.2d 111, 118 (7th Cir. 1986), certiorari denied, 481 U.S. 1041, 95 L.Ed. 2d 823, 1075.

Ct. 1983 (1987), overruled on other grounds, <u>Coston vs. Plitt Theaters, Inc</u>. 860 F.2d 834, 836 (7th Cir. 1988)

Title VII explicitly authorizes reinstatement as an equitable remedy; front pay is the functional equivalent of reinstatement because it is a substitute remedy that affords the plaintiff the same benefit as the plaintiff would have received had he/she reinstated. As the equivalent of reinstatement, front pay falls squarely within the statutory language authorizing any other equitable relief. See, Williams vs. Pharmacia, Inc. 137 F.3d 944, 951-52 (7th Cir. 1999).

Front pay is also an appropriate remedy where an employee is unable to work for a prolonged period because of emotional harm caused by the discriminatory conduct. *Gotthardt v. National R.R. Passenger Corp*., 191 F.3d 1148, 1149 (9th Cir. 1999). In *Gotthardt*, the Ninth Circuit concluded that the district court did not abuse its discretion in ordering front pay instead of reinstatement in a Title VII hostile environment sexual harassment action, even though one of several available positions was in a non hostile work environment. The court found that front pay was appropriate because the employee's treating psychologist testified that the employee's ongoing impairment of Post Traumatic Stress Disorder (PTSD) would render her unable to perform any job. Front pay may be awarded whenever the antagonism between the plaintiff and her employer is such that it would be inappropriate to expert her to return to work. See Pannell vs. Food Services of America, 61 Wash. App. 418, 810 P.2d 952, 966 (Wash. Ct. App. 1991). Front pay may also be awarded when the antagonism precludes the plaintiff form remaining at work following the trial, even if she has not yet quit at the time it is being conducted. See Thorne vs. City of El Segundo, 802 F.2d 1131, 1137 (9th Cir. 1986).

In Passantino vs. Johnson & Johnson Consumer Products, 212 F.3d 493, 512-513 (9th Cir. 2000) the Ninth Circuit Court observed that:

Here, there was ample evidence to support a finding that substantial hostility existed between Passantino and her employer, such that a front pay award was appropriate. While Passantino had not resigned at the time of the trial, she testified that she had been unable to resign because of financial constraints, as she was the primary breadwinner for her family. Nonetheless, she made it clear that she could not remain in her job much longer. Thus, the evidence also permitted the jury to find that, as a result of the hostile atmosphere, Passantino would be forced to actually terminate her employment. Accordingly, the jury could properly award front pay on the ground that Passantino was entitled to compensation for the difference between what she would have earned had she been promoted (in the absence of retaliation) and what she is able to earn at a new job. *See Gotthardt v. National Railroad Passenger Corporation*, 191 F.3d 1148, 1156–57 (9th Cir. 1999) (upholding district court's award of front pay calculated by reference to what plaintiff would have made had she been promoted). The district court did not err in upholding the jury's front pay award.

In *Julian v. City of Houston, Tex.*, 314 F.3d 721, 728-29 (5th Cir. 2002), the court considered the circumstances in which front pay may be appropriate. However, an important additional point of this case concerns the reliance on front pay where the violation concerned not a discharge, but rather a promotion. Although he was awarded back pay, Julian sought front pay from May 25, 2000 (the date of the back pay award) to October 2, 2005, his expected retirement date. Finding that the district court should have considered an award of front pay, the court held: A primary remedial purpose of the ADEA is to make the individual victim of discrimination whole. To effectuate this purpose, Congress gave courts broad authority to "grant such legal or equitable relief as may be

appropriate…, including without limitation judgments compelling employment, reinstatement or promotion….” Although reinstatement is the preferred equitable remedy for a discriminatory discharge, this court has held that front pay—money awarded for future lost compensation—is appropriate when reinstatement is not feasible.

But this is a failure to promote case, not a discharge case. This distinction requires a slight change in our terminology: In a failure to promote case, the preferred remedy is instatement to an illegally denied position, not reinstatement. If instatement is not feasible, however, front pay is the appropriate award. Another good example of the appropriate circumstances for awarding front pay is *Hite v. Vermeer Mfg. Co.,* 361 F. Supp. 2d 935, 945 (S.D. Iowa 2005), where the court concluded: In the present case, Plaintiff has not requested reinstatement. Indeed, the Court finds that reinstatement of Plaintiff to her former position at Vermeer would be impracticable. To expect Plaintiff to return to work for an employer who violated her federal rights, and according to Plaintiff, caused her serious medical condition to be substantially exacerbated, would not be reasonable. Indeed, the clear animosity between Vermeer, Leedom, and Plaintiff, makes it unreasonable to expect Plaintiff to return to her employ at Vermeer. Accordingly, the Court finds that an award of front pay as an equitable remedy is appropriate under the `circumstances.`

## c) <u>Duration of Front Pay</u>

However, awards of front pay for extended periods of time have been provided in some circumstances. *Passantino v. Johnson & Johnson Consumer Prods.*, 212 F.3d 493, 511 (9thCir. 2000) (upholding a front–pay award based on twenty–two years of future earnings); *Padilla v. Metro–North Commuter R.R.*, 92 F.3d 117, 125–26 (2d Cir. 1996) (upholding a front–pay award based on twenty years of future earnings). In *Passantino v. Johnson & Johnson Consumer Prods.*,

212 F.3d 493, 512–13 (9th Cir. 2000), the Ninth Circuit affirmed an award of some $2 million in front pay under Title VII and State law. Passantino was a 43 year old female employee who had been passed over for promotion because she had filed a complaint of gender discrimination. The award of front pay covered a 22 year period through the normal retirement age of 65. Of additional interest in *Passantino* is the fact that the plaintiff was still working at the time of trial and the court rejected an argument that front pay was not warranted because, despite hostility in the workplace, she was the breadwinner in the family and could not afford to quit.

**d)**    **Other Considerations in Awarding Front Pay**

In *Suggs v. ServiceMaster*, 72 F.3d 1228, 1234 (6th Cir. 1996), the Sixth Circuit laid out the factors to be considered in awarding front pay: Generally, in awarding front pay, the following factors are relevant: (1) the employee's future in the position from which she was terminated; (2) her work and life expectancy; (3) her obligation to mitigate her damages; (4) the availability of comparable employment opportunities and the time reasonably required to find substitute employment; (5) the discount tables to determine the present value of future damages; and (6) other factors that are pertinent in prospective damage awards.

In Reed v. A.W. Lawrence & Co., Inc. 95 F.3d 1170, 1182 (2nd Cir. 1996) the Court held that an award of front pay can continue for an extended period of time and may, under some circumstances, continue until the date the employee would otherwise have retired.  In Morse v. Southern Union Co., 174 F.3d 917, 927 (8th Cir. 1999), the Eight Circuit found that an award of front pay was appropriate until the time the employee would otherwise have retired.  The court noted that in structuring an award of front pay under the ADEA, it is presumed that the employee would have

continued to work for the same employer until he retired, and it is up to the employer to prove otherwise.

An award of front pay can be substantial, especially in those circumstances when the employee may be unable to work for an extended time or may never be able to find comparable work. In *Kelley v. Airborne Freight Corporation d/b/a Airborne Express*, 140 F.3d 335 (1st Cir. 1998), discussed elsewhere in this chapter regarding the court's decision not to reinstate plaintiff, the front–pay award under the ADEA and State law was $1,000,000. The First Circuit refused to order a remittitur, finding that the award was supported by the evidence presented at trial. The award was based largely on a finding that Kelley intended to work at Airborne for the rest of his life, was only six years away from becoming fully vested in the company's pension plan; when he was fired, the company's stated retirement age was sixty–five. Experts for both sides agreed that, without a college education, it would have been extremely difficult for Kelley to obtain a comparable salary. Moreover, the jury award represented only about two–thirds of the front–pay damages Kelly's expert calculated he would suffer had he worked until he was sixty–years old. *Id.* at 355–56.

### e) Reinstatement

Reinstatement is specifically provided for in Title VII and is presumed to be an appropriate remedy available within the discretion of the trial court or the Commission. "Reinstatement, which is recognized under Title VII, is not a mandatory remedy; 'it lies within the discretion of the trial court after careful consideration of the particular facts of the case.'" *Shea v. Tosco*, 2000 U.S. App. LEXIS 18610 (9th Cir. 2000) (citing *Cancellier v. Federated Department Stores*, 672 F.2d 1312, 1319 (9th Cir. 1982). However, most courts of appeals have held that it is a presumptive remedy and the Fifth Circuit has gone so far as to require that before a district court can decline reinstatement

35

it must articulate its reasons for not granting reinstatement. *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 188 (5th Cir. 1999); *see also Glymph v. District of Columbia*, 374 F. Supp.2d 219, 226 (D.D.C. 2005) (citing *Pollard v. E.I. DuPont de Nemours & Co.*, 532 U.S. 843 (2001), in which the court noted that front pay may be an appropriate substitute where reinstatement is not viable). The importance of being returned to the workplace cannot be replaced by a monetary award of any amount. As the Eleventh Circuit noted in *Allen v. Autauga County Bd. Of Educ.*, 685 F.2d 1302, 1306 (11th Cir. 1982):

> This rule of presumptive reinstatement is justified by reason as well as precedent.
>
> When a person loses his job, it is at best disingenuous to say that money damages can suffice to make that person whole. The psychological benefits of work are intangible, yet they are real and cannot be ignored.

### i.) Reinstatement not Favored

Although reinstatement is generally assumed to be the remedy of choice, there are circumstances where it is simply impossible or impractical. In *Roush v. KFC Nat'l. Management Co.*, 10 F.3d 392, 398 (6th Cir. 1993), the Sixth Circuit noted that: "Indeed, reinstatement is 'the presumptively favored equitable remedy.'…However, this presumption may be negated where reinstatement requires the displacement of an uninvolved third party, where hostility would result, or where the plaintiff has found other work." And in *Slayton v. Ohio Dept. of Youth Services*, 206 F.3d 669, 680 (6th Cir. 2000), a female corrections officer who was subjected to egregious sexual harassment, "programmed for failure," and in fact was later fired, was nonetheless reinstated to her former position because, "[w]ithout evidence that Slayton's reinstatement would unduly displace an

innocent third party or result in unnecessary hostility, we cannot conclude that the district court abused its discretion in ordering reinstatement."

Of course, reinstatement of a successful Title VII plaintiff may be more problematic when plaintiff holds a management position, or would be supervised by the same individuals ho discriminated against him in the first place. *Bruso v. United Airlines, Inc*., 239 F.3d 848 (7th Cir. 2001).

### ii.) Employment Relationship Impossible

Reinstatement has been held to be inappropriate where the employee–employer relationship has been so badly damaged as to make further employment infeasible. 78 Tit le VII Equitable Damages Chapter 2 *Shore v. Federal Exp. Corp*., 777 F.2d 1155, 1159 (6th Cir. 1985) ("…the hostility which unfortunately exists between the parties precludes the possibility of a satisfactory employment relationship.").

## III. Uncontested Facts:

1.      Plaintiff was employed by codefendant U.S.P.S. and is a member of A.P.W.U. since 1988.

2.      Plaintiff filed several complaints about health and safety hazards at his workplace, the Caparra Heights Station of the U.S.P.S., at the Occupational Safety and Health Administration ("O.S.H.A.").

3.      O.S.H.A. investigated plaintiff's complaints and assured plaintiff that he was protected under federal law against any acts of retaliation or discrimination resulting from his safety and health activities. After O.S.H.A. confirmed through its inspections that plaintiff's complaint were true, O.S.H.A. ordered that the safety and health violations be corrected. O.S.H.A. sent its inspectors

twice. However, well after the time period allowed after each inspection for the corrections to take place, no action was taken by the U.S.P.S. through its management for the Caparra Heights Station.

4.    For several years, Plaintiff had been interested in a position with Saturdays and Sundays off. He had bided on several occasions for a Distribution and Window Clerk position with those days off, arriving second on the last bid. In January 1996, a new bid was posted for a position as the one sought by the Plaintiff.  Upon gaining knowledge of Plaintiff's interest in the position and his chances to get it, Manager José Supúlveda and Supervisor Juan Rodríguez changed the days off, from Sunday and Saturday to Sunday and Thursday, in retaliation for an E.E.O. complaint filed by the Plaintiff several years ago against them.

5.    On February 15, 1996, Plaintiff filed an E.E.O. precomplaint before E.E.O. officer Carmen Rosa, wife of U.S.P.S. of Safety Manager, Cándido López, based on retaliation against Manager José Sepúlveda and Supervisor Juan Rodríguez.  Nothing has been done as of this date with regard to Plaintiff's complaint.

6.    Caparra Station Supervisor Enrique López issued a letter of warning to Plaintiff on March 23, 1996 for unsatisfactory performance based on Mr. Morales alleged abuse of his coffee breaks. The letter of warning was later eliminated from Plaintiff's record as it was proven that the same was based on false facts.  Same day Plaintiff informed John Malavé by certified letter all relevant facts up that date.

7.    On April 6, 1996, Plaintiff sent a second certified letter to John Malavé explaining in detail and in chronological order, everything regarding the safety and health violations at Caparra Station, the discriminatory acts committed against him and the hostile environment promoted particularly by supervisor Enrique López against Plaintiff.  Plaintiff received no response to this letter.  Three

(3) days later, a new discriminatory policy of coffee and lunch breaks was established by supervisor, Enrique López at Caparra Station on April 9, 1996, against male employees, especially Plaintiff.

8.      On April 25th, 1996, Plaintiff filed an E.E.O. precomplaint based on sex discrimination, regarding the application of the new break policy.

9.      On May 18, 1996, Supervisor Enrique López met with clerks of Caparra Station and said, in an angry manner, that "because somebody filed an E.E.O. complaint against me, now everybody must use time cards and hit them each time an employee takes a break".  With this action he tried to put employees against Plaintiff, and to promote and maintain a hostile environment against him. As a result, several employees blamed Plaintiff for López' action.

10.     On or about May 21, 1996, Caparra Station Supervisor, Enrique López removed Plaintiff from his regular duties as a Business Reply Mail Clerk, Postage Due Clerk and Express Mail Clerk, where Plaintiff had been assigned as a reasonable accommodation due to a job related injury.  He was replaced by coworker Mayra Irene.  Later, due to his new duties, Plaintiff hurt his right arm and was forced to begin treatment for his condition in August 1996 from a physical therapist.  Plaintiff had to file an O.W.C.P. Form CA-2A.

11.     On July 6, 1996, while Plaintiff's car was within the parking lot area of Caparra Station, which has a controlled access system, one tire was punctured.  Four (4) days after that incident, on July 10th, 1996, the two (2) front tires of Plaintiff's car were punctured while the vehicle was within the same parking lot area.  Both incidents were reported to the Postal Inspection Service, but no action was taken.

12.     Caparra Station Supervisor, Enrique López met on August 24, 1996 with Plaintiff and another coworker.  He warned that he was going to watch them very closely but especially Plaintiff

because of the E.E.O. complaint Plaintiff filed against him, mentioned above. López said that he was going to check their coffee breaks.

13.   On August 21st, 1996, after the retaliatory and discriminatory treatment he had been receiving at his workplace, Plaintiff began to receive treatment from doctor Víctor Irizarry, Psychologist.

14.   On September 5, 1996, Plaintiff filed a formal E.E.O. complaint based on sex discrimination and retaliation, regarding breaks policy, harassment, and the removal of his duties.

15.   On October 26, 1996, Caparra Station Supervisor Enrique López asked Plaintiff to provide medical evidence regarding his right arm condition. He explained Plaintiff that he had to open his right arm injury case in order to return Plaintiff to his granted reasonable accommodation duties.

16.   On December 6, 1996, O.S.H.A. inspectors Madeline Medina and Efigenio Rivera came to perform a second inspection at Caparra Station. They found that the violations had not been corrected. In addition, they found an hostile and aggressive behavior from supervisor, Enrique López. In a very revealing narrative report made by O.S.H.A. inspectors, they quoted Supervisor Enrique López saying that "the employee who was reporting conditions to O.S.H.A. will be severely punished". O.S.H.A. inspectors warned López that he could not do that.

17.   On December 7, 1996 supervisor Enrique López was notified the formal complaint from the EEO office. After that day, Plaintiff's work within the U.S.P.S. became a nightmare. Harassment against him was severe and on a daily basis.

18.   Same day, Plaintiff received a strange provocation from employee Antonio López. Without any reason, he called Plaintiff "you are a son of a bitch". There were witnesses but nobody wanted to testify. Plaintiff reported in writing this to supervisor Enrique López, but he did nothing.

19.     Plaintiff received a letter of warning on December 13th, 1996 from Supervisor Enrique López urging Plaintiff to submit a medical evaluation regarding Plaintiff's right arm condition.

20.     On December 14, 1996, Plaintiff received another provocation from supervisor Enrique López.  At the end of the tour, when Plaintiff was going to reach his time card, López stood at one side of Plaintiff while letter carrier Eliezer Báez stood at the other side almost not letting Plaintiff pass so he had to look for a little space in order to avoid bumping them while Eliezer Báez shouted provocative phrases.

21.     On December 17, 1996, a new uniform policy was notified by Caparra Station Supervisor Enrique López in a meeting with all employees. During the meeting, supervisor Enrique López approached Plaintiff and informed him that he could no longer wear the U.S.P.S. jacket that he had been wearing for several years.  On the same day, Plaintiff meet with the superiors of Enrique López, Virginia Matías and Rubén Lugo, Acting Postal Operations Manager, about his need to wear his jacket because Plaintiff was very sensitive to cold.  Both superiors acknowledged that the jacket was proper within the U.S.P.S. Code and told Plaintiff not to worry because they would discuss the issue with supervisor Enrique López.

22.     In despite of the above, Plaintiff was suspended for seven days on December 20th, 1996, for using his jacket.  The letter of suspension was given to Plaintiff during the Christmas party in front of several coworkers of the Caparra Station.  It was humiliating to Plaintiff.

23.     On or about December 21, 1996, Supervisor Enrique López was promoted to Manager.

24.     On December 23, 1996, Plaintiff met with Rubén Lugo, Acting Postal Operations Manager, a superior of newly named manager Enrique López, regarding the suspension letter.  During the conversation Lugo admitted that the suspension was an act of revenge from Enrique López and

further assured Plaintiff that he was going to take care of this situation.  Nevertheless, Lugo did nothing.

25.     On December 28, 1996, Plaintiff was threatened and received provocations of sexual nature from coworker Antonio López (same employee who provoked him on December 7, 1996).  He informed, in writing, to manager Enrique López about the occurrence of this incident. No action was taken.

26.     On January 4th, 1997, for the third time Plaintiff's car was vandalized when someone poured sugar in the fuel tank.  Plaintiff was driving on the highway when suddenly the car stopped running. This life threatening incident was notified to the Postal Inspection Service by certified letter. Nothing was done.

27.     Manager Enrique López kicked out Plaintiff on January 10th, 1997 from Caparra Station. He explained that suddenly he did not have any work for Plaintiff because of his right arm condition. Plaintiff's expulsion was until January 14th, 1997, and he did not received payments for that period.

28.     On January 17, 1997, due to the hostile environment promoted against him, Plaintiff began to see psychologist Iris Tous, of U.S. U.S.P.S. Employee Assistance Program.

29.     On January 18, 1997 Plaintiff began his seven (7) days suspension regarding the jacket issue. On the same date, he received a letter from manager Enrique López notifying him to report at the Caparra Station on or before January 22nd, 1997 with the medical evidence. This was in despite of the fact that Plaintiff had already submitted all the medical evidence on December 24, 1996.

30.     Plaintiff returned to work on January 21, 1997, as per requested in the above mentioned letter. However Manager Enrique López kicked out him again on the same date and alleged he was still suspended, that he only wanted from Plaintiff was the medical evidence about the condition in

42

Plaintiff's right arm. On the same date Manager López expressed Plaintiff that he had received his certification as Union Shop Steward for the Caparra Station.

31.    The following day, January 22nd, 1997, in a letter directed to Manager Enrique López, a minority of the employees at Caparra Station -encouraged by Mr. López- protested Plaintiff's appointment as Union Shop Steward.

32.    On February 1, 1997, acting supervisor William Morales, a subordinate to Manager Enrique López, kicked out Plaintiff once again from the Caparra Station because, supposedly, there was no work for Plaintiff. However, Plaintiff's duties were assigned to another employee. Plaintiff was thereby placed on leave without pay.

33.    On February 4, 1997, Plaintiff was kicked out from work again by acting supervisor William Morales for the same reason stated above.

34.    On February 5, 1997, Plaintiff was forced to go to Hospital del Maestro for emergency treatment on his right arm as a result of the duties imposed on Plaintiff, as stated above, in despite of the fact that he had a diagnosed disability and that he had been given a reasonable accommodation for such disability. On the same day, Plaintiff began to see Psychiatrist Guillermo Hoyos (recommended by U.S.P.S. Employee Assistance Program Iris Tous) who found Plaintiff with a Mixed Anxiety and Depression Adjustment Disorder related to his work environment.

35.    On February 8, 1997 after Plaintiff gave to supervisor William Morales notice of the settlement of the grievances filed by plaintiff regarding his suspension letter of December 20, 1996, and the letter of warning of December 13, 1996. Mr. Morales got very angry and threatened Plaintiff in the presence of other coworkers saying: "Remember that from all supervisors here I am the one who can fuck you up the most." To date, plaintiff not been compensated for the time that he was

suspended.

36.    On February 20, 1997, Plaintiff came back to work.  He was removed from Caparra Station by Virginia Matías because allegedly he was a safety hazard and a homosexual.  She transferred him to the General Post Office, in San Juan.  She alleged that Plaintiff was the one who promoted the hostile atmosphere at Caparra Station, that he was a safety hazard and that she had statements about Plaintiff from some of his co-workers saying that he was a homosexual.  However, she refused to produce such statements to Plaintiff.

37.    On February 27, 1997, after several months under emotional and physical therapy, Plaintiff was given a medical certificate stating that he was not able to work.  The U.S.P.S. was not a safe workplace anymore for Plaintiff as a result of the intentional emotional distress inflicted on the Plaintiff.

38.    Same day, Plaintiff, as a result of the retaliations taken and the hostile environment created against him, became afraid for his life and personal security and was forced to leave his employment at USPS.

39.    In a sworn statement by Caparra Heights Station employee Samuel Cora it is described in great detail the hostile work environment and Federal Criminal Acts in which plaintiff was subject of.

40.    Most of plaintiff's direct supervisors at the time and coworkers who discriminated against him are currently in managerial positions.  As an example Antonio López is an acting supervisor at Caparra Heights Station; Enrique López is a Postmaster at Gurabo; and Mayra Irene is a supervisor at Bayamón.

## IV.  ARGUMENT:

Plaintiff Angel David Morales-Vallellanes been favored in a Title VII discrimination case has a strong presumption of a back pay remedy in his favor.  Moreover, at the time of the discrimination was waiting for a promotion as postal inspector.

The record at trial according to the testimony of Plaintiff and witness Pedro Reyes shows that the appointment of plaintiff as a postal inspector was imminent.  At the time of discrimination plaintiff already passed the test for a postal inspector position in which only two (2) candidates (one of them plaintiff) did it.  Plaintiff already went for three (3) days to Washington, D.C. at USPS headquarters at L'enfant Plaza for an assessment.  Plaintiff passed a background check and was waiting for his appointment to go training at the FBI Academy at Quantico, Virginia.  Needless to say that the appointment and/or promotion of plaintiff as a postal inspector was much more "than a mere speculation that the employee would have been promoted".  It is evident not only that plaintiff was very interest to pursue a career within the postal service but also a promotion as postal inspector.

Plaintiff was not finally appointed and/or promoted as part of the discrimination and retaliation practices he was subject of.  That it so, because otherwise he would likely be appointed and/or promoted to postal inspector.  In view of the above an award of back pay in favor of plaintiff should include earnings as an appointed and/or a promoted postal inspector.

It has been held that an award of back pay must include overtime.  Plaintiff used to work overtime at Caparra Heights Station specifically the years before he filed his two (2) EEO's in 1996.  To determine the amount of overtime plaintiff is entitled according to court decisions is to compare

the overtime earned by the person who holds the position. Angel David Morales-Vallellanes position at Caparra Heights Station is currently held by co-worker Raymond Ruiz. Therefore, it should be compared the overtime by co-worker Raymond Ruiz in order to determine the amount of overtime to be awarded in favor of plaintiff.

Plaintiff is also entitled to interest in back pay in order to ensure that the victim [plaintiff] receives the full value of an award of damages. Also, according to courts decisions it has been held that "it would be an abuse of discretion for a court not award interest on back pay". An award on back pay in favor of plaintiff should include interest.

Plaintiff Angel David Morales Vallellanes while working at Caparra Heights Station he had such benefits as health insurance, life insurance, annual leave, sick leave, retirement benefits known as Thrift Savings Plan (401 k). Also, plaintiff made contributions to the social security as well as the contributions made by his employer the USPS. Such benefits were lost, therefore an award of back pay should include fringe benefits. It should be noted that the concept of back pay constitutes equitable relief designed to restore and make whole the victims of discrimination, therefore the back pay award in favor of plaintiff should consist of lost salary, including anticipated raises, and fringe benefits. The amount contributed to the Thrift Savings Plan shall have interest and dividends. The calculation of fringe benefits should be determined based on the salary and fringe benefits of plaintiff as a postal inspector.

Plaintiff is entitled to an award of back pay because the defendants' discriminatory conduct caused the disability that prevented him (Morales) from seeking alternative work. Such condition was exposed at trial by plaintiff's psychiatric doctor Guillermo Hoyos testimony and on his report.

46

Plaintiff was awarded in 1997 workers compensation benefits and was unable to work due to the discriminatory conduct by defendant. Such benefits under the collateral source rule should not be offset from the back pay award. Moreover, a deduction of said benefits from the back pay award, as supported by courts decisions, would negate the purpose of the law to deter the discriminatory practices. The collateral source rule according to the Supreme Court "gains in significance in the context of employment discrimination claims". It is also has been stated that FECA benefits does not preclude Title VII remedies.

Plaintiff Angel David Morales-Vallellanes is entitled to front pay due to the fact that reinstatement is impractical. At trial the evidence showed that most of the supervisors and coworkers at Caparra Heights Station responsible for the discriminatory and retaliatory practices against plaintiff were promoted. The evidence at trial showed that supervisor Enrique López was promoted to Postmaster in Gurabo; coworker Mayra Irene is currently a supervisor at Bayamón; and Antonio López is acting supervisor at Caparra Heights Station.

It is evident that defendant USPS stimulates the discriminatory practices as it reward to managerial positions the people responsible for unlawful practices. Moreover, defendant can not guarantee that one of the above mentioned former supervisors and/or coworkers of plaintiff may supervise plaintiff once he is reinstated at USPS. At this date in spite of the outcome of this trial there is no evidence that a reprimand nor a disciplinary actions have been taken to them.

Indeed, the evidence at trial showed that when plaintiff notified all the discriminatory and criminal acts he was subject to the postal inspector's office nothing was done and he was left defenseless. Therefore, a hostile work environment can resume against plaintiff after he (plaintiff) went to court and was favored in the above captioned case. Moreover, the defendant USPS has a

47

long term resistance history to antidiscrimination efforts which is contrary to its policy of zero tolerance to the violence at the workplace. On the other hand, plaintiff psychiatrist doctor Guillermo Hoyos in his report and during his testimony at trial do not recommend Morales to return to the USPS.

In view of the above front pay should be awarded in favor of plaintiff due to the fact that reinstatement is unavailable. In the circumstances described above front pay would be a substitute for reinstatement especially when the employer-employee relationship is pervaded by hostility. In this case, as noted before plaintiff was very interested to end his career with the postal service especially as a postal inspector.

For plaintiff is no easy to find a job at his age with similar earnings and fringe benefits plus the promotion opportunities that USPS offers. Therefore, the availability of comparable employment opportunities and the time to reasonably required to find substitute employment should be taken in consideration to determine the duration of front pay. Also, there is the fact that plaintiff emotional condition due to the discrimination and retaliation practices of defendant requires an almost free-stress job according to the testimony of doctor Guillermo Hoyos. In this case the award of front pay should be substantial due to the fact that plaintiff may be unable to work for an extended time or may never be able to find a comparable work.

In summary, back pay and front pay should be awarded to plaintiff both with interest and with the fringe benefits. The calculation for both (back pay and front pay) should be made as if plaintiff was appointed and/or promoted to the postal inspector position. Such calculations are included in the economic report prepared by expert witness Vicente Feliciano in which the back pay calculation would be in the amount of $834,462.00 plus interest, and the front pay calculation would

be in the amount of $521,705.00.

**WHEREFORE**, it is respectfully requested from this Honorable Court to take notice of memorandum filed by Plaintiff.

**RESPECTFULLY SUBMITTED.**

**I HEREBY CERTIFY** that on February 15, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: **Fidel A. Sevillano-Del Río, Esq.**, Assistant U.S. Attorney, Federico Degetau Federal Build., 150 Carlos Chardón Av., Hato Rey, Puerto Rico 00918.

S/MIGUEL E. MIRANDA-GUTIERREZ
**MIGUEL E. MIRANDA-GUTIERREZ, ESQ.**
USDC 203110
ATTORNEY FOR PLAINTIFF
PO Box 192271
San Juan, Puerto Rico 00919-2271
TEL: (787) 282-0022
FAX: (787) 753-7655

49